Steven N. Serajeddini, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

-and-

David L. Eaton (*pro hac vice* admission pending)
Jaimie Fedell (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North La Salle  Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LE TOTE, INC., *et al.*,[1] | ) Case No. 20-33332 |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF ED KREMER,
## CHIEF RESTRUCTURING OFFICER OF LE TOTE, INC.,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Ed Kremer, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Le Tote, Inc. ("Le Tote"), a corporation

organized under the laws of Delaware and one of the above-captioned debtors and debtors in

possession (collectively, the "Debtors," the "Company").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter
11 Cases and (II) Granting Related Relief* filed contemporaneously herewith.  The location of the Debtors' service
address is 250 Vesey Street, 22nd Floor, New York, New York 10281.

2.      I have served in this role since March, 2020.  Prior to becoming the Debtors' Chief Restructuring Officer, I served as Chief Operating Officer since joining the Company in November, 2019.  I previously served as a consultant to Le Tote since the end of 2018.  Prior to joining the Company, I served as the Chief Executive Officer of Noon Home, Inc. and the Chief Financial Officer of 360fly, Inc.  I also served as acting Chief Executive Officer of invention platform startup Quirky, Inc. ("Quirky"), and helped guide Quirky and its  subsidiary Wink through their chapter 11 proceedings in the U.S. Bankruptcy Court for the Southern District of New York.  Before serving in those roles, I served as the Vice President of Finance at Beats by Dr. Dre.  I hold a Bachelor's of Business Administration in Finance from the University of Massachusetts at Amherst.  In my capacity as Chief Restructuring Officer of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today.

3.      Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

**Preliminary Statement**

4.      The Debtors are the combination of Le Tote—a venture-backed fashion rental subscription service founded in 2012 in San Francisco—and Lord & Taylor LLC ("Lord & Taylor")—the iconic luxury retailer which traces its origins to 1826 in New York.

Through Le Tote and Lord & Taylor, the Debtors operate both an online, subscription-based clothing rental service and a full-service fashion retailer with 38 brick-and-mortar locations (the "Stores") with a robust e-commerce platform.  Through multiple business channels, the Debtors offer more than 150 brands of clothing and accessories for rental or sale.  Le Tote acquired Lord & Taylor from HBC US Holdings Inc. ("HBC Holdings"), a subsidiary of Hudson's Bay Company ULC (f/k/a Hudson's Bay Company) ("HBC"), and HBC US Propco Holdings LLC ("HBC Propco"), a subsidiary of HBC Holdings, pursuant to an asset purchase agreement (as amended from time to time, the "APA") in a transaction which closed in November 2019 (the "Acquisition").  The Acquisition was premised on providing Le Tote access to brand recognition through the iconic Lord & Taylor name and access to new customers through Lord & Taylor's preexisting customer base, while providing Lord & Taylor access to Le Tote's proprietary technology and the ability break into the rental market during a time of declining sales at traditional retailers.  In connection with the Acquisition, Le Tote entered into a Transition Services Agreement (the "TSA") with certain affiliates of HBC to facilitate a smooth transition of the Lord & Taylor assets into the Le Tote organization.  The TSA obligates HBC Propco and certain of its affiliates to provide mission-critical services necessary to the functioning of Lord & Taylor, such as accounting, human resources, IT services, and merchant support.  Under the APA and as one of its primary benefits, HBC Propco is also obligated to pay rent for the Lord & Taylor physical locations (excluding common area maintenance and other similar charges).

5.      Even before the emergence of the COVID-19 pandemic, like many other retail companies, the Debtors were under significant pressure from adverse macro-trends, including increased competition among both online retailers and established brick-and-mortar retailers that have less leveraged capital structures and greater economies of scale.  These factors have been

greatly compounded by the devastating impact of COVID-19 that has caused retailers throughout the country to close their doors.  As states across the country ordered all "non-essential" businesses closed, the Debtors temporarily closed all retail locations in March 2020.  Recently, as state and local jurisdictions have begun to relax stay-at-home orders, the Debtors begun to reopen Stores.  Nevertheless, foot traffic has declined significantly compared to pre-COVID levels.  COVID-19 has also caused a drop in subscriptions for Le Tote, as the Company's subscriber base has suffered from the wave of job losses gripping the country and the demand for apparel has diminished due to hundreds of millions of Americans being affected by stay-at-home orders.

6.      As a result of these factors, the Debtors' revenue has declined precipitously from prior years and from pre-COVID forecasts.  More specifically, with the increased debt service following the Acquisition, and the prolonged closure of the majority of the Debtors' recently acquired Stores due to the COVID-19 pandemic, the Debtors are carrying the increased expenses associated with the Acquisition, as well as the brick-and-mortar assets which were unusable for a substantial period of time.  These unprecedented market developments, compounded by lower-than-expected financial results and burdensome TSA charges, adversely impacted liquidity and left the Debtors overleveraged.  To preserve liquidity in the months preceding this filing, the Debtors made the difficult decision to suspend the majority of their vendor payments and to furlough or lay off approximately 4,690 employees.  As the Debtors have slowly begun to reopen Stores, they have recalled approximately 400 furloughed employees.

7.      Faced with diminished liquidity, the Debtors and their advisors also engaged in vigorous negotiations with HBC and its affiliates in an effort to restructure the TSA payment obligations and limit go-forward services to only those services necessary in a post-COVID-19 world.  As a result of these efforts, the Debtors, HBC Holdings, and HBC Propco executed an

Omnibus Agreement Term Sheet (the "Term Sheet") on April 10, 2020, which, among other things, offset certain amounts owed under the TSA against certain amounts owed by HBC to the Debtors, and also restructured go-forward services under the TSA to reflect the Debtors' scaled-down enterprise. The Term Sheet greatly reduced the Debtors' go-forward payments under the TSA.

8.      Simultaneously, the Debtors engaged in arm's-length negotiations with their prepetition secured lenders for continued funding during the store closures and throughout the pendency of these chapter 11 cases. Following extensive negotiations, the Debtors and their prepetition secured lenders came to an agreement regarding the consensual use of cash collateral during these proceedings that will provide the Debtors with the breathing room necessary to continue retail sales while they market the valuable Le Tote and Lord & Taylor brands and proprietary technology in a process that the Debtors believe will maximize value for all stakeholders.

9.      The Debtors believe there remains value in their business as a going-concern, and have explored potential transactions surrounding Le Tote and Lord & Taylor in the preceding months. Accordingly, the Debtors intend to continue marketing the Le Tote and Lord & Taylor assets to maximize the value of their estates. Nonetheless, the Debtors recognize that they are beset by a perfect storm and cannot continue to operate Lord & Taylor in a business as usual fashion in the current environment. Recognizing this reality, the Debtors entered into a store closing agreement (as amended and restated, the "Consultant Agreement") with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC ("Consultant") to conduct store closing sales at their Stores. The Debtors commenced "soft" store closing sales at some of their locations prepetition, and will continue such sales in all stores throughout the chapter 11 process.

10.     Recognizing the challenges that have beset many of their peers in the retail space who have filed for chapter 11 only to be unable to reorganize or confirm a plan without lengthy and expensive in-court proceedings, the Debtors have filed contemporaneously herewith a proposed chapter 11 plan (as may be amended or otherwise modified from time to time, the "Plan").  The Plan sets forth the key goals of the Debtors in these chapter 11 cases: (1) to swiftly and efficiently monetize the value of the Debtors' estates and (2) to distribute estate assets in accordance with the priorities of the Bankruptcy Code.

11.     To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously herewith, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' prepetition restructuring efforts, including the relevant terms of the Plan; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the first day pleadings.

## I.      Corporate History and Business Operations.

### A.      Le Tote Corporate History.

12.     Conceived in 2012 when Brett Northart and Rakesh Tondon noticed that their wives had to constantly buy new clothes for maternity, work, events, and other occasions, the two co-founders aimed to answer a simple question:  why should consumers pay full price to own clothes that they won't wear again?  The original concept, which launched in 2012, allowed

customers to subscribe to a "tote" that included three garments and two accessories for one low monthly price. Consumers received their totes in the mail and could return the items when they were ready for a new tote, with the option to purchase items at 20%-70% off retail price. The Company, which operated out of Mr. Tondon's home during its first year, has grown from a small San Francisco-based start up to a market-leading fashion rental subscription service. From 2014 to 2018, the Company grew at a compound annual growth rate of approximately 122% and increased revenue from $2.5 million to $60.8 million, before experiencing a decline in 2019. Now with an advanced personalization algorithm and offerings from more than 150 brands, including French Connection, Vince Camuto, BCBGeneration, Sanctuary, Kate Spade, Rebecca Minkoff, Cole Haan, and Nike, Le Tote has been described as the "Netflix of fashion."

13.    In March 2015, following two initial years of explosive growth, Le Tote introduced the "tote swap" personalization feature to its rental subscription platform, which increased interface functionality by allowing customers to view a snapshot of the five pieces that would be contained in their totes and swap items for 24 hours. Prompted by high customer demand, shortly thereafter the Company expanded its rental subscription offerings to include maternity clothing. Based on customer feedback, the Company opened a waitlist to allow its customer base, including approximately 30% of customers who were mothers, to enroll in early access to Le Tote's maternity offerings. As 2015 progressed, it became clear that Le Tote was "infectiously changing how consumers look[ed] at shopping." In October of the same year, the Company debuted its mobile app, which provided customers with direct access to rent more than 150,000 pieces of clothing and accessories.

### 1.    Le Tote China.

14.    In 2017, just five years after the launch of the original "tote" concept, Le Tote became the first U.S. fashion rental subscription service to enter the Chinese market—the world's

largest e-commerce market.  Through a joint venture with an executive of China's largest shoe retailer, the Company launched Le Tote China (the "Joint Venture").  Before opening to the general public, the Joint Venture admitted a select group of 3,000 women for "beta" testing, which provided the admitted customers with premier access to Le Tote China's fashion rental subscription service and allowed the Joint Venture partners to navigate the Chinese consumer landscape.  Le Tote China opened to the general public in the winter of 2017.

15.     The Joint Venture provides the same service as its U.S. counterpart to Chinese consumers:  the ability to rent unlimited clothing and accessories for a flat monthly fee.  Le Tote China is currently headquartered in Shenzhen, with satellite offices in Beijing, Shanghai, and Hong Kong and distribution centers in Dongguan, Beijing, and Shanghai.  Le Tote is a direct, minority equity holder in Le Tote Venture Limited and thereby an indirect, minority equity holder in Le Tote (Hong Kong) Limited and Le Tote (Shenzhen) Technology Limited.  The entities that comprise the Joint Venture are not Debtors in these chapter 11 cases.

### B.     Lord & Taylor Corporate History.

16.     In 1824, Samuel Lord started a dry goods business in New York and, in 1826, opened the nation's first department store.  George Washington Taylor joined Samuel Lord in the enterprise in 1834, and the two renamed the store Lord & Taylor.  Lord & Taylor opened its second store in 1859 in New York's modern-day SoHo neighborhood and, by 1894, was growing quickly.  It would open stores on Fifth Avenue in 1903 and 1906 and become a publicly traded entity in 1904.  The Lord & Taylor Building, which housed Lord & Taylor's premier department store and corporate headquarters, opened in February of 1914 and, when Samuel Reyburn became president of Lord & Taylor in 1916, began the tradition of holiday window displays.  In 2007, the Lord & Taylor Building became a New York City Landmark.  Further, in 1916, Lord & Taylor became a

founding member of Associated Dry Goods Company (later Corporation), an association of independent department stores, and was considered to be its "crown jewel."

17.     In the years following World War II, Lord & Taylor thrived under the leadership of Dorothy Shaver, the first woman to head a major retail establishment in the United States. Under Shaver, Lord & Taylor launched its first suburban branch store locations, introduced the concept of personal shoppers, and commissioned Lord & Taylor's iconic logo.  In 1986, the May Department Stores Company acquired Associated Dry Goods, including Lord & Taylor and other retail chains, in what was considered the largest ever retail acquisition at the time.  Federated Department Stores (now Macy's) later acquired May Department Stores Company in 2005, and, in 2006, sold Lord & Taylor to National Retail and Development Company Equity Partners ("NRDC"), which held it privately.  In 2008, NRDC acquired HBC and positioned Lord & Taylor under the HBC umbrella in 2012.

### 1.     Le Tote's Acquisition of Lord & Taylor.

18.     In November 2019, Le Tote completed the Acquisition of certain assets comprising the Lord & Taylor business from HBC Holdings and HBC Propco, including an online retail platform, leases for 38 brick-and-mortar Stores situated throughout the United States, the inventory located at the Stores (or in HBC's distribution centers and available for sale in the Stores), and Lord & Taylor intellectual property.  The Acquisition expanded the range of clothing styles offered by Le Tote in its subscription-based service and represented the first acquisition of a long-standing brick-and-mortar retailer by a "digitally native" brand.[2]  Further, Le Tote hired the vast majority of Lord & Taylor's Store employees and entered into the TSA, pursuant to which HBC Holdings

---

[2]     Coined by Marc Prensky in 2001, "digital native" was first used to refer to the generation that grew up and came of age using digital technology.  Digitally native brands are companies that have only existed in the digital world, transacting primarily online with little or no brick-and-mortar presence.

and HBC Propco must provide certain general and administrative functions related to the Lord & Taylor business to Le Tote through 2021 (subject to extension in accordance with the terms of the TSA) to assist with integration of the Lord & Taylor business into Le Tote.

19.     The APA sets forth a complex arrangement with respect to the Stores.  HBC Propco is obligated to pay fixed and percentage rent (excluding common area maintenance and other similar charges) (the "Operating Rent") from November 8, 2019, until November 8, 2022 (the "Rent Payment Period").  Only thereafter is Le Tote obligated under the APA to pay Operating Rent.  The Stores are also subject to certain "Put" (by Le Tote) and "Call" (by HBC) rights under the APA.  Upon the exercise of a "Put" or "Call" after the expiration of the Rent Payment Period, Le Tote has no obligation to pay Operating Rent for the applicable Store, the lease with respect to which would be transferred back to affiliates of HBC.  During the Rent Payment Period and thereafter, unless a "Put" or a "Call" has been exercised and effectuated, Le Tote is obligated to pay all other amounts related to the operation of the Stores due under any lease with respect to any Store, including all common area maintenance and similar charges (*e.g.*, insurance, utilities and services, and real estate taxes).

20.     As discussed in further detail herein, Le Tote financed the purchase price of the Acquisition through: (a) $75 million in cash (subject to adjustments as specified in the APA), including cash borrowed under a senior secured asset-based revolving credit facility (the "ABL Credit Facility") and a secured term loan credit facility (the "Term Loan Credit Facility"), (b) issuing a secured promissory note to HBC Propco in the original principal amount of approximately $30 million, and (c) issuing preferred shares convertible into approximately 25% of Le Tote's post-closing issued and outstanding equity on a fully diluted basis, to HBC Propco.

### 2. The TSA.

21.     Le Tote, HBC Holdings, and HBC Propco, are also party to the TSA, dated as of November 8, 2019, pursuant to which Le Tote receives a wide variety of services, including accounting, human resources, IT services, and merchant support, among others, from HBC Holdings and HBC Propco on a transitional basis in connection with the Acquisition.

22.     Since the Acquisition, certain service categories under the TSA have already been terminated, but with the majority of the Stores closed due to the COVID-19 pandemic, certain services under the TSA remain mission-critical, specifically those services that support the Lord & Taylor e-commerce operations.  As discussed above, in April 2020 Le Tote successfully renegotiated the TSA, resulting in a reduced array of services and greatly reducing their go-forward payment obligations.

### C. Business Operations.

23.     By pairing tradition and technology, Le Tote erases the lines between online and in-store retail services and offers its customers an innovative and intuitive retail experience across three business channels:  (a) Le Tote fashion rental subscription service; (b) Lord & Taylor Stores and e-commerce; (c) cross-brand collaborations.  Le Tote's fashion rental subscription service allows women to rent unlimited clothing and accessories for a flat monthly fee while offering customers a truly personalized experience within Le Tote's subscription service model, which is depicted below.



1. Choose What Ships
Browse our styles and pick the items you want to rent.

2. Wear Your Items
Wear everything in your tote out and about, as many times as you'd like.

3. Return Or Keep
Return your items in our pre-paid envelope. Love something? Keep it for up to 50% off retail.

24.     In 2019, sales revenue through the rental subscription service was approximately $8.5 million and subscription revenue from the rental subscription service was approximately $24.1 million (exclusive of final sales).  The Debtors continue to operate the fashion rental subscription service during the COVID-19 pandemic.

25.     Le Tote leases the majority of the Lord & Taylor Stores from HBC or certain of HBC's affiliates, which own or lease a majority of Store properties.  Le Tote operates 38 Lord & Taylor Stores across eleven different states and the District of Columbia, half of which are located in New York or New Jersey.  Prior to the COVID-19 pandemic, Le Tote implemented plans to operate the Lord & Taylor Stores as a key integrated component of the Company's business.  Specifically, certain Lord & Taylor Stores were to serve as premier locations for Le Tote rental studios, facilitating Le Tote's cross-brand collaboration efforts.  Due to the COVID-19 pandemic, the Debtors were forced to close the 38 Lord & Taylor Stores for a prolonged period.

26.     The Debtors also maintain the Lord & Taylor e-commerce website www.lordandtaylor.com, and mobile applications across a variety of digital platforms, both of which the Debtors continue to operate during the COVID-19 pandemic.  As a digitally native retail brand, Le Tote has historically invested significantly into its digital presence and has continued to develop the Lord & Taylor website into a profitable and promising revenue channel since the Acquisition.

### 3. Cross Brand Collaborations.

27.     In addition to the fashion rental subscription service and the Lord & Taylor Stores and e-commerce website, the Debtors began cross-brand collaborations after acquiring Lord & Taylor.  The first cross-brand collaboration between Le Tote and Lord & Taylor was in October 2019, when Le Tote launched its premier rental studio in the Ridge Hill, New York Lord & Taylor Store.  The premier rental studio offers customers the opportunity to shop at Lord & Taylor, learn about Le Tote's fashion rental subscription service first hand, browse a sampling of rental inventory, and have their measurements taken by a store associate.  Customers who are already members of the rental subscription service may also return their totes at such locations.  Due to the prolonged closure of the Lord & Taylor Stores as a result of the COVID-19 pandemic, the Debtors were unable to fully implement cross-brand collaborations between Le Tote and Lord & Taylor.  As of the Petition Date, the Debtors had opened approximately four premier rental studios in Lord & Taylor Stores.

### D. Critical Components of Le Tote's Cost Structure.

### 1. Supply Chain.

28.     The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise for Le Tote's fashion rental subscription service, the Lord & Taylor e-commerce website, and the brick-and-mortar Lord & Taylor locations. Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign manufacturers.  In limited circumstances, the Debtors contract with foreign manufacturers directly.  Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the Debtors ship the merchandise to a domestic warehouse that serves as the Debtors' distribution center.

### 2. Employee Compensation and Benefits.

29.     The Debtors currently employ approximately 651 employees (collectively, the "Employees"), including approximately 106 salaried Employees and approximately 545 hourly Employees.  Prior to the Petition Date, the Debtors made the difficult decision to lay off approximately 130 Le Tote Employees and approximately 980 Lord & Taylor Employees due to the COVID-19 pandemic.  The Debtors furloughed a significant number of additional Employees, recalling such Employees throughout the incremental reopening of the Stores.

### 3. Digital Service Expenses.

30.     As an internet based "digitally native" brand, the Debtors incur significant digital expenses on account of the Le Tote rental subscription service and, now, the Lord & Taylor e-commerce website.  Services related to these two e-commerce platforms include information technology, marketing, photo studio, creative, site merchandising, labor and fulfillment, shipping, and credit card processing.  Under normal volumes, the Debtors would expect to spend approximately $5 million per month on account of expenses relating to the Le Tote and Lord & Taylor digital platforms.  Many of these services are delivered pursuant to the TSA. Consequently, the costs of such services have been reduced in connection with the renegotiation of the TSA and as a result of reduced volume due to the COVID-19 pandemic.

## II. Le Tote's Prepetition Corporate and Capital Structure.

31.     The Debtors' corporate enterprise consists of Debtor entities Le Tote, Inc., French Tote LLC, a Delaware limited liability company ("French Tote"), Le Tote, LLC, a Delaware limited liability company, Lord & Taylor LLC, a Delaware limited liability company ("L&T"), and LT Card Company LLC, a Virginia limited liability company ("LT Card"), and non-Debtor entities, related to the operations of Le Tote China, Le Tote Venture Limited, an exempted company incorporated with limited liability in the Cayman Islands, Le Tote

(Hong Kong) Limited, a company incorporated in Hong Kong with registered number 2534318, and Le Tote (Shenzhen) Technology Limited, a company incorporated in the People's Republic of China.  A simplified illustration of the Company's corporate structure is set forth below.[3]



32.    As of the Petition Date, the Debtors have outstanding secured debt obligations in the aggregate principal amount of approximately $137.9 million under:  (a) the ABL Credit Facility; (b) the Term Loan Credit Facility; and (c) a promissory note, dated as of November 8, 2019, issued to HBC Propco with a maturity of November 8, 2021 (the "Seller Note").  The Debtors' aggregate secured debt obligations are depicted in the table below.

| Secured Debt | Agent | Maturity | Commitment / Original Principal Amount | Outstanding Principal Amount |
|---|---|---|---|---|
| ABL Credit Facility | Wells Fargo, N.A. | Nov. 8, 2024 | $225 million | $77.2 million |
| Term Loan Credit Facility | TCG BDC, Inc. | Nov. 8, 2024 | $30 million | $31.5 million |

---

[3]    A more detailed capital structure chart, attached hereto as **Exhibit A**, depicts the Debtors' corporate structure, as well as the Debtors' various debt obligations.

| Secured Debt | Agent | Maturity | Commitment / Original Principal Amount | Outstanding Principal Amount |
|---|---|---|---|---|
| Seller Note | HBC US Propco Holdings LLC | Nov. 8, 2021 | $30.4 million | $29.2 million |
| **Total Secured Debt** | | | | **$137.9 million** |

### A.    The ABL Credit Facility.

33.    The Debtors are party to that certain *Credit Agreement*, dated as of November 8, 2019 (as amended by Amendment No. 1 to the Credit Agreement, dated as of January 9, 2020, and Amendment No. 2 to the Credit Agreement, dated as of March 23, 2020, and as further amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "ABL Credit Agreement"), by and among Le Tote, Inc., as lead borrower, French Tote, Le Tote, LLC and L&T, as additional borrowers, LT Card, as guarantor party thereto (collectively, the "Le Tote Loan Parties"), Wells Fargo Bank, National Association ("Wells Fargo"), in its capacity as administrative and collateral agent (the "ABL Agent"), and each of the lenders from time to time party thereto (the "ABL Lenders").  The ABL Credit Agreement provides for commitments of $225 million under the ABL Credit Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of November 8, 2024.

34.    The obligations under the ABL Credit Facility are secured by a first-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory.  As of the Petition Date, in the aggregate, approximately $77.2 million remains outstanding under the ABL Credit Facility.

### B.    The Term Loan Credit Facility.

35.    The Le Tote Loan Parties are also party to that certain Term Loan Agreement, dated as of November 8, 2019 (as amended by Amendment No. 1 to the Term Loan Agreement, dated

as of January 9, 2020, and Amendment No. 2 to the Term Loan Agreement, dated as of March 23, 2020, and as further amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Term Loan Credit Agreement"), by and among the Le Tote Loan Parties, TCG BDC, Inc. ("Carlyle"), in its capacity as administrative agent and collateral agent (the "Term Agent"), and each of the lenders from time to time party thereto (the "Term Lenders").  The Term Loan Credit Agreement provides for a $30 million Term Loan Credit Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of November 8, 2024.

36.    The obligations under the Term Loan Credit Facility are secured by a second-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory.  As of the Petition Date, in the aggregate, approximately $31.5 million remains outstanding under the Term Loan Credit Facility.

### C.    The Seller Note.

37.    In addition to the ABL Credit Facility and Term Loan Credit Facility, Debtor Le Tote, Inc. issued the Seller Note, in aggregate principal amount of approximately $30 million, and an inventory note, in aggregate principal amount of approximately $27 million, to HBC Propco to partially finance the Acquisition and inventory in connection therewith.  The inventory note was repaid in December 2019.  The Seller Note bears 0% interest through November 8, 2021, and 12% per annum thereafter.  The obligations under both notes are guaranteed by Debtors French Tote, L&T, LT Card, and Le Tote, LLC.

38.    The obligation under the Seller Note are secured in favor of HBC Propco (in such capacity, the "Junior Creditor Representative") by a third-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures,

intellectual property, and goods and inventory.   As of the Petition Date, in the aggregate,

approximately $29.2 million remains outstanding under the Seller Note.

**D.    The TSA Obligations.**

39.    To facilitate the integration of Lord & Taylor, Le Tote, HBC Holdings, and HBC

Propco entered into the TSA, which obligates HBC Holdings and HBC Propco to provide certain

transition services to Le Tote.  Pursuant to the terms of the TSA, HBC Propco is required to provide

monthly invoices to the Debtors, and the Debtors are required to pay such invoices within 30 days

of receipt.  The TSA provides for a grace period of 15 business days, with respect to the payment

of obligations thereunder.  The Debtors' obligations under the TSA are guaranteed by the Le Tote

Loan Parties and are cross-securitized with the collateral that secures the Seller Note (such

obligations, collectively, the "Secured Acquisition Obligations").   In connection with the

investigation being undertaken by the Restructuring Committee as described below, the Debtors

are investigating certain claims and causes of action with respect to the Secured Acquisition

Obligations and the Debtors reserve all their rights to bring in the future any such claims and/or

causes of action.

40.    On March 23, 2020, the Debtors elected to enter the fifteen (15) business day grace

period provided under the TSA, with respect to approximately $4 million of obligations due

thereunder.  After suspending payments, the Debtors commenced renegotiation of the TSA in

earnest.  Subsequently, on April 10, 2020, the Debtors, HBC Holdings, and HBC Propco executed

the Term Sheet, which, among other things, reset existing obligations owing under the TSA to

zero.

**E.    The ABL Intercreditor Agreement.**

41.    The ABL Agent and Term Agent, as representatives of the ABL Lenders and Term

Lenders, as applicable, are parties to that certain Intercreditor Agreement, dated as of

November 8, 2019 (the "ABL Intercreditor Agreement").  The ABL Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders and the Term Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.  As detailed in the ABL Intercreditor Agreement, the ABL Lenders have priority over, and are senior in all respects, to the Term Lenders with respect to the Collateral (as defined therein).

42.    Section 6.2 of the ABL Intercreditor Agreement provides that, in the event of a chapter 11 filing, if the ABL Lenders consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing secured by any portion of the Collateral, then the Term Lenders agree not to raise any objection on the grounds of a failure to provide "adequate protection" for the liens in favor of the Term Lenders or request adequate protection (except as provided below), so long as the Term Lenders retain their liens on the Collateral with the same priority as existed before, the liens on the Collateral securing any such debtor in possession financing are senior to or pari with the liens on the Collateral securing the ABL Lenders, the size of the debtor in possession financing does not exceed the maximum size provided for in the ABL Intercreditor Agreement, and the debtor in possession financing does not require the Debtors to seek confirmation of a specific plan of reorganization.  In addition, the same section of the ABL Intercreditor Agreement requires the ABL Lenders and the Term Lenders to subordinate the Prepetition Liens under any debtor in possession financing facility as well as any "carveout" for professional or United States Trustee fees, in each case, with respect to the Collateral. Section 6.04 of the ABL Intercreditor Agreement also provides that if the ABL Lenders receive adequate protection with respect to the Collateral, then the Term Lenders shall have the right to seek their

own adequate protection; *provided that* such adequate protection is subordinate to any adequate protection provided to the ABL Lenders with respect to the Collateral.

### F.    The Seller Intercreditor Agreement.

43.    The ABL Agent, the Term Agent (together with the ABL Agent, the "Senior Agents"), as representatives of the ABL Lenders, Term Lenders, and the Junior Creditor Representative, as representative of HBC Propco, respectively, are parties to that certain *Seller Intercreditor Agreement*, dated as of November 8, 2019 (the "Seller Intercreditor Agreement"). The Seller Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders and Term Lenders (collectively, the "Senior Creditors") and HBC Propco (the "Junior Creditor") relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Credit Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.  As detailed in the Seller Intercreditor Agreement, the Senior Creditors have priority over, and are senior to in all respects, to the Junior Creditor with respect to the Collateral (as defined in the Seller Intercreditor Agreement).

44.    Section 5.2 of the Seller Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the Senior Creditors consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing, the Junior Creditor agrees not to raise any objection.  Section 5.4 of the Seller Intercreditor Agreement provides that if the Senior Creditors receive adequate protection in the form of additional or replacement liens on the Collateral or additional or replacement collateral, then the Junior Creditor shall have the right to seek its own adequate protection; *provided that* such adequate protection is subordinate to any adequate protection provided to the Senior Creditors.

III.    **Events Leading to These Chapter 11 Cases.**

A.    **Challenging Operating Environment and Transition Obligations.**

45.    A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These include:  (a) the general downturn in the retail industry and the shift away from shopping at brick-and-mortar stores, which has led to a decrease in sales; (b) a challenging commercial environment over the past several years brought on by increased competition from retailers like Walmart and Amazon; and (c) the enormous impact of the COVID-19 pandemic, which has forced retailers across the country to stomach the expense of brick-and-mortar assets which were rendered unusable for a prolonged period of time.  Over time, these factors have tightened the Debtors' liquidity and complicated their vendor relationships, culminating in a liquidity crisis by the end of March 2020, when the Debtors faced dwindling cash flows, inaccessible inventory, and the inability to access even incremental liquidity.  The combination of the above factors precipitated these chapter 11 cases.

B.    **The COVID-19 Pandemic.**

46.    Demand for discretionary retail products has plummeted during the COVID-19 pandemic as consumers prioritize—with good reason—their health and maintaining a source of income.  In this environment, most discretionary retail products are an unnecessary luxury for most consumers.  To combat the unprecedented global spread of COVID-19, the majority of states, and many foreign governments, have shuttered all "non-essential" businesses—stores that trade in discretionary (clothing, home furnishings, electronics, beauty) as opposed to life-preserving products (food, pharmacies, cleaning supplies).  Mass merchandisers, such as Walmart, which sell food and household supplies in addition to traditional retail items, have been allowed to remain open—increasing the already extreme competition in the retail market.

47.     In the wake of COVID-19, the Debtors placed all of their vendors (including the service providers under the TSA) on hold, laid off approximately 130 Le Tote Employees and approximately 980 Lord & Taylor Employees, furloughed a significant number of additional Employees, and temporarily closed all Lord & Taylor Stores.  As of the Petition Date, the Debtors have reopened all but two of their Lord & Taylor locations.  The Debtors have recalled certain furloughed Employees to operate the reopened Stores.  COVID-19 has also caused a drop in subscriptions for Le Tote as the Company's subscriber base has suffered from the wave of job losses gripping the country and the demand for apparel has diminished due to hundreds of millions of Americans being affected by stay-at-home orders.  As a result of these and other factors, the Debtors' revenue has declined precipitously from forecasts.

## IV.   Prepetition Restructuring Efforts.

### A.     Efforts to Manage Liquidity.

48.     In response to the liquidity shortfall, the Debtors engaged Berkeley Research Group, LLC ("BRG") to act as their financial advisor, to assist in managing their cash flows in response to these unprecedented crises.  BRG and the Debtors' management analyzed the Debtors' cash flows and prepared "mothball" forecasts to manage the Debtors' liquidity despite a significant revenue decline.  As noted above, the Debtors significantly reduced their cash burn by suspending payments to vendors, furloughing Store employees, and initiating significant layoffs at their corporate office.  On March 29, 2020, in connection with the Debtors' restructuring efforts, I was appointed as Chief Restructuring Officer.

49.     The Debtors also engaged in negotiations with the ABL Agent and the Term Agent to continue operating their business in their "mothball" period notwithstanding the existence of several defaults under the ABL Credit Agreement and the Term Loan Credit Agreement.  On June 23, 2020, the Debtors entered into forbearance agreements (the "Forbearance Agreements")

with each of the ABL Agent and the Term Agent whereby the respective agents agreed to forbear from exercising remedies based on these defaults.  The Forbearance Agreements provided a bridge for the Debtors to reopen their Lord & Taylor locations in advance of the Petition Date, thereby enhancing the ability of the Debtors to maximize value for the benefit of all stakeholders.

### B.    Appointment of Restructuring Committee.

50.    In connection with their restructuring efforts, the Board of Directors (the "Board") of Le Tote, acting on behalf of itself and the other Debtor entities, established a special committee (the "Restructuring Committee") of independent directors to explore, review, evaluate and negotiate strategic restructuring alternatives and, as approved and directed by the Board, implementing those strategic restructuring alternatives.  To that end, on April 16, 2020, the Debtors established the Restructuring Committee and appointed two independent directors, Pamela B. Corrie and Matthew R. Kahn, to serve on the Restructuring Committee.  Beginning in April 2020, the Restructuring Committee met regularly with the Debtors and their advisors to evaluate the merits of proposed transactions.

51.    The Restructuring Committee is also conducting an independent investigation into certain potential claims and causes of action held by the Debtors' Estates.  The Restructuring Committee's investigation is focused on weighing the merits of any claims against insiders or third parties, including those arising in connection with the Acquisition.    To that end, Katten Muchin Rosenman LLP has been retained as independent counsel to the Restructuring Committee.  In addition, the Restructuring Committee is investigating whether the releases by the Debtors provided for in the Plan are proper under the circumstances and are being given in exchange for adequate consideration.  The investigation is ongoing, and the Debtors reserve all rights, in the reasonable exercise of their business judgment, to prosecute, settle, release, abandon, or otherwise resolve any potential colorable claims that are identified in connection with the investigation.

### C.    Negotiations with HBC.

52.    In response to liquidity pressures and increased costs under the TSA, the Debtors undertook multiple efforts to reach a mutually agreeable re-negotiation of certain terms (including payment and economic terms) of the TSA or a temporary deferral of payment under the TSA to ensure the continued provision of essential services.  On March 23, 2020, the Debtors elected to forego their payment obligations under the TSA and enter the 15 business day grace period thereunder.  HBC Holdings and HBC Propco promptly issued a notice of non-payment indicating the TSA would be terminated on April 13, 2020, unless the Debtors cured the payment default. After suspending payments under the TSA, the Debtors and their advisors engaged in hard-fought negotiations with HBC and its affiliates in an effort to restructure the payment obligations under the TSA and limit go-forward services to only those services necessary in a post-COVID-19 world.

53.    Consequently, on April 10, 2020, the Debtors, HBC Holdings, and HBC Propco executed the Term Sheet, which withdrew the notice of non-payment and reset the balances owing under the TSA to zero.  Pursuant to the Term Sheet, HBC Holdings and HBC Propco committed to provide the Debtors with services relating to the operation of the Debtors' e-commerce platforms and certain financial and accounting functions, among others, through December 31, 2020 while agreeing to stop providing certain services that were no longer needed in light of the scaled-down nature of the Debtors' enterprise.  In consideration for such go-forward services, the Debtors agreed to pay HBC Holdings and HBC Propco approximately $550,000 per month, in advance, weekly variable payments, invoiced weekly in arrears, and weekly variable deposits, equal to 75% of such weekly variable payments as deposits against future invoices. Beginning on January 1, 2021, payments under the TSA will revert to the terms set forth in the TSA without giving effect to the modifications described in the Term Sheet.  The Term Sheet

greatly reduced the size of the Debtors' go-forward payments under the TSA and resolved a

potential cross-default under the Debtors' secured credit facilities.

      **D.**      **Prepetition Marketing Efforts.**

      54.      In April 2020, the Debtors retained Nfluence Partners ("Nfluence") to commence

a prepetition marketing process of the Debtors' Le Tote business.  Shortly thereafter, the Debtors,

in the exercise of their business judgment, determined to market the Lord & Taylor business in

parallel.  With the assistance of Nfluence, the Debtors prepared a list of approximately 78 potential

acquirers (including various financial sponsors and strategic buyers) that were considered likely

participants in a sale process of both the Le Tote and Lord & Taylor business.  The Debtors also

identified 30 additional parties that were considered potential acquirers of solely the Le Tote

business and 15 additional parties that were considered potential acquirers of solely the

Lord & Taylor business.  Following the initial outreach to the identified 128 parties, information

was provided to these parties to gauge their interest prior to executing a non-disclosure agreement

("NDAs").  Of these 128 total parties, approximately 13 parties entered into confidentiality

agreements with the Debtors.  Several potential counterparties requested additional information

and received access to a virtual data room and/or conducted in-person meetings with the Debtors'

management or telephonic diligence meetings with Nfluence.  The Debtors are engaged in active

dialogue with several potential bidders with respect to both Le Tote and Lord & Taylor and will

continue this dialogue postpetition.  The Debtors have filed a motion seeking approval of bidding

procedures setting out the process pursuant to which parties can submit bids for the Debtors' Le

Tote and Lord &Store Closing Sales.

      55.      The current Store footprint is unsustainable in light of the Debtors' strained

liquidity.  Contemporaneously with this declaration, the Debtors have filed a motion requesting

authority to market Le Tote and Lord & Taylor pursuant to certain bidding procedures and a motion

requesting authority to implement customary Store closing procedures.  The Debtors are committed to achieving the highest or otherwise best bid for Le Tote and/or Lord & Taylor by marketing those assets pursuant to the bidding procedures, and, if necessary, conducting an auction for such assets as well as any additional assets of the Debtors.  The Debtors anticipate that any Stores which a potential purchaser does not seek to acquire will be wound down through Store closing sales.  As discussed above, the Debtors entered into the Consultant Agreement with the Consultant to conduct these Store closing sales.  The Debtors evaluated other national liquidation firms before selecting the Consultant and believe that that the terms set forth in the Consultant Agreement, including a percentage fee based on the proceeds from asset dispositions, are the best alternative for the conduct of asset sales and Store closures.  The Debtors believe that utilizing the skills and resources of the Consultant to effectively and efficiently conduct the sales and Store closings will maximize value for all stakeholders.

### E.    Chapter 11 Plan.

56.    It is critical that the Debtors consummate a sale, liquidation, or other asset disposition as soon as possible to maximize recoveries to all stakeholders and reduce the administrative expense of these chapter 11 cases.  The Debtors' prepetition secured lenders support the marketing of Le Tote and Lord & Taylor and have conditioned the use of cash collateral on certain sale process milestones, including, among others, that the Court (a) enter an order approving the sale of Le Tote no later than October 5, 2020, and (b) unless the Debtors have not received one or more binding bids in form and substance satisfactory to the prepetition agents, approving the sale of Lord & Taylor no later than October 20, 2020.  Accordingly, the Debtors have filed a Plan on the first day of these chapter 11 cases which will efficiently monetize their assets and utilize proceeds from asset sales, Store closing sales, and any other asset dispositions to pay their secured lenders in accordance with their respective priorities and distribute any remaining

value to general unsecured creditors. The Debtors intend to swiftly proceed with a fair and efficient process to preserve and maximize value for enterprise-wide stakeholders.

## V.    Evidentiary Support for First Day Motions.[4]

57.    Contemporaneously herewith, the Debtors filed a number of "first day" motions (the "First Day Motions") and are seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run the Debtors' business, ensure the continuation of the Debtors' cash management systems, and allow for other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors stakeholders.

58.    The First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

59.    I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I

---

[4]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors

to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical

element in successfully implementing a chapter 11 strategy.   A description of the relief requested

and the facts supporting each of the First Day Motions is detailed in **<u>Exhibit B</u>**.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: August 2, 2020
Richmond, Virginia

*/s/ Ed Kremer*

Name:  Ed Kremer
Title:  Chief Restructuring Officer

**Exhibit A**

**Capital and Corporate Structure**



**Corporate and Capital Structure Chart**





## **Exhibit B**

**Evidentiary Support for First Day Motions**

**Evidentiary Support for First Day Motions**[5]

I.    **Debtors' Motion Seeking Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Prepetition Claims of (I) Critical Vendors, (II) 503(b)(9) Claimants, and (III) Lien Claimants, (B) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (C) Granting Related Relief (the "<u>All Vendor Motion</u>").**

1.    Pursuant to the All Vendor Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to pay prepetition amounts in the ordinary course owing on account of certain (i) Critical Vendors, (ii) 503(b)(9) Claimants, and (iii) Lien Claimants (each as defined below), in an aggregate interim amount not to exceed $2.2 million (the "<u>Interim Order Cap</u>") and on a final basis in the ordinary course of business; (b) authorizing, but not directing, the Debtors to honor outstanding obligations to the Critical Vendors, the 503(b)(9) Claimants, and the Lien Claimants on a postpetition basis in the ordinary course of business and consistent with historical practice; (c) confirming administrative expense priority of Outstanding Orders (as defined below); and (d) granting related relief.

2.    In the ordinary course of business, the Debtors engage a limited number of providers for many of the critical products and services the Debtors depend upon to operate their businesses and service their customers.  Without strong vendor relationships, the Debtors' ability to weather the COVID-19 pandemic would be severely impacted.

A.    **Critical Vendors.**

3.    It is essential to the success of the Debtors' business that they are able to maintain the supply of the goods critical to the Debtors' business operations from certain Service and Retail Vendors, Operating Providers, and Marketing Support Vendors (collectively, the "<u>Critical</u>

---

[5]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

Vendors"). The Debtors are not able to easily switch suppliers or service providers on short notice and would face significant risks to their supply chain if prepetition amounts owed to their Critical Vendors (collectively, the "Critical Vendor Claims") cannot be paid.

4.    Pursuant to the All Vendor Motion, the Debtors estimate that, as of the Petition Date, approximately $2.6 million is accrued and outstanding on account of Critical Vendor Claims, of which approximately $1.8 million may come due within the first 21 days after the Petition Date.

### 1.    Service and Retail Vendors.

5.    The Debtors rely on a variety of vendors to provide necessary goods and services that allow the Debtors to run their stores and online subscription rental service on a day-to-day basis (collectively, the "Service and Retail Vendors"). These goods and/or services include: (a) inventory and merchandise; (b) customer subscription management; (c) customer support software; (d) data center support, repair, and hardware and software management; (e) information technology and compliance support; and (f) other third-party services. Certain of the Service and Retail Vendors provide the Debtors with merchandise directly to the Debtors' customers under dropshipping relationships with the Debtors. The Debtors rely on various Service and Retail Vendors to perform essential services related to their online subscription rental service, which remained operational throughout prolonged store closures due to the COVID-19 pandemic. Any delay or loss of critical supplies or services related to the operation of their stores or online subscription rental service could delay or reduce commercial sales and materially harm the Debtors' businesses.

6.    As of the Petition Date, the Debtors estimate that the Service and Retail Vendors may hold claims in excess of $1.1 million that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code, of which approximately $795,000 will become due and owing within 21 days after the Petition Date.

### 2. Operating Providers.

7. The Debtors do business with certain suppliers of goods, services, and/or equipment that are vital to the Debtors' day-to-day operations (collectively, the "Operating Providers"). Essential goods and/or services provided by such vendors include general supplies and packaging materials, maintenance, and support infrastructure for the Debtors' facilities and personnel, among others. The Operating Providers provide goods and services that allow the Debtors to sell their merchandise to customers in an efficient manner and otherwise smoothly operate their businesses. If the Operating Providers cease to provide such goods or services, the Debtors could be unable to continue serving their customers, which would materially reduce revenues, to the detriment of all stakeholders. Without the Operating Providers, the Debtors cannot operate the type of store or subscription service that their customers have come to expect. Moreover, the Debtors do not believe that alternative providers are readily available to be substituted given the "real-time" nature of the Debtors' operations.

8. As of the Petition Date, the Debtors estimate that the Operating Providers may hold claims in excess of $1.7 million that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code, of which approximately $1.1 million will become due and owing within 21 days after the Petition Date.

### 3. Marketing Support Vendors.

9. The Debtors use certain vendors that provide critical marketing support products and services for their business operations (the "Marketing Support Vendors"). For example, these vendors provide essential services related to digital marketing campaigns, customer relationship management capabilities, and brand creative services. The Debtors rely on the Marketing Support Vendors to attract customers and drive sales. This infrastructure is essential to promote events and programs, build customer loyalty, and ultimately drive revenue for the benefit of the Debtors'

estates and all stakeholders.  If the Marketing Support Vendors refuse to provide services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors' would be forced to onboard third-party vendors, to the extent they are even able to master the Debtors' marketing and advertising systems.  This process would result in interruptions to the Debtors' customer interface that would require additional support in an untimely and cost-inefficient manner.  At this critical time, there is a risk that the loss of the Marketing Support Vendors would have a significant negative impact on the Debtors' operations and revenues to the detriment of all parties in interest.

10.    As of the Petition Date, the Debtors estimate that the Marketing Support Vendors may hold claims in excess of $12,000 that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code, of which approximately $5,000 will become due and owing within 21 days after the Petition Date.

**B.    503(b)(9) Claimants.**

11.    The Debtors may have received certain inventory, goods, and materials within the 20-day period immediately preceding the Petition Date from various vendors (collectively, the "503(b)(9) Claimants") which do not have long-term contracts with the Debtors. The 503(b)(9) Claimants may refuse to supply new orders without payment of their prepetition claims.  Such refusal could negatively impact the Debtors' estates.  Prior to the Petition Date, the Debtors stopped accepting merchandise and inventory due to the COVID-19 pandemic.  As a result, the Debtors do not believe that there are any outstanding amounts owed to 503(b)(9) Claimants.  Out of an abundance of caution, however, the Debtors request the authority, but not the direction, to pay any outstanding and undisputed claims on account of goods sold to the Debtors in the ordinary course of business which may have been received by the Debtors within the 20 days immediately preceding the Petition Date (each, a "503(b)(9) Claim").  The Debtors do not seek to

4

accelerate or modify existing payment terms with respect to the 503(b)(9) Claims.  Rather, the

Debtors will pay any such 503(b)(9) Claims as they come due in the ordinary course of business.

The Debtors intend to pay prepetition 503(b)(9) Claims only where they believe, in their business

judgment, that the benefits to their estates from making such payments will exceed the costs to

their estates.

### C.    The Lien Claimants.

12.    The Debtors' supply chain and order fulfillment depends on the services provided

by, among others, customs brokers, freight forwarders, shippers, common or contract carriers,

consolidators, and third-party logistics systems providers (collectively, the "Shippers") as well as

third-party employees at storage and distribution warehouses (the "Warehousemen").  Without the

services of the entire supply chain functioning smoothly and efficiently, the Debtors would likely

not be able to timely procure merchandise, guarantee timely development of trend-reliant

merchandise, and/or reliably deliver the merchandise to their customers, which would be

detrimental to the value of the Debtors' estates and cost the Debtors the ability to effectively

compete with its competitors in the marketplace.  Additionally, the Debtors employ various general

contractors and vendors to assist with remodels and on-site construction and repairs at their

corporate headquarters, warehouses, and retail stores (the "Non-Merchant Lienholders").

13.    A number of the Debtors' merchandising providers supply inventory to the Debtors

on consignment (the "Consignment Vendors" and together with the Warehousemen and Shippers

and the Non-Merchant Lienholders, the "Lien Claimants").  To the extent that these Consignment

Vendors have properly filed financing statements, their claims are likely secured by inventory in

the Debtors' possession, and may be superior to the liens of the Debtors' prepetition lenders.  To

the extent the Consignment Vendors are not paid timely, they may stop providing inventory to the

Debtors at a time when one of the few sources of inventory available to the Debtors is through consignment arrangements or potentially seek to enforce their liens.

14.     Collectively, the Debtors estimate that approximately $570,000 is due and owing to the Lien Claimants as of the Petition Date (the "Lien Claims"), of which approximately $300,000 may become due and owing within 21 days after the Petition Date.

**D.     Customary Trade Terms.**

15.     Subject to the Court's approval, the Debtors intend to satisfy prepetition claims described herein only to the extent necessary to preserve their business.  In order to avoid disruption of the Debtors' operations, the Debtors seek authorization, but not direction, to condition payment, either in full or in part, of prepetition vendor claims upon each vendor's agreement to  continue—or recommencement of—supplying goods and services on terms that are acceptable to the Debtors in accordance with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms").  The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms condition to payment be made in writing.

16.     In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made

pursuant to the relief requested by the motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

### E.    Outstanding Orders.

17.    Prior to the Petition Date, the Debtors stopped ordering merchandise and inventory. As a result of shipping delays due to the COVID-19 pandemic, however, the Debtors may have ordered merchandise or other goods for which delivery will not occur until after the Petition Date (the "Outstanding Orders").  As a result of the commencement of these chapter 11 cases, certain suppliers may be concerned that goods ordered prior to the Petition Date pursuant to the Outstanding Orders will render the suppliers—with respect to such goods—general unsecured creditors of the Debtors' estates.  The Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

18.    I believe that the relief requested in the All Vendor Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  I believe that the relief requested in the All Vendor Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the All Vendor Motion.

II.    **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief (the "Cash Management Motion").**

19.    The Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to (i) continue to operate their Cash Management System (as defined below), (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees and Armored Car Services Fees (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions (as such terms are defined below) consistent with historical practice; and (b) granting related relief.

20.    The Debtors operate an intricate cash management system (the "Cash Management System").  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Debtors' corporate accounting, treasury, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

21.    The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business.  The Debtors estimate that cash collections for the Cash Management System average approximately $65 million per month, including store cash receipts, credit and debit card receipts, and website sales.  Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close their existing bank accounts, it is critical that the Debtors' Cash Management System remain in place on a postpetition basis.

22.     As of the Petition Date, the Cash Management System includes a total of 57 bank accounts (collectively, the "Bank Accounts"), which are held at two (2) different banks, Bank of America, N.A. and Silicon Valley Bank, N.A. (collectively, the "Cash Management Banks").

23.     The Cash Management System is organized around the Master Account, which pools incoming funds from the Store Accounts as a result of cash sales at the Debtors' brick and mortar locations, as well as various operating, deposit, and concentration.  The Master Account, in turn, funds the Debtors' various disbursement accounts.

24.     Pursuant to the respective credit agreements and other loan documents (including intercreditor and deposit account control agreements) governing the Debtors' prepetition asset-based revolving credit facility (the "ABL Facility") and the Debtors' term loan credit facility ("Term Loan Facility"), substantially all of the cash held in the Bank Accounts is subject to properly-perfected security interests in favor of the ABL Agent and TCG BDG, Inc., solely in its capacity as administrative agent under the Term Loan Facility.  On a daily basis, all cash amounts that remain in the Store Concentration Account and Credit Card Concentration Account and all other cash receipts and proceeds (with limited exceptions set forth in the ABL Loan) are swept by the ABL Agent to pay down balances of the ABL Loan.

25.     ***Cash Collections***.    The Debtors maintain 38 Store Accounts for their Lord & Taylor store locations, into which all non-credit card store-level cash sales are deposited by the store manager on a daily basis.  Under ordinary circumstances, each week, armored cars collect and transfer cash from each of the Debtors' 38 store locations to a depository vault where the cash is counted and electronically deposited into the applicable store Bank Accounts.  On average, approximately $400,000 - $700,000 in cash is in transit in the armored car services, depending on the season.  Additionally, each store location maintains a certain level of cash on

hand in a vault to populate cash registers.  Currently, the Debtors have approximately $1,000,000 in vaults across the 38 store locations.  However, due to the COVID-19 pandemic, the Debtors are currently not transacting in cash.  This cash will remain in the store location vaults until such time that the Debtors resume cash transactions.

26.      ***Bank and Armored Car Fees.***  On a monthly basis the Debtors pay approximately $680,000 in service charges and other fees in connection with the maintenance of the Cash Management System (the "Bank Fees").  The Debtors paid approximately $4 million on account of Bank Fees in 2019.  The Debtors estimate that they owe approximately $90,000 on account of Bank Fees as of the Petition Date and request authority to pay outstanding Bank Fees in the ordinary course of business, including on a on a postpetition basis, in order to ensure the uninterrupted operation of the Cash Management System.

27.      In addition, the Debtors' pay approximately $11,000 in monthly fees on account of the Armored Car Services (the "Armored Car Services Fees").  The Debtors paid approximately $22,000 on account of the Armored Car Services Fees in 2019.  As of the Petition Date, the Debtors do not believe that they have any amounts outstanding on account of the Armored Car Services Fees.  Although the Debtors do not currently utilize the Armored Car Services because they are currently only taking electronic payments due to the COVID-19 pandemic, the Debtors anticipate they will need to utilize these services once it is safe to accept cash payments.  Out of an abundance of caution, the Debtors request authority to pay any amounts outstanding on account of Armored Car Services Fees, including any prepetition amounts, in the ordinary course of business on a postpetition basis to ensure the uninterrupted operations of their store locations and the Cash Management System.

28.     ***Commercial Card Program.***  As part of the Cash Management System, the Debtors provide certain of their employees in their brick and mortar store locations with access to purchase cards issued by Bank of America (the "Purchase Cards") to be utilized for approved purchases and business expenses (the "Commercial Card Program").  Each of the Debtors' store locations maintains one or two Purchase Cards and certain employees have access to the Purchase Cards to purchase certain approved goods or services.  The Purchase Cards are paid monthly.  In order to maintain the Commercial Card Program, which is critical to the Debtors' ability to maintain ordinary course operations at the store level, the Debtors request authority to continue utilizing and making payments on account of the Commercial Card Program in the ordinary course of business on a postpetition basis.

29.     ***Business Forms and Books and Records.***  As part of the Cash Management System, the Debtors utilize preprinted business forms in the ordinary course of business, including letterhead, purchase orders, invoices, and preprinted checks (the "Business Forms").  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  If the Debtors exhaust their existing supply of checks during these chapter 11 cases, the Debtors will print or order checks with the designation "Debtor in Possession" and the corresponding bankruptcy case number.

30.     ***Intercompany Transactions.***  The Debtors maintain business relationships and have entered into certain agreements with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables in the ordinary course of business (collectively, the "Intercompany Claims").  The Intercompany Transactions do not include the transfer of funds

11

through direct deposits, but instead include inventory transfers and other non-cash transfers between the Debtor entities. Accordingly, at any given time there may be Intercompany Claims owed by one Debtor to another Debtor. Such Intercompany Transactions are typically conducted pursuant to informal intercompany arrangements. The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions. As of the Petition Date, there are no Intercompany Claims between the Debtors and any non-debtor affiliates. If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be unnecessarily disrupted to the detriment of the Debtors, their creditors, and other stakeholders.

31.    I believe that the continuation of the Cash Management System, including with regard to the continued use of the Bank Accounts, payment of Bank Fees, continuation of the Corporate Card Program, maintenance of their existing Business Forms and Books and Records, and engagement in the Intercompany Transactions, is vital to the Debtors' ability to operate effectively in these chapter 11 cases. Due to of the complexity of the Cash Management System and the interconnected-nature of the Debtors' operations, any delay in granting the relief requested in the Cash Management Motion would severely disrupt the Debtors' operations at this critical juncture, imperil the Debtors' restructuring, and irreparably jeopardize the Debtors' ability to maximize the value of their estates for the benefit of all stakeholders.

32.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

III.  **Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of Stretto as Claims and Noticing Agent (the "Stretto 156(c) Retention Application").**

33.    Pursuant to the Stretto 156(c) Retention Application, the Debtors seek entry of an order appointing Stretto[6] as claims, noticing and solicitation agent (the "Claims, Noticing, and Solicitation Agent") for the Debtors in their chapter 11 cases, effective as of the Petition Date.  As the Claims, Noticing, and Solicitation Agent, Stretto would assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

34.    Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Stretto to act as the Claims, Noticing, and Solicitation Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and comparable to the rates charged by its competitors for similar services.

35.    The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of the Debtors' estates and their creditors because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.  Accordingly, it is my opinion that the Court should approve the Stretto 156(c) Retention Application.

---

[6]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

**IV.** **Debtors' Motion for Entry of an Order (A) Extending Time to File Schedules and Statements of Financial Affairs, (B) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix For Each Debtor, (C) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (D) Authorizing the Debtors to Redact Certain Personal Identification Information, and (E) Granting Related Relief (the "Creditor Matrix, SOFAs, and Schedules Motion").**

36.     Pursuant to the Creditor Matrix, SOFAs, and Schedules Motion, the Debtors seek entry of an order:  (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 14 days, for a total of 28 days, from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown; (b) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (c) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors in lieu of filing lists for each Debtor; (d) authorizing the Debtors to redact certain personal identification information; and (e) granting related relief.

37.     ***Schedules and Statements Extension***.  To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to the claims of thousands of creditors, as well as the Debtors' many assets, contracts, and leases across stores located nationwide.  This information is voluminous and located in numerous places throughout the Debtors' organization.  Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term—when these resources would be best used to stabilize the Debtors' business operations.

38.     Although the Debtors, with the assistance of their professional advisors, are working diligently and expeditiously to prepare the Schedules and Statements, the Debtors'

resources are strained.  Considering the amount of work entailed in completing the Schedules and

Statements combined with the competing demands on the Debtors' employees and professional

advisors to assist in efforts to stabilize business operations during the initial postpetition period,

the Debtors likely will not be able to properly and accurately complete the Schedules and

Statements within the required time period.  The Debtors therefore request that the Court extend

the initial 14-day period for an additional 14 days, without prejudice to the Debtors' right to request

further extensions, for cause shown.

39.     ***Consolidated Creditor Matrix***.  Although a list of creditors usually is filed on a

debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor,

the debtors may file a consolidated creditor matrix.  Here, compiling separate top creditor lists for

each individual Debtor would consume an excessive amount of the Debtors' time and resources,

and filing a consolidated list would more appropriately reflect the liabilities against the Debtors'

operations on an enterprise level.

40.     ***Consolidated List of the 30 Largest Unsecured Creditors***.  The Debtors request

authority to file a single, consolidated list of their 30 largest general unsecured creditors.  This will

help alleviate administrative burdens, costs, and the possibility of duplicative service, and will

prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple

notices to the parties listed on the Debtors' voluminous creditor matrix.

41.     Accordingly, on behalf of the Debtors, I respectfully submit that the Court should

approve the Creditor Matrix, SOFAs, and Schedules Motion.

V.   **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto And (B) Granting Related Relief (the "Customer Programs Motion").**

42.   Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer their customer-related programs (collectively, the "Customer Programs") and honor certain prepetition obligations related thereto, and (b) granting related relief.

43.   The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships in the ordinary course of business.  On account of the Customer Programs, the Debtors may owe certain obligations to their customers as well as other third parties (collectively, the "Customer Obligations") arising both before and after the Petition Date.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  These Customer Programs include the Loyalty Program, the Refund and Exchange Program, the Le Tote Subscription Program, and other customer programs described in the Customer Programs Motion.

44.   I believe that continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases is critical to preserve the value of the Debtors' estates.  Customers expect and rely on the Customer Programs and may not continue to support the Debtors' business if the Customer Programs are discontinued.  It is incontrovertible that support from the Debtors' customers and the communities in which they conduct business, is essential for go-forward operations.

45.   Further, any disruption in the Customer Programs would immediately and irreparably jeopardize the viability of the Debtors' ongoing operations by upsetting the "business

as usual" message that is critical to the Debtors' ability to maximize the value of their estates for the benefit of all stakeholders.  I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of the Debtors' business, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of these chapter 11 cases.

46.     I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**VI.     Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain, Renew, or Supplement Their Insurance Policies and Honor All Obligations in Respect Thereof, and (B) Granting Related Relief (the "<u>Insurance Motion</u>").**

47.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain, renew, or supplement their insurance policies and honor all obligations in respect thereof, and (b) granting related relief.  The requested relief includes paying all amounts arising in connection with the Insurance Policies, including Broker's Fees and Insurance Deductibles (collectively, and including any related fees, the "<u>Insurance Obligations</u>"), whether due and payable before, on, or after the Petition Date.

48.     In the ordinary course of business, the Debtors maintain approximately 24 insurance policies (collectively, the "<u>Insurance Policies</u>") that are administered by various third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>").  These Insurance Policies provide coverage for, among other things, the Debtors' general liability, excess liability, D&O, property, and workers' compensation policies.  All of the Insurance Policies are essential to the

ongoing operation of the Debtors' business.  The aggregate annual premium for the Insurance

Policies is approximately $8.1 million, plus applicable taxes and surcharges.

49.     The Debtors do not believe that any Insurance Policies will need to be renewed in

the 21 days after the Petition Date.  The Debtors estimate that, as of the Petition Date, there are

approximately $766,000 in premiums due on account of the Insurance Policies.  Accordingly, the

Debtors seek authority to maintain, renew, and/or supplement their Insurance Policies and to

continue honoring any amounts on account of the Insurance Obligations in the ordinary course of

business to ensure uninterrupted coverage during the course of these chapter 11 cases.

50.     Pursuant to certain of the Insurance Policies, the Debtors are required to pay various

deductibles or retention amounts (the "Insurance Deductibles"), depending upon the type of claim

and Insurance Policy involved.   Additionally, under some Insurance Policies, the Debtors'

third-party administrator may pay claimants directly and then invoice the Debtors for any

applicable Insurance Deductible.  In such situations, the Insurance Carriers may have prepetition

claims against the Debtors.  If the Debtors fail to make any Insurance Deductible payments, the

Debtors could be in jeopardy of losing the underlying Insurance Policy, being in violation of state

laws, and/or having certain letters of credit or bonds drawn, each of which would be detrimental

to the Debtors' business and a potential hardship on their employees.

51.     The Debtors obtain their Insurance Policies through USI Financing ("USI" or

the "Insurance Broker").  The Insurance Broker assists the Debtors in obtaining comprehensive

insurance coverage for their operations in a cost-effective manner, manages renewal data, markets

the Insurance Policies, handles all interactions with Insurance Carriers (including negotiating

policy terms, provisions, and premiums), and provides ongoing support throughout the applicable

policy periods.  As of 2020, the Debtors pay USI approximately $18,000 per month (the "USI

Monthly Payment") for costs related to the Insurance Policies, with all other brokerage fees having

been paid up front.  As of the Petition Date, the Debtors believe that they owe the Insurance Broker

the USI Monthly Payment (the "Brokers' Fees"), but the Debtors do not believe that they owe the

Third-Party Administrator any fees (the "Administrator Fees" and together with the Brokers' Fees,

collectively, the "Fees").

52.    I believe that continuation and renewal of the Insurance Policies, and entry into new

Insurance Policies, as needed, is essential to the preservation of the value of the Debtors' business

and operations.  Moreover, in many instances, insurance coverage is required by the regulations,

laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee's

requirements that a debtor maintain adequate insurance coverage given the circumstances of its

chapter 11 case.  Accordingly, the Debtors request authority to maintain their existing Insurance

Policies, pay prepetition obligations related thereto, and enter into new Insurance Policies in the

ordinary course of business.

53.    I believe that failure to receive the requested relief in the Insurance Motion at the

outset of these chapter 11 cases would expose the Debtors to direct liability for payment of claims

otherwise covered by the Insurance Policies, distract the Debtors from the vital task of stabilizing

their business through this process, and disrupt the Debtors' operations at this important juncture.

The relief requested in the Insurance Motion is necessary for the Debtors to operate their business

in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize

the value of their estates for the benefit of all stakeholders.

54.    I believe that the relief requested in the Insurance Motion is in the best interests of

the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

## VII. Debtors' Motion for Entry of an Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief (the "Joint Administration Motion").

55.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

56.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

## VIII. Debtors' Motion for Entry of Interim and Final Orders (A) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (B) Granting Related Relief (the "NOL Motion").

57.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders (a) approving certain notification and hearing procedures (the "Procedures") related to certain transfers of, or declarations of worthlessness with respect to, Le Tote, Inc.'s common stock or any Beneficial Ownership (as defined under the applicable sections of the Internal Revenue Code) therein (any such record or Beneficial Ownership of common stock, the "Common Stock"),

(b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*, and (c) granting related relief.

58.    As of the end of the fiscal year ended February 1, 2020, the Debtors estimate they had NOLs in the amount of approximately $128 million and approximately $6.6 million of 163(j) Carryforwards.[7]   They further estimate that they may generate additional NOLs, disallowed interest carryforwards, or other tax attributes in the 2020 and 2021 fiscal years (NOLs, together with certain other tax attributes, the "Tax Attributes").

59.    I believe that implementation of the Procedures is necessary and appropriate to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  The Tax Attributes may provide the potential for material future tax savings (including in post-emergence years) or other potential tax structuring opportunities in these chapter 11 cases.  In addition, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.

60.    I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

---

[7]    Prior to February 2, 2020, the Debtors utilized a calendar fiscal year.  As of the Petition Date, the Debtors utilize a non-calendar fiscal year, as is common for many retailers, which began on February 2, 2020.  These attribute estimates are based on the Debtors' pretax book losses for the 2019 fiscal year and the period from January 1, 2020 through February 1, 2020.  The attribute estimates herein remain subject to change until the tax returns for the fiscal year ended December 31, 2019 and the short fiscal year ended February 1, 2020 are filed.

**IX.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (B) Granting Related Relief (the "Taxes Motion").**

61.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors, to remit and pay Taxes and Fees (as defined in below) without regard to whether such obligations accrued or arose before or after the Petition Date, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date; and (b) granting related relief.

62.    In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, withholding, income, franchise, property, and import related taxes and charges, as well as other business and regulatory fees (collectively, the "Taxes and Fees").[8]    The Debtors remit the Taxes and Fees to various federal, state, provincial, and local governments, including taxing and licensing authorities (collectively, the "Authorities").    Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.    The Debtors estimate that approximately $8.0 million in Taxes and Fees are outstanding as of the Petition Date, in addition to other amounts that will become due and owing to the Authorities after the Petition Date in the ordinary course.

63.    The Debtors believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including that:  (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and

---

[8]    By the Taxes Motion, the Debtors do not seek the authority to collect and remit state, provincial, and federal employee-related taxes and withholdings.  Such relief is instead requested in the Wages Motion.

(c) certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract them from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both. Lastly, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and such funds may not constitute property of the Debtors' estates.

64.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**X.    Debtors' Motion for Entry of Interim and Final Orders (A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (C) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (D) Granting Related Relief (the "Utilities Motion").**

65.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests (as such terms are defined in the Utilities Motion); and (d) granting related relief.

66.    In connection with the operation of their business and management of their approximately 43 retail locations, distribution centers, and corporate offices, the Debtors obtain necessary electricity, telephone, internet, natural gas, water, waste management, and other similar services (collectively, the "Utility Services") from a number of utility companies (collectively the "Utility Companies").

67.    On average, the Debtors pay approximately $764,369.02 each month for Utility Services, calculated as a historical average payment for the twelve-month period ended

March 30, 2020.  The Debtors do not anticipate this monthly average will change materially during the initial thirty days following the commencement of these chapter 11 cases.  The Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid or fees payable to Engie) will be approximately $764,396.02.

68.     To provide additional assurance of payment, the Debtors propose to deposit $382,184.51 into a segregated account (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the twelve-month period ending March 31, 2020, and excludes Utility Services billed directly to the Landlords.

69.     Additionally, the Debtors seek approval of their proposed adequate assurance procedures, which set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

70.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and hence, the overall success of these chapter 11 cases.  The Debtors' retail locations, distribution centers, and corporate offices require electricity, telecommunications, heat, water, waste management, and other Utility Services to operate.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations may be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

71.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their business in chapter 11.    Accordingly, on behalf of the Debtors, I

respectfully submit that the Utilities Motion should be granted.

XI.    **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs, and (B) Granting Related Relief (the "Wages Motion").**

72.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders:

(a) authorizing the Debtors to (i) pay all prepetition wages, salaries, reimbursable expenses, and

other obligations on account of the Employee Compensation and Benefits Programs (as defined in

the Wages Motion) in the ordinary course of business and (ii) continue to administer the Employee

Compensation and Benefits Programs in the ordinary course of business and (b) granting related

relief.

73.    The Debtors employ approximately 651 individuals, on a full-time basis or part-

time basis (collectively, the "Employees").    Approximately 545 Employees are paid on an hourly

basis, and approximately 106 Employees earn a salary.[9]    The Employees are not party to any

collective bargaining agreements.

74.    The Debtors' Employees perform a wide variety of functions critical to the Debtors'

operations at the Debtors' home office, distribution centers, and stores.    Certain of these

individuals are highly trained and have an essential working knowledge of the Debtors' business

that cannot be easily replaced.    Additionally, certain of the Temporary Staff provide services

necessary to continue the Debtors' store-level operations, and without their continued utilization

would require the Debtors to expend additional resources in this current, competitive labor market.

---

[9]    The included figures do not include seasonal staff, which the Debtors do not anticipate utilizing during these chapter 11 cases.

Without the continued, uninterrupted services of their Employees, the Debtors' reorganization efforts will be severely hampered.

75.     The vast majority of Employees rely exclusively or primarily on the Employee Compensation and Benefits Programs to pay their daily living expenses and support themselves or their families.  Thus, Employees will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business.  The Debtors seek to minimize the personal hardship the Employees and Temporary Staff would suffer if employee obligations are not paid when due or as expected.  Consequently, the relief requested is necessary and appropriate.

76.     The Debtors seek authority, but not direction, to pay the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs:

| Employee-Related Obligations | Interim Amount | Final Amount |
| --- | --- | --- |
| Employee Compensation | $250,000 | $250,000 |
| Payroll Processing Fees | $45,000 | $45,000 |
| Withholding Obligations | $550,000 | $550,000 |
| Reimbursable Expenses | $25,000 | $25,000 |
| Employee Discount | N/A | N/A |
| Health Programs | $709,000 | $709,000 |
| Life Insurance and Disability Programs | $113,000 | $113,000 |
| Workers' Compensation Programs | $508,350 | $508,350 |
| 401(k) Plan | $50,000 | $50,000 |
| Paid and Unpaid Leave | $116,520[10] | $116,520[11] |

---

[10]   The Debtors do not, as of the Petition Date, anticipate the need to pay any amounts due with respect to earned but unused Paid and Unpaid Leave during the Interim Period. However in the event of termination of an Employee during the Interim Period, prepetition earned but unused Paid and Unpaid Leave would become due within the Interim Period. Accordingly, the Debtors seek authorization, but not direction, to pay prepetition amounts in respect of earned but unused Paid and Unpaid Leave should they become due, by applicable law or otherwise, during the Interim Period.

[11]   The final amount with respect to Paid and Unpaid Leave reflects the aggregate liability of the Debtors if every Employee's employment were terminated immediately, and all accrued and untaken Paid and Unpaid Leave were paid in accordance with the Debtors' practices and applicable law.

| Employee-Related Obligations | Interim Amount | Final Amount |
|---|---|---|
| Non-Insider Employee Severance Program | $0 | $0 |
| Postpetition Non-Employee Director Compensation | $0 | $0 |
| **Total** | **$2,250,350** | **$2,250,350** |

77.     The Debtors do not believe that amounts owed to any Employees on account of the Employee Compensation and Benefits Programs will exceed the statutory cap of $13,650 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of $13,650 per Employee pursuant to the Interim Order.

78.     The Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases.  The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face.  Such Employees may then elect to seek alternative employment opportunities.  Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

79.     Payment of the Employee Compensation and Benefits Programs is warranted under this authority and the facts of these chapter 11 cases.  Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits Programs.  Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

80.     For the foregoing reasons, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

**XII.     Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Assume the Consulting Agreement, (B) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (C) Authorizing and Approving the Store Closing Procedures, (D) Authorizing Customary Bonuses for Employees of Closing Stores and (E) Granting Related Relief (the "<u>Store Closing Motion</u>").**

81.     Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to assume that certain Consulting Agreement; (b) authorizing and approving the continuation or initiation of 38 store closings or similar themed sales at the stores listed on the schedules attached to the Interim Order and through the Debtors' e-commerce platform (collectively, the "<u>Sales</u>", "<u>Closing Stores</u>", or "<u>Store Closings</u>"); (c) subject to entry of a final order, authorizing customary bonuses to non-insider Closing Store employees who remain employed for the duration of the store closing process (the "<u>Store Closing Bonuses</u>"); and (d) authorizing and approving the terms of the store closing procedures (the "<u>Store Closing Procedures</u>").

82.     Given the challenging commercial environment brought on by adverse macroeconomic trends, along with the devastating impact of COVID-19, the Debtors' management team and advisors undertook an extensive performance analysis of all existing stores, evaluating, among other factors, historical and recent store profitability, historical and recent sales trends, occupancy costs, the geographic market in which each store is located, the mall or property in which each store is located, the outcome of the third-party sale, and specific operational circumstances related to each store's performance.  In consultation with their prepetition lenders, the Debtors and their advisors ultimately determined in their business judgment to commence preparations for store closing sales at each of the 38 Stores.

83.     As described herein, the Debtors are simultaneously conducting a comprehensive marketing process to execute a value-maximizing sale with regards to the Debtors' most profitable Lord & Taylor locations.  The Debtors are hopeful that there will be active bidding on their store assets at the Auction; however, they recognize it is unlikely that a retail buyer will purchase all of their 38 locations.  Accordingly, the Debtors intend to conduct the Store Closings for each of their locations at this time.  To the extent potential bidders express interest in purchasing one or more of the locations, the Debtors intend to discontinue the Store Closings at such locations.  The Debtors believe this process will maximize value for creditors and stakeholders by providing flexibility for a potential winning bidder to purchase the Debtors' most profitable stores.

84.     The Debtors entered into the Consulting Agreement with the Consultant, which sets forth the terms pursuant to which the Consultant will operate the Store Closings for the Debtors. The Debtors evaluated other national liquidation firms before selecting the Consultant and believe that the terms set forth in the Consulting Agreement, including a percentage fee based on the proceeds from asset dispositions, are the best alternative for the conduct of asset sales and Store

Closings.  The Debtors believe that utilizing the skills and resources of the Consultant to effectively and efficiently conduct the Sales and Store Closings will maximize value for all stakeholders.

85.     To effectuate the Store Closings, the Debtors seek approval of the streamlined procedures (*i.e.*, the Store Closing Procedures) to maximize the value of the Store Closure Assets. The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize the value of the Debtors' estates.

86.     Debtors are requesting the authority, but not the obligation, to pay Store Closing Bonuses (the "Store Closing Bonus Plan") upon entry of the Final Order only to store-level non-insider employees and non-insider employees conducting the Sales, who remain in the employ of the Debtors during the Sales.  Approximately 1600 non-insider employees will be eligible for the Store Closing Bonuses.  If the Debtors were to close every Closing Store, the aggregate amount of Store Closing Bonuses paid will not be more than $2.6 million, assuming one hundred percent of the eligible employees remain employed through the duration of the Closing Sales at every Closing Store.

87.     Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing process.  This will increase the likelihood of a successful Store Closing and encourage store management to provide uninterrupted leadership during this challenging period.  Significantly, the Store Closing Bonus Plan ties payment incentives to a retail manager's primary duty: to realize successful sales performance.

88.    I believe that the Store Closings and the Sales represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.  Delay in approving the continuance of the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons.  Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sales of the Store Closure Assets and the termination of operations at the Closing Stores.  Further, the swift and orderly authorization of the Sales will allow the Debtors to timely reject the applicable store leases, and, therefore, avoid the accrual of unnecessary administrative expenses for rent payment.

89.    I believe that the relief requested in the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Store Closing Motion should be approved.