Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

David L. Eaton (admitted *pro hac vice*)
Jaimie Fedell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North La Salle  Street
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LE TOTE, INC., *et al.*,[1] | ) | Case No. 20-33332 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF AMENDED DISCLOSURE STATEMENT
## JOINT CHAPTER 11 PLAN OF LE TOTE, INC. AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE THAT**, on August 2, 2020, the above-captioned debtors-in-possession (collectively, the "Debtors") filed  the *Disclosure Statement for the Joint Chapter 11 Plan of Le Tote, Inc. and Its Debtor Affiliates* [Docket No. 25] (the "Disclosure Statement").[2]

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/letote/.  The location of the Debtors' service address is 250 Vesey Street, 22nd Floor, New York, New York 10281.

[2]    Capitalized terms not otherwise defined herein shall have the meanings set forth in the Plan or Disclosure Statement, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Le Tote, Inc. and Its Debtor Affiliates* (the "Amended  Disclosure Statement "), which is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the attached hereto as **Exhibit B** is a redline of the Amended Disclosure Statement as compared to the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Disclosure Statement, and all other documents filed in these chapter 11 cases are available free of charge by (a) visiting the Debtors' restructuring website at https://cases.stretto.com/letote; or (b) by calling (855)-217-8030; You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.vaeb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Richmond, Virginia
Dated:  December 21, 2020

/s/ *Jeremy S. Williams*
_____

**KUTAK ROCK LLP**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192
Email:      Michael.Condyles@KutakRock.com
            Peter.Barrett@KutakRock.com
            Jeremy.Williams@KutakRock.com
            Brian.Richardson@KutakRock.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          steven.serajeddini@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
David L. Eaton (admitted *pro hac vice*)
Jaimie Fedell (admitted *pro hac vice*)
300 North La Salle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          david.eaton@kirkland.com
                jaimie.fedell@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit A

**Amended Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LE TOTE, INC., *et al.*,[1] | ) | Case No. 20-33332 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE AMENDED JOINT
CHAPTER 11 PLAN OF LE TOTE, INC. AND ITS DEBTOR AFFILIATES**

Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:       (804) 644-1700
Facsimile:       (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

David L. Eaton (admitted *pro hac vice*)
Jaimie Fedell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: December 21, 2020

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY
THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN
APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE DISCLOSURE STATEMENT IS
SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND
IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://cases.stretto.com/letote/.  The location of the Debtors' service address is
250 Vesey Street, 22nd Floor, New York, New York 10281.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF LE TOTE, INC. AND ITS DEBTOR AFFILIATES.[2]

THE DEBTORS URGE HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THESE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Amended Joint Chapter 11 Plan of Le Tote, Inc. and its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "Plan"), attached hereto as **Exhibit A**.

REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.    THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  THE DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## TABLE OF CONTENTS

**Page**

**ARTICLE I. INTRODUCTION** ...........................................................................................................1

    A.    Introduction. ...........................................................................................................1
    B.    Plan and Settlement Overview. ..............................................................................1
    C.    The Debtors' Businesses, Prepetition Negotiations, and Chapter 11 Filing. .......2
    D.    The 363 Process. ....................................................................................................3
    E.    Postpetition Negotiations. ......................................................................................3
    F.    Recommendation. ...................................................................................................4

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT** .................5

    A.    What is Chapter 11? ...............................................................................................5
    B.    Why are the Debtors sending me this Disclosure Statement? ................................5
    C.    Am I entitled to vote on the Plan? .........................................................................5
    D.    What will I receive from the Debtors if the Plan is consummated? .......................6
    E.    Are any regulatory approvals required to consummate the Plan? ..........................8
    F.    What happens to my recovery if the Plan is not confirmed or does not go effective? .....................8
    G.    What is the deadline to vote on the Plan? ..............................................................8
    H.    How do I vote for or against the Plan? ...................................................................8
    I.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? .............................................................................................9
    J.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim? .......................................................9
          1.    Administrative Claims and Priority Tax Claims. ......................................9
          2.    Professional Compensation. .....................................................................10
          3.    Statutory Fees. .........................................................................................11
          4.    TSA Shortfall Claim. ...............................................................................11
    K.    Will the final Amount of General Unsecured Claims affect my recovery under the Plan? ............11
    L.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .............11
    M.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur? .....................................................................12
    N.    What is the purpose of the Confirmation Hearing? ..............................................12
    O.    Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .......................................................................................13
    P.    Do the Debtors recommend voting in favor of the Plan? .....................................13

**ARTICLE III. SOLICITATION AND VOTING PROCEDURES** ...............................................13

    A.    Holders of Claims Entitled to Vote on the Plan. ..................................................13
    B.    Voting Record Date. .............................................................................................14
    C.    Voting on the Plan. ...............................................................................................14
    D.    Ballots Not Counted. ............................................................................................14
    E.    Confirmation Hearing. ..........................................................................................15

**ARTICLE IV. THE DEBTORS' BACKGROUND** .......................................................................15

    A.    Corporate History and Business Operations. .......................................................15
          1.    Le Tote Corporate History. ......................................................................15
          2.    Le Tote China. .........................................................................................16
          3.    Lord & Taylor Corporate History. ...........................................................16

i

|   |   | 4. | Critical Components of Le Tote's Cost Structure. | 17 |
|   | B. | The Debtors' Prepetition Corporate and Capital Structure. |   | 18 |
|   |   | 1. | The ABL Credit Facility. | 20 |
|   |   | 2. | The Term Loan Credit Facility. | 20 |
|   |   | 3. | The Seller Note. | 20 |
|   |   | 4. | The Transition Services Agreement Obligations. | 21 |
|   |   | 5. | The ABL Intercreditor Agreement. | 21 |
|   |   | 6. | The Seller Intercreditor Agreement. | 22 |

**ARTICLE V. EVENTS LEADING TO THESE CHAPTER 11 CASES & MATERIAL DEVELOPMENTS** ........................................................................................ **22**

|   | A. | Market Distress. |   | 22 |
|   |   | 1. | Challenging Operating Environment and Transition Obligations. | 22 |
|   |   | 2. | The COVID-19 Pandemic. | 22 |
|   | B. | Prepetition Restructuring Efforts. |   | 23 |
|   |   | 1. | Efforts to Manage Liquidity. | 23 |
|   |   | 2. | Negotiations with HBC. | 23 |
|   |   | 3. | Store Closing Sales. | 23 |

**ARTICLE VI. EVENTS OF THE CHAPTER 11 CASES** ........................................................ **24**

|   | A. | First Day Relief. | 24 |
|   | B. | Approval of Use of Cash Collateral | 24 |
|   | C. | Schedules and Statements | 24 |
|   | D. | Appointment of Official Committee | 24 |
|   | E. | Sale Process and Bidding Procedures | 25 |
|   | F. | Store Closing Process | 26 |
|   | G. | Extension Order | 26 |
|   | H. | Key Employee Incentive Program | 26 |
|   | I. | Wilmington Trust Litigation | 26 |
|   | J. | Investigation of Estate Causes of Action by the Debtors. | 27 |
|   |   | 1. Appointment of Restructuring Committee. | 27 |
|   |   | 2. Summary of the Investigation. | 27 |
|   |   | 3. Claims Investigated. | 27 |
|   |   | 4. Cost and Delay of Litigation. | 28 |
|   | K. | Settlement and Plan Negotiations. | 29 |
|   | L. | Evaluation of the Proposed HBC Settlement. | 29 |
|   | M. | The Committee's Standing Motion | 30 |
|   | N. | Litigation Matters | 30 |
|   | O. | Other Procedural and Administrative Motions | 31 |

**ARTICLE VII. SUMMARY OF THE PLAN** .............................................................................. **31**

|   | A. | Classification and Treatment of Claims and Interests | 32 |
|   |   | 1. Classification of Claims and Interests. | 32 |
|   |   | 2. Confirmation Pursuant to 1129(a)(10) and 1129(b) of the Bankruptcy Code. | 32 |
|   | B. | Means for Implementation of the Plan. | 32 |
|   |   | 1. General Settlement of Claims. | 32 |
|   |   | 2. The HBC Settlement. | 32 |
|   |   | 3. Cancellation of Securities and Agreements. | 33 |
|   |   | 4. Exemption from Certain Taxes and Fees. | 33 |
|   |   | 5. Sources of Plan Consideration and Priority Waterfall. | 33 |
|   |   | 6. Restructuring Transactions. | 34 |
|   |   | 7. Corporate Action. | 34 |
|   |   | 8. Post-Effective Date Debtors. | 34 |

|  | 9. | Plan Administrator. | 35 |
|  | 10. | Wind-Down. | 36 |
|  | 11. | Continued HBC Support. | 37 |
|  | 12. | Wind-Down Support. | 38 |
|  | 13. | Dissolution and Board of Directors. | 38 |
|  | 14. | Management Payments. | 38 |
|  | 15. | Effectuating Documents; Further Transactions. | 38 |
|  | 16. | Preservation of Causes of Action. | 38 |
|  | 17. | Closing the Chapter 11 Cases. | 39 |
| C. | Treatment of Executory Contracts and Unexpired Leases. | | 39 |
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 39 |
|  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 39 |
|  | 3. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 40 |
|  | 4. | D&O Policies. | 40 |
|  | 5. | Indemnification Obligations. | 41 |
|  | 6. | Termination Agreements. | 41 |
|  | 7. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 41 |
|  | 8. | Reservation of Rights. | 41 |
|  | 9. | Nonoccurrence of Effective Date. | 42 |
| D. | Provisions Governing Distributions. | | 42 |
|  | 1. | Timing and Calculation of Amounts to be Distributed. | 42 |
|  | 2. | Rights and Powers of the Disbursing Agent. | 42 |
|  | 3. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 42 |
|  | 4. | Setoffs and Recoupment. | 44 |
| E. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims. | | 44 |
|  | 1. | Allowance of Claims and Interests. | 44 |
|  | 2. | Claims and Interests Administration Responsibilities. | 44 |
|  | 3. | Estimation of Claims and Interests. | 44 |
|  | 4. | Adjustment to Claims or Interests Without Objection. | 45 |
|  | 5. | Time to File Objections to Claims. | 45 |
|  | 6. | Disallowance of Claims. | 45 |
|  | 7. | Amendments to Claims. | 45 |
|  | 8. | No Distributions Pending Allowance. | 45 |
|  | 9. | Distributions After Allowance. | 46 |
| F. | Settlement, Release, Injunction, and Related Provisions. | | 46 |
|  | 1. | Settlement, Compromise, and Release of Claims and Interests. | 46 |
|  | 2. | Term of Injunctions or Stays. | 46 |
|  | 3. | Release of Liens. | 46 |
|  | 4. | Releases by the Debtors. | 46 |
|  | 5. | Releases by Holders of Claims and Interests. | 47 |
|  | 6. | Exculpation. | 48 |
|  | 7. | Injunction. | 48 |
|  | 8. | Limited Substantive Consolidation. | 49 |
|  | 9. | Protection Against Discriminatory Treatment. | 50 |
|  | 10. | Recoupment. | 50 |
|  | 11. | Subordination Rights. | 50 |
| G. | Conditions Precedent to Effective Date. | | 50 |
|  | 1. | Conditions Precedent to the Effective Date. | 50 |
|  | 2. | Waiver of Conditions. | 51 |
|  | 3. | Substantial Consummation. | 51 |
|  | 4. | Effect of Non-Occurrence of Conditions to the Effective Date. | 51 |

**ARTICLE VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** .... 51

| A. | Confirmation Hearing. | 52 |
| B. | Confirmation Standards. | 52 |

1.     Requirements for Confirmation of the Plan................................................52
2.     Best Interests of Creditors. ......................................................................52
3.     Financial Feasibility..................................................................................53
C.     Acceptance by Impaired Classes.........................................................................53
D.     Confirmation Without Acceptance by All Impaired Classes................................54
1.     No Unfair Discrimination. .......................................................................54
2.     Fair and Equitable Test. ...........................................................................54

**ARTICLE IX. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING** ...............................54

A.     Risks Related to the Confirmation and Consummation of the Plan. .....................55
1.     Parties in Interest May Object to the Plan's Classification of Claims and
       Interests.....................................................................................................55
2.     The Conditions Precedent to the Effective Date of the Plan May Not Occur. ...............55
3.     The Debtors May Fail to Satisfy Vote Requirements. ...............................55
4.     The Debtors May Not Be Able to Secure Confirmation of the Plan. ...............................55
5.     Nonconsensual Confirmation. ...................................................................56
6.     Continued Risk Upon Confirmation.........................................................56
7.     These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the
       Bankruptcy Code. .....................................................................................56
8.     The Debtors May Object to the Amount or Classification of a Claim. ...........................56
9.     Risk of Non-Occurrence of the Effective Date..........................................56
10.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the
       Plan. ..........................................................................................................57
11.    The Plan's Release, Injunction, and Exculpation Provisions May Not Be
       Approved. ..................................................................................................57
12.    The Total Amount of Allowed Unsecured Claims May Be Higher Than
       Anticipated By the Debtors. ......................................................................57
13.    The Total Amount of Allowed Administrative and Priority Claims May Be
       Higher and/or the Amount of Distributable Cash May Be Lower Than
       Anticipated by the Debtors. .......................................................................57
14.    The Committee's Standing Motion May Be Granted..................................57
B.     Risks Related to the Debtors' Businesses. ...........................................................57
1.     The Debtors May Not Be Able to Generate Sufficient Cash to Service All of
       Their Indebtedness.....................................................................................57
2.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the
       Chapter 11 Cases. ......................................................................................58
3.     Results of Store Closing Sales May Not Meet Projections. ......................58
4.     The Wind-Down Budget May Change Materially. ....................................58
5.     Renewed Shelter-in-Place Orders May Interrupt Going Out of Business Sales. ..............58
6.     The Debtors Rely on Services Provided By HBC Which May Be Interrupted..................59
C.     Disclosure Statement Disclaimer. .......................................................................59
1.     Information Contained in this Disclosure Statement is for Soliciting Votes....................59
2.     This Disclosure Statement Was Not Approved by the United States Securities
       and Exchange Commission.........................................................................59
3.     No Legal or Tax Advice Is Provided to You by this Disclosure Statement. ....................59
4.     No Admissions Made. ...............................................................................59
5.     Failure to Identify Litigation Claims or Projected Objections. .................59
6.     No Waiver of Right to Object or Right to Recover Transfers and Assets......................59
7.     Information Was Provided by the Debtors and Was Relied Upon by the Debtors'
       Advisors. ...................................................................................................60
8.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. .................60
9.     No Representations Outside this Disclosure Statement Are Authorized.........................60

**ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
      THE PLAN**...........................................................................................................**60**

A.      Introduction. ..........................................................................................................................60
B.      Certain U.S. Federal Income Tax Consequences to the Debtors. ....................................61
        1.      Tax Consequences of the Asset Sales...................................................................61
        2.      COD Income...........................................................................................................62
C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed
        Claims Entitled to Vote.........................................................................................................62
        1.      U.S. Federal Income Tax Consequences for Holders of Allowed Class 4 Claims............62
        2.      Accrued but Untaxed Interest. ..............................................................................62
        3.      Market Discount. ...................................................................................................63
        4.      Character of Gain or Loss With Respect to Impaired Claims. ..........................63
        5.      Distribution Reserve Accounts and Delayed Equity Distributions. .................64
D.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims. ...........64
        1.      Gain Recognition. ..................................................................................................64
        2.      Accrued Interest.....................................................................................................64
        3.      FATCA. ...................................................................................................................65
E.      Information Reporting and Back-Up Withholding. ...........................................................65

**ARTICLE XI. RECOMMENDATION OF THE DEBTORS** ..................................................................66

**EXHIBITS**

Exhibit A          Plan

Exhibit B          Corporate Structure Chart

Exhibit C          Disclosure Statement Order

Exhibit D          Settlement Term Sheet

# ARTICLE I.
## INTRODUCTION

A.    *Introduction.*

Le Tote, Inc. ("Le Tote") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan.[3]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

B.    *Plan and Settlement Overview.*

The proposed Plan achieves an orderly wind-down of the Debtors' estates that maximizes the value of all estate assets, including the Debtors' remaining inventory and certain potential litigation assets stemming from the 2019 acquisition (the "Acquisition") of Lord & Taylor LLC from HBC US Holdings Inc. ("HBC Holdings"), a subsidiary of Hudson's Bay Company ULC (f/k/a Hudson's Bay Company) ("HBC"), and HBC US Propco Holdings LLC ("HBC Propco" and together with HBC Holdings and Hudson's Bay, the "HBC Parties"), a subsidiary of HBC Holdings, and certain post-Acquisition transactions, and certain other litigation claims.  The proposed Plan is the culmination of more than six months of successful going-out-of-business sales, asset sales outside of the ordinary course business, investigations and related diligence into the Debtors' assets by the Debtors' independent directors and their advisors, and approximately three months of hard-fought post-petition negotiations with HBC.  Importantly, the proposed Plan incorporates an integrated settlement of claims and causes of action among the Debtors and HBC.  Through this settlement, the Plan provides the ability of the Debtors to satisfy administrative and priority claims in full and to make a significant distribution to unsecured creditors who likely otherwise would receive minimal and substantially delayed, if any, recovery.

The Plan provides this value by settling estate claims and causes of action against HBC Holdings and HBC Propco on account of the Acquisition and the parties' subsequent business dealings and other potential claims arising on or before the effective date of the Plan (the "HBC Settlement"), the terms of which are encompassed in the term sheet attached to this Disclosure Statement as **Exhibit D**.  In exchange, the HBC Parties have, among other things, agreed to subordinate their secured claims under their seller note to administrative and priority claims and split recoveries on account of the Debtors' remaining assets with unsecured creditors as set forth below.  The HBC Parties have also agreed to provide key operational support, enabling the Debtors to extend their store-closing sales and deliver additional value.  Finally, the HBC Parties have consented to the disallowance of certain rejection damages claims on account of a master lease held by an affiliate of the HBC Parties and to certain pricing reductions for the Debtors' critical transition services agreement with certain of the HBC Parties.  The HBC Settlement provides the Debtors a path forward to exit these chapter 11 cases while delivering significant value to unsecured creditors—an outcome that would be fraught with significant uncertainty and litigation risk, and likely not achievable at all, absent the HBC Settlement.  As of the date of this Disclosure Statement, the official committee of unsecured creditors (the "Committee") disagrees and believes that the HBC Settlement falls below the lowest point in the range of reasonableness.

The Plan provides the following recoveries to stakeholders:

- Administrative Claims and other Priority Claims will be paid in full in cash or otherwise unimpaired except to the extent that an individual holder agrees to less favorable treatment.

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

- Allowed Other Secured Claims will receive, at the election of the Debtors: (a) payment in full in Cash; (b) the Collateral securing such Allowed Other Secured Claim; (c) reinstatement of such Allowed Other Secured Claim; or (d) such other treatment rendering such Allowed Other Secured Claim Unimpaired.

- Holders of the Seller Note Secured Claim and General Unsecured Claims will receive their *pro rata* share of Distributable Cash pursuant to the Waterfall Recovery. The Waterfall Recovery establishes the following recoveries following payment in full of Administrative Claims (other than the TSA Shortfall Claim) and Priority Claims:

  - Distributable Cash other than Urban Proceeds is allocated as follows: (i) first, to holders of the TSA Shortfall Claim; (ii) second, to holders of the Seller Note Secured Claim, until such holders receive $8 million on account of the Seller Note Secured Claim; (iii) third, to holders of Allowed General Unsecured Claims, until such holders have received $3 million on account of such claims; (iv) fourth, split 50/50 between holders of the Seller Note Secured Claim and the holders of Allowed General Unsecured Claims until the Seller Note Secured Claim is paid in full; and (v) fifth, to the holders of Allowed General Unsecured Claims.

  - The Urban Proceeds are allocated as follows: (i) first to holders of Allowed General Unsecured Claims until such holders have received $1 million on account of the Allowed General Unsecured Claims; (ii) second, split 50/50 between holders of the Seller Note Secured Claim and holders of Allowed General Unsecured Claims; and (iii) third, to holders of Allowed General Unsecured Claims.

The Plan maximizes creditor recoveries, provides the Debtors a path forward to quickly and efficiently complete these chapter 11 cases while extending their store closing sales to further increase recoveries, and has the support of the HBC Parties and the Debtors' independent directors. The Debtors encourage you to vote to accept the Plan.

C.    *The Debtors' Businesses, Prepetition Negotiations, and Chapter 11 Filing.*

The Debtors are the combination of Le Tote—a venture-backed fashion rental subscription service founded in 2012 in San Francisco—and Lord & Taylor LLC ("Lord & Taylor")—the iconic luxury retailer which traces its origins to 1826 in New York. Through Le Tote and Lord & Taylor, the Debtors operate both an online, subscription-based clothing rental service and a full-service fashion retailer with 38 brick-and-mortar locations (the "Stores") with a robust e-commerce platform. Through multiple business channels, the Debtors offer more than 150 brands of clothing and accessories for rental or sale. Le Tote acquired Lord & Taylor from HBC Holdings and HBC Propco pursuant to an asset purchase agreement (as amended from time to time, the "APA") in a transaction which closed in November 2019 (the "Acquisition"). The Acquisition was premised on providing Le Tote access to brand recognition through the iconic Lord & Taylor name and access to new customers through Lord & Taylor's preexisting customer base, while providing Lord & Taylor access to Le Tote's proprietary technology and the ability to break into the rental market during a time of declining sales at traditional retailers. In connection with the Acquisition, Le Tote entered into a Transition Services Agreement (the "Transition Services Agreement") with certain affiliates of HBC to facilitate a smooth transition of the Lord & Taylor assets into the Le Tote organization. The Transition Services Agreement obligates HBC Propco and certain of its affiliates to provide mission-critical services necessary to the functioning of Lord & Taylor, such as accounting, human resources, IT services, and merchant support. Under the APA and as one of its primary benefits, HBC Propco is also obligated to pay rent for the Lord & Taylor physical locations (excluding common area maintenance, real estate taxes, and other similar charges).

Even before the emergence of the COVID-19 pandemic, like many other retail companies, the Debtors were under significant pressure from adverse macro-trends, including increased competition among both online retailers and established brick-and-mortar retailers that have less leveraged capital structures and greater economies of scale. These factors have been greatly compounded by the devastating impact of COVID-19 that has caused retailers throughout the country to close their doors. As states across the country ordered all "non-essential" businesses closed, the Debtors temporarily closed all retail locations in March 2020. Although all of the Debtors' locations ultimately reopened as states and local jurisdictions have begun to relax stay-at-home orders. Nevertheless, foot traffic has

declined significantly compared to pre-COVID levels.  COVID-19 also caused a drop in subscriptions for Le Tote, as the Company's subscriber base suffered from the wave of job losses gripping the country and the demand for apparel diminished due to hundreds of millions of Americans affected by stay-at-home orders.

As a result of these factors, the Debtors' revenue declined precipitously from prior years and from pre-COVID forecasts.  More specifically, with increased debt following the Acquisition and the prolonged closure of the majority of the Debtors' recently acquired Stores due to the COVID-19 pandemic only months after they were acquired, the Debtors carried the increased expenses associated with the Acquisition and brick-and-mortar assets that were unusable for a substantial period of time.  These unprecedented market developments, compounded by lower-than-expected financial results and burdensome Transition Services Agreement charges, adversely impacted liquidity and left the Debtors overleveraged.  To preserve liquidity in the months preceding this filing, the Debtors made the difficult decision to suspend the majority of their vendor payments and to furlough or lay off approximately 4,690 employees.  As the Debtors' location reopened, they recalled approximately [400] furloughed employees.

Faced with diminished liquidity, the Debtors and their advisors also engaged in vigorous negotiations with HBC and its affiliates in an effort to restructure the Transition Services Agreement payment obligations and limit go-forward services to only those services necessary in a post-COVID-19 world.  As a result of these efforts, the Debtors, HBC Holdings, and HBC Propco executed an Omnibus Agreement Term Sheet (the "Omnibus Agreement") on April 10, 2020, which, among other things, offset certain amounts owed under the Transition Services Agreement against certain amounts owed by HBC to the Debtors, and also restructured go-forward services under the Transition Services Agreement to reflect the Debtors' scaled-down enterprise, subject to a reset to pre-Omnibus Agreement pricing for "fixed non-payroll costs related to technology" following October 31, 2021 and a global reset to pre-Omnibus Agreement pricing beginning on January 1, 2021.  The Omnibus Agreement greatly reduced the Debtors' go-forward payments under the Transition Services Agreement.

Simultaneously, the Debtors engaged in arm's-length negotiations with their prepetition secured lenders for continued funding during the store closures and throughout the pendency of these chapter 11 cases.  Following extensive negotiations, the Debtors and their prepetition secured lenders came to an agreement regarding the consensual use of cash collateral during these proceedings that will provide the Debtors with the breathing room necessary to continue retail sales while they market the valuable Le Tote and Lord & Taylor brands and proprietary technology in a process that the Debtors believe will maximize value for all stakeholders.  On August 2, 2020 (the "Petition Date"), the Debtors commenced these chapter 11 cases with the goal of maximizing the value of all estate assets for the benefit of creditors.

To further this goal, prior to the commencement of the chapter 11 cases the Debtors entered into a store closing agreement (as amended from time to time, the "Consultant Agreement") with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Consultant") to conduct store closing sales at their Lord & Taylor locations.  The Debtors commenced storewide sales at some of their locations prepetition, with the remaining stores commencing store closing sales following the Petition Date.

D.    *The 363 Process.*

In addition to the store closing sales, in April 2020, the Debtors commenced a prepetition marketing process for their Le Tote business, which process was later expanded to include the Lord & Taylor business in the summer of 2020.  Following a robust marketing process, on October 8, 2020, the Debtors selected ZG Apparel Group LLP to act as stalking horse bidder with respect to both the Le Tote and Lord & Taylor intellectual property and e-commerce assets.  Following a competitive auction, the Debtors' selected Saadia Group LLC's ("Saadia") $12 million bid (more than three times the size of the stalking horse bid) as the winning bidder.  The sale to Saadia closed on November 23, 2020.  The Debtors used the sale proceeds to pay down significant amounts of their senior secured debt, allowing the Debtors to repay their term loan obligations in full.

E.    *Postpetition Negotiations.*

The Debtors have sought to create consensus regarding the path forward for the Debtors' two remaining main assets—their potential litigation claims and their remaining inventory.  To that end, the Debtors funded an extensive investigation by their independent directors and (following the Petition Date) the Committee into the Acquisition and

3

related potential estate claims.  The Debtors' cash collateral orders negotiated with their senior secured lenders and the HBC Parties at the outset of these chapter 11 cases provided that the customary stipulations as to the validity of the HBC Parties' secured claims remained subject to these investigations until October 17, 2020 (the "Reservation of Rights Period").  As of the date of this Disclosure Statement, the Committee extended their Reservation of Rights Period by filing a motion to seek standing to prosecute certain estate claims, discussed later in this Disclosure Statement.  The Debtors' Reservation of Rights Period has been extended through January 7, 2021.

During the Reservation of Rights Period, the Debtors engaged in simultaneous negotiations with both the HBC Parties and the Committee, seeking to establish a plan framework that would resolve several long-standing business disputes between the Debtors and the HBC Parties, provide meaningful recovery to unsecured creditors, and avoid the need for costly (and inherently uncertain) litigation with the HBC Parties.  To that end, on October 22, 2020, after consulting with the Committee and the independent directors, the Debtors distributed a proposed settlement term sheet setting forth the framework of a potential global plan settlement.  Following delivery of this initial term sheet, the Debtors, the independent directors, and the HBC Parties engaged in more than a month of hard-fought negotiations regarding the potential settlement.  The Debtors also encouraged the Committee to participate in these negotiations including by providing regular updates as to the status of negotiations, sharing with the Committee a recovery model that would allow the Committee to evaluate potential distributions to both the HBC Parties and unsecured creditors, and sharing the Debtors' views as to how the Committee could constructively engage in direct negotiations with the HBC Parties.

Despite these efforts, the Debtors were unable to broker a global settlement between the Debtors, the HBC Parties, and the Committee.  It became apparent that the Debtors faced two alternative paths with respect to these chapter 11 cases.  First, the Debtors could pursue a chapter 11 plan premised on a value-maximizing settlement with the HBC Parties that maintained the valuable go-forward business relationship with the HBC Parties until the conclusion of the Debtors' store closing sales, while extracting valuable concessions from the HBC Parties to subordinate their secured claims in part to ensure payment of administrative and priority claims in full, a commitment to provide continued transition services at greatly discounted rates to the contractual amount, and an assurance that the Debtors' could extend their store closing sales to maximize distributable cash and provide a meaningful recovery to unsecured creditors.  In the alternative, the Debtors could pursue litigation against the HBC Parties, which would require the Debtors to either obtain the non-consensual use of cash collateral or pursue the litigation entirely on contingency and would significantly jeopardize the Debtors' ability to confirm a chapter 11 plan.

The Debtors, at the direction of their independent directors and in consultation with advisors, ultimately determined that the first path represented the superior outcome for all stakeholders, and will provide meaningful recovery to unsecured creditors.  Accordingly, the Debtors and their independent directors continued negotiations with the HBC Parties and reached an agreement in principle on the terms of the HBC Settlement on December 10, 2020.  The Debtors, at the direction of their independent directors, encouraged the Committee to engage further with the HBC Parties and join the HBC Settlement, but the Committee declined to do so.  Following the recommendation of the Debtors' independent directors, the Debtors' board of directors voted to approve the terms of the HBC Settlement on the same day.

F.       *Recommendation.*

The Debtors seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Stretto, the Debtors' Notice and Claims Agent (the "Notice and Claims Agent"), no later than **[February 12], 2020, at 5:00 p.m., prevailing Eastern Time** (the "Voting Deadline").  The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing (as defined herein).

## ARTICLE II.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

A.    *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan provides for the sale of assets (if not completed prior to Plan confirmation), the wind-down and dissolution of the Debtors' Estates, and for the making of distributions to Holders of Claims and Interests.  This Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.    *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Seller Note Secured Claim | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| 6 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 7 | Le Tote Interests | Impaired | Deemed to Reject |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving

distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan. As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

D.    *What will I receive from the Debtors if the Plan is consummated?*

The table below summarizes the treatment and projected recovery of all classified Claims and Interests against each Debtor (as applicable) under the Plan. **The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change. In particular, recoveries available to the Holders of General Unsecured Claims against various Debtors entities are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided below. In such an instance, the recoveries available to the Holders of General Unsecured Claims could be materially lower when compared to the estimates provided below.** To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| SUMMARY OF EXPECTED RECOVERIES[4] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[5] | Projected Recovery |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired. | $3.6 million | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors: (i) payment in full in Cash of such Allowed Other Secured Claim; (ii) the Collateral securing such Allowed Other Secured Claim; (iii) Reinstatement of such Allowed Other Secured Claim, notwithstanding any | $0 | 100% |

---

[4]    The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code. Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

[5]    These amounts reflect estimates as of the date hereof and may ultimately be higher or lower depending on, among other things, timely Filed Proofs of Claim.

| SUMMARY OF EXPECTED RECOVERIES[4] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[5] | Projected Recovery |
| | | contractual provision or applicable non-bankruptcy Law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired. | | |
| 3 | Seller Note Secured Claim | On the Effective Date, except to the extent that the HBC Parties agree to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for the Allowed Seller Note Secured Claim, each Holder of an Allowed Seller Note Claim shall receive payment of its Pro Rata share of the Distributable Cash allocated to the Seller Note Secured Claim, if any, pursuant to the Waterfall Recover. | $35.2 million | 32%[6] |
| 4 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Distributable Cash allocated to Allowed General Unsecured Claims, if any, pursuant to the Waterfall Recovery. | $82.8 million | 8%[7] |
| 5 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated, distributed, contributed, set off, settled, cancelled and released or otherwise addressed at the option of the Debtors; provided, that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |
| 6 | Intercompany Interests | In full and final satisfaction of each Allowed Intercompany Interest each Intercompany Interest shall be Reinstated solely to maintain the Debtors' corporate structure. | N/A | N/A |
| 7 | Le Tote Interests | Each Allowed Le Tote Interest shall be | N/A | N/A |

---

[6]    The projected recovery to holders of the Class 3 Seller Note Secured Claim does not include potential recoveries on account of proceeds of the litigation against Urban Outfitters, the value of which is not yet determined but the Debtors believe to be significant.

[7]    The projected recovery to holders of Class 4 General Unsecured Claims does not include potential recoveries on account of proceeds of the litigation against Urban Outfitters, the value of which is not yet determined but the Debtors believe to be significant.

Case 20-33332-KLP    Doc 710    Filed 12/21/20    Entered 12/21/20 10:33:17    Desc Main
Document    Page 21 of 175

| SUMMARY OF EXPECTED RECOVERIES[4] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[5] | Projected Recovery |
| | | canceled, released, and extinguished, and will be of no further force or effect and no Holder of Le Tote Interests shall be entitled to any recovery or distribution under the Plan on account of such Interests. | | |
| 8 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist. | N/A | 0% |

Based on the foregoing, (i) Holders of Claims in Class 3 and Class 4 are impaired under the Plan, and, therefore, are entitled to vote, (ii) Holders of Claims and Interests in Class 1, Class 2, and Class 6 are not impaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan, (iii) Holders of Claims and Interests in Class 7 and Class 8 are receiving no distribution under the Plan and, therefore, are deemed to reject the Plan, and (iv) Holders of Claims in Class 5 are either impaired or unimpaired and will be presumed to accept or deemed to reject the Plan.

E.    *Are any regulatory approvals required to consummate the Plan?*

There are no known U.S. regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

F.    *What happens to my recovery if the Plan is not confirmed or does not go effective?*

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions. It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article VIII of this Disclosure Statement, entitled "*Statutory Requirements for Confirmation of the Plan.*"

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a distinctly possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan. Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority.

G.    *What is the deadline to vote on the Plan?*

The Voting Deadline is [January 4], 2021, at 5:00 p.m., prevailing Eastern Time.

H.    *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan. For your vote to be counted, you must submit your Ballot in accordance with the instructions provided in Article III of this Disclosure Statement. **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

I.     *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims can only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article VI.G of this Disclosure Statement, entitled "*Conditions Precedent to Effective Date,*" for a discussion of the conditions precedent to consummation of the Plan.

"Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means: (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan. Note that Holders of certain types of Claims, such as General Unsecured Claims, may not receive any distributions until the Debtors or Wind-Down Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

J.     *What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.     <u>Administrative Claims and Priority Tax Claims</u>.

Except as otherwise provided in Article II.A of the Plan and except with respect to the TSA Shortfall Claim, Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Plan Administrator and/or Post-Effective Date Debtors no later than the applicable Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date**. Objections to such requests, if any, must be Filed and served on the Plan Administrator and/or Post-Effective Date Debtors and the requesting party on or before the Administrative Claim Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except with respect to the TSA Shortfall Claim, Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the Priority Claims Reserve the unpaid portion of its Allowed Administrative Claim on the latest of: (i) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (ii) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable, or with respect to a Holder of a Priority Tax Claim, treated in accordance with section 1129(a)(C) of the Bankruptcy Code; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served). Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or a Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

2.      Professional Compensation.

(a)      Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the [Confirmation] Date shall be Filed no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Post-Effective Date Debtors or the Plan Administrator, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

(b)      Professional Fee Escrow Account.

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Post-Effective Date Debtors without any further action or order of the Bankruptcy Court, and shall thereupon become Distributable Cash.

(c)      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Post-Effective Date Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)      Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Post-Effective Date Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

(e)      Substantial Contribution.

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors, the Committee,

and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

3.    Statutory Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors.  On and after the Effective Date, to the extent applicable, the Post- Effective Date Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Post-Effective Date Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

4.    TSA Shortfall Claim.

The TSA Shortfall Claim is Allowed.  On the Effective Date, and following the funding of the Priority Claim Reserve, the TSA Shortfall Claim shall be paid in full in Cash.

K.    *Will the final Amount of General Unsecured Claims affect my recovery under the Plan?*

Holders of General Unsecured Claims will receive their Pro Rata share of the Distributable Cash, if any, pursuant to the Waterfall Recovery.  In addition, Holders of General Unsecured Claims that (i) vote to accept the Plan, (ii) abstain from voting on the Plan and who do not affirmatively opt-out of the third-party releases contained in the Plan, or (iii) vote to reject the Plan and who do not affirmatively opt-out of the third-party releases contained in the Plan shall be deemed a Released Party for all purposes under the Plan.  Although the Debtors' estimate of General Unsecured Claims is ongoing, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided in the Plan, which difference could be material.

The projected amount of Allowed General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

L.    *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (i) all Holders of Claims or Interests that are deemed to accept the Plan and who do not opt out of the releases provided by the Plan, (ii) all Holders of Claims and Interests who vote to accept the Plan, and (iii) all Holders of Claims or Interests that abstain from voting on the Plan and who do not opt out of the releases provided by

the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fourth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article VI.F of this Disclosure Statement, entitled "*Settlement, Release, Injunction and Related Provisions*."

M.    *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **[February 22], 2021, at 1:00 p.m., prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

N.    *What is the purpose of the Confirmation Hearing?*

At the Confirmation Hearing, the Bankruptcy Court will determine if the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan.  Some of the key requirements for confirmation of a chapter 11 plan are that (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of creditors.  A plan is typically considered not to "discriminate unfairly" if similarly situated creditors do not received disparate recoveries without reasonable justification.  A plan will generally be considered "fair and equitable" with regards to unsecured creditors if it satisfies the absolute priority rule, meaning if a senior class of creditors rejects the plan, a more junior class of creditors cannot receive a recovery until the senior class is paid in full.  Finally, the "best interests" of creditors test means that a voting creditor must either accept the plan or receive more than they would in a hypothetical chapter 7 liquidation.  For a more detailed discussion of the Confirmation Hearing and the confirmation requirements, *see* Article VII of this Disclosure Statement.

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose prior to the effective date of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **[February 12], 2021, at 5:00 p.m., prevailing Eastern Time**.

O.      *Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Stretto:

> *By Regular mail, hand delivery or overnight mail at:*
>
> Le Tote Inc.
> c/o Stretto
> 410 Exchange, Suite 100
> Irvine, CA 92602
>
> *By electronic mail at:*
> TeamLeTote@Stretto.com
> *By telephone:*
> (855) 217-8030 (Toll Free)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at https://cases.stretto.com/letote (free of charge) or the Bankruptcy Court's website at https://ecf.deb.uscourts.gov (for a fee).

P.      *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which provides for the wind-down and dissolution of the Debtors' Estates and for distributions to Holders of Claims and Interests, is in the best interests of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

**ARTICLE III.
SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement is being distributed to the Holders of Claims in those Classes that are entitled to vote or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

A.      *Holders of Claims Entitled to Vote on the Plan.*

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in Article II of this Disclosure Statement provides a summary of the

status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3 and 4 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 5, 6, 7, and 8.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.       *Voting Record Date.*

**The Voting Record Date is [January 4], 2021**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.       *Voting on the Plan.*

**The Voting Deadline is [February 12], 2020, at 5:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Notice and Claims Agent on or before the Voting Deadline:

| **DELIVERY OF BALLOTS** |
| :---: |
| **Le Tote Inc. Balloting Processing Center**<br>**c/o Stretto**<br>**410 Exchange, Suite 100**<br>**Irvine, CA 92602**<br><br>**and/or**<br><br>**To submit your Ballot to the Notice and Claims Agent via electronic mail:**<br>**LeToteBallots@Stretto.com.** |

D.       *Ballots Not Counted.*

**No ballot will be counted toward Confirmation if, among other things**:  (1) any ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (2) any ballot cast by any Entity that does not hold a Claim in a Voting Class; (3) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (4) any unsigned ballot or ballot lacking an original signature (for the avoidance of doubt, a ballot submitted via the Notice and Claims Agent online balloting portal shall be deemed an original signature); (5) any ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (6) any ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,
> PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT**
>
> **(855) 217-8030 (Toll Free)**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
> NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

E.    *Confirmation Hearing.*

The Bankruptcy Court has scheduled the Confirmation Hearing for [February 22], 2021, 1:00 p.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [February 12], 2021, at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **<u>Exhibit C</u>** and incorporated herein by reference.

The Debtors will publish notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *New York Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

## ARTICLE IV.
## THE DEBTORS' BACKGROUND

A.    *Corporate History and Business Operations.*

1.    <u>Le Tote Corporate History</u>.

Conceived in 2012 when Brett Northart and Rakesh Tondon noticed that their wives had to constantly buy new clothes for maternity, work, events, and other occasions, the two co-founders aimed to answer a simple question: why should consumers pay full price to own clothes that they won't wear again?  The original concept, which launched in 2012, allowed customers to subscribe to a "tote" that included three garments and two accessories for one low monthly price.  Consumers received their totes in the mail and could return the items when they were ready for a new tote, with the option to purchase items at 20%-70% off retail price.  The Company, which operated out of Mr. Tondon's home during its first year, has grown from a small San Francisco-based start up to a market-leading fashion rental subscription service.  From 2014 to 2018, the Company grew at a compound annual growth rate of approximately 122% and increased revenue from $2.5 million to $60.8 million, before experiencing a decline in 2019.  Now with an advanced personalization algorithm and offerings from more than 150 brands, including French Connection, Vince Camuto, BCBGeneration, Sanctuary, Kate Spade, Rebecca Minkoff, Cole Haan, and Nike, Le Tote has been described as the "Netflix of fashion."

In March 2015, following two initial years of explosive growth, Le Tote introduced the "tote swap" personalization feature to its rental subscription platform, which increased interface functionality by allowing customers to view a snapshot of the five pieces that would be contained in their totes and swap items for 24 hours.  Shortly thereafter, prompted by high customer demand, the Company expanded its rental subscription offerings to include maternity clothing.  Based on customer feedback, the Company opened a waitlist to allow its customer base, including approximately 30% of customers who were mothers, to enroll in early access to Le Tote's maternity offerings.  As 2015 progressed, it became clear that Le Tote was "infectiously changing how consumers look[ed] at shopping."  In October of the same year, the Company debuted its mobile app, which provided customers with direct access to rent more than 150,000 pieces of clothing and accessories.

2.      <u>Le Tote China</u>.

In 2017, just five years after the launch of the original "tote" concept, Le Tote became the first U.S. fashion rental subscription service to enter the Chinese market—the world's largest e-commerce market.  Through a joint venture with an executive of China's largest shoe retailer, the Company launched Le Tote China (the "<u>Joint Venture</u>"). Before opening to the general public, the Joint Venture admitted a select group of 3,000 women for "beta" testing, which provided the admitted customers with premier access to Le Tote China's fashion rental subscription service and allowed the Joint Venture partners to navigate the Chinese consumer landscape.  Le Tote China opened to the general public in the winter of 2017.

The Joint Venture provides the same service as its U.S. counterpart to Chinese consumers:  the ability to rent unlimited clothing and accessories for a flat monthly fee.  Le Tote China is currently headquartered in Shenzhen, with satellite offices in Beijing, Shanghai, and Hong Kong and distribution centers in Dongguan, Beijing, and Shanghai. Le Tote is a direct, minority equity holder in Le Tote Venture Limited and thereby an indirect, minority equity holder in Le Tote (Hong Kong) Limited and Le Tote (Shenzhen) Technology Limited.  The entities that comprise the Joint Venture are not Debtors in these chapter 11 cases.

3.      <u>Lord & Taylor Corporate History</u>.

In 1824, Samuel Lord started a dry goods business in New York and, in 1826, opened the nation's first department store.  George Washington Taylor joined Samuel Lord in the enterprise in 1834, and the two renamed the store Lord & Taylor.  Lord & Taylor opened its second store in 1859 in New York's modern-day SoHo neighborhood and, by 1894, was growing quickly.  It would open stores on Fifth Avenue in 1903 and 1906 and become a publicly traded entity in 1904.  The Lord & Taylor Building, which housed Lord & Taylor's premier department store and corporate headquarters, opened in February of 1914 and, when Samuel Reyburn became president of Lord & Taylor in 1916, began the tradition of holiday window displays.  In 2007, the Lord & Taylor Building became a New York City Landmark.  Also in 1916, Lord & Taylor became a founding member of Associated Dry Goods Company (later Corporation), an association of independent department stores, and was considered to be its "crown jewel."

In the years following World War II, Lord & Taylor thrived, led by company president Dorothy Shaver, the first woman to head a major retail establishment in the United States.  Under Shaver, Lord & Taylor launched its first suburban branch stores, introduced the concept of personal shoppers, and commissioned Lord & Taylor's iconic logo. In 1986, the May Department Stores Company acquired Associated Dry Goods, including Lord & Taylor and other retail chains, in what was considered the largest ever retail acquisition at the time.  Federated Department Stores (now Macy's) later acquired May Department Stores Company in 2005, and, in 2006, sold Lord & Taylor to National Retail and Development Company Equity Partners ("<u>NRDC</u>"), which held it privately.  In 2008, NRDC acquired HBC and positioned Lord & Taylor under the HBC umbrella in 2012.

(a)      Le Tote's Acquisition of Lord & Taylor.

In November 2019, Le Tote completed the Acquisition of certain assets comprising the Lord & Taylor business from HBC Holdings and HBC Propco, including an online retail platform, leases for 38 brick-and-mortar Stores situated throughout the United States, the inventory located at the Stores (or in HBC's distribution centers and available for sale in the Stores), and Lord & Taylor intellectual property.  The Acquisition expanded the range of clothing styles offered by Le Tote in its subscription-based service and represented the first acquisition of a long-standing brick-and-mortar retailer by a "digitally native" brand.[8]  Further, Le Tote hired the vast majority of Lord & Taylor's Store employees and entered into the Transition Services Agreement, pursuant to which HBC Holdings and HBC Propco must provide certain general and administrative functions related to the Lord & Taylor business to Le Tote through 2021 (subject to extension in accordance with the terms of the Transition Services Agreement) to assist with integration of the Lord & Taylor business into Le Tote.

---

[8]    Digitally native brands are companies that have only existed in the digital world, transacting primarily online with little or no brick-and-mortar presence.

Pursuant to the APA, HBC Propco is obligated to pay fixed and percentage rent (excluding common area maintenance and other similar charges) (the "Operating Rent") from November 8, 2019, until November 8, 2022 (the "Rent Payment Period"). Only thereafter is Le Tote obligated to pay Operating Rent. The Stores are also subject to certain "Put" (by Le Tote) and "Call" (by HBC) rights under the APA. Upon the exercise of a "Put" or "Call" after the expiration of the Rent Payment Period, Le Tote has no obligation to pay Operating Rent for the applicable Store, the lease with respect to which would be transferred back to affiliates of HBC. During the Rent Payment Period and thereafter, unless a "Put" or a "Call" has been exercised and effectuated, Le Tote is obligated to pay all other amounts related to the operation of the Stores due under any lease with respect to any Store, including all common area maintenance and similar charges (*e.g.*, insurance, utilities and services, and real estate taxes).

As discussed in further detail herein, Le Tote financed the purchase price of the Acquisition through: (a) $75 million in cash (subject to adjustments as specified in the APA), including cash borrowed under a senior secured asset-based revolving credit facility (the "ABL Credit Facility") and a secured term loan credit facility (the "Term Loan Credit Facility"), (b) issuing two secured promissory notes to HBC Propco in the original principal amount of approximately $57 million in the aggregate, and (c) issuing preferred shares, convertible into approximately 25% of Le Tote's post-closing issued and outstanding equity on a fully diluted basis, to HBC Propco. In connection with the Acquisition, HBC Propco also received the right to designate two seats to Le Tote's board of directors. Both of HBC Propco's designees to the board resigned in March 2020 and HBC Propco no longer has any voting securities or other equity securities of the Debtors.

<div align="center">(b)    The Transition Services Agreement.</div>

Le Tote, HBC Holdings, and HBC Propco, are also party to the Transition Services Agreement, dated as of November 8, 2019, pursuant to which Le Tote receives a wide variety of services, including accounting, human resources, IT services, and merchant support, among others, from HBC Holdings and HBC Propco on a transitional basis in connection with the Acquisition.

Since the Acquisition, certain service categories under the Transition Services Agreement have already been terminated, but with the majority of the Stores closed due to the COVID-19 pandemic, certain services under the Transition Services Agreement remain mission-critical, specifically those services that support the Lord & Taylor e-commerce operations. As discussed above, in April 2020 Le Tote successfully renegotiated the Transition Services Agreement, resulting in a reduced array of services and greatly reducing their go-forward payment obligations.

<div align="center">4.    Critical Components of Le Tote's Cost Structure.</div>

<div align="center">(a)    Supply Chain.</div>

The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise for Le Tote's fashion rental subscription service, the Lord & Taylor e-commerce website, and the brick-and-mortar Lord & Taylor locations. Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign manufacturers. In limited circumstances, the Debtors contract with foreign manufacturers directly. Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the Debtors ship the merchandise to a domestic warehouse that serves as the Debtors' distribution center.

<div align="center">(b)    Employee Compensation and Benefits.</div>

The Debtors currently employ approximately 651 employees (collectively, the "Employees"), including approximately 480 salaried Employees and approximately 170 hourly Employees. Prior to the Petition Date, the Debtors made the difficult decision to lay off approximately 130 Le Tote Employees and approximately 980 Lord & Taylor Employees due to the COVID-19 pandemic. The Debtors furloughed a significant number of additional Employees, recalling such Employees throughout the incremental reopening of the Stores.

(c)    Digital Service Expenses.

As an internet based "digitally native" brand, the Debtors incur significant digital expenses on account of the Le Tote rental subscription service and, now, the Lord & Taylor e-commerce website.  Services related to these two e-commerce platforms include information technology, marketing, photo studio, creative, site merchandising, labor and fulfillment, shipping, and credit card processing.  Under normal volumes, the Debtors would expect to spend approximately $5 million per month on account of expenses relating to the Le Tote and Lord & Taylor digital platforms.  Many of these services are delivered pursuant to the Transition Services Agreement.  Consequently, the costs of such services have been reduced in connection with the renegotiation of the Transition Services Agreement and as a result of reduced volume due to the COVID-19 pandemic.

B.    *The Debtors' Prepetition Corporate and Capital Structure.*

The Debtors' corporate enterprise consists of Debtor entities Le Tote, Inc., French Tote LLC, a Delaware limited liability company ("French Tote"), Le Tote, LLC, a Delaware limited liability company, Lord & Taylor LLC, a Delaware limited liability company ("L&T"), and LT Card Company LLC, a Virginia limited liability company ("LT Card"), and non-Debtor entities, related to the operations of Le Tote China, Le Tote Venture Limited, an exempted company incorporated with limited liability in the Cayman Islands, Le Tote (Hong Kong) Limited, a company incorporated in Hong Kong with registered number 2534318, and Le Tote (Shenzhen) Technology Limited, a company incorporated in the People's Republic of China.  A simplified illustration of the Company's corporate structure is set forth below.[9]

---

[9]    A more detailed capital structure, attached hereto as **Exhibit B**, depicts the Debtors' corporate structure, as well as the Debtors' various debt obligations.



As of the Petition Date, the Debtors have outstanding secured debt obligations in the aggregate principal amount of approximately $137.9 million under: (a) the ABL Credit Facility; (b) the Term Loan Credit Facility; and (c) a promissory note, dated as of November 8, 2019, issued to HBC Propco with a maturity of November 8, 2021 (the "Seller Note"). The Debtors' aggregate prepetition secured debt obligations are depicted in the table below.

| Secured Debt | Agent / Beneficiary | Maturity | Commitment / Original Principal Amount | Outstanding Principal Amount |
|---|---|---|---|---|
| ABL Credit Facility | Wells Fargo, N.A. | Nov. 8, 2024 | $225 million | $77.2 million |
| Term Loan Credit Facility | TCG BDC, Inc. | Nov. 8, 2024 | $30 million | $31.5 million |
| Seller Note | HBC US Propco Holdings LLC | Nov. 8, 2021 | $30.4 million | $35.2 million[10] |
| **Total Secured Debt** | | | | **$143.9 million** |

---

[10]  The Seller Note balance includes approximately $4.7 million in obligations related to the Debtors' unpaid prepetition common area maintenance and real estate tax liabilities.

1.    The ABL Credit Facility.

The Debtors are party to that certain Credit Agreement, dated as of November 8, 2019 (as amended by Amendment No. 1 to the Credit Agreement, dated as of January 9, 2020, and Amendment No. 2 to the Credit Agreement, dated as of March 23, 2020, and as further amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "ABL Credit Agreement"), by and among Le Tote, Inc., as lead borrower, French Tote, Le Tote, LLC and L&T, as additional borrowers, LT Card, as guarantor party thereto (collectively, the "Le Tote Loan Parties"), Wells Fargo Bank, National Association ("Wells Fargo"), in its capacity as administrative and collateral agent (the "ABL Agent"), and each of the lenders from time to time party thereto (the "ABL Lenders"). The ABL Credit Facility provides for commitments of $225 million under the ABL Credit Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of November 8, 2024.

The obligations under the ABL Credit Facility are secured by a first-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory. As of the Petition Date, in the aggregate, approximately $77.2 million remained outstanding under the ABL Credit Facility. On December [●], 2020, following the payment in full of the ABL Credit Agreement the Debtors and the ABL Agent entered into a Termination Agreement terminating the ABL Credit Agreement and releasing liens over the Debtors' assets, subject to the satisfaction of certain continuing obligations.

2.    The Term Loan Credit Facility.

The Le Tote Loan Parties are also party to that certain Term Loan Agreement, dated as of November 8, 2019 (as amended by Amendment No. 1 to the Term Loan Agreement, dated as of January 9, 2020, and Amendment No. 2 to the Term Loan Agreement, dated as of March 23, 2020, and as further amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Term Loan Credit Agreement"), by and among the Le Tote Loan Parties, TCG BDC, Inc. ("Carlyle"), in its capacity as administrative agent and collateral agent (the "Term Loan Agent"), and each of the lenders from time to time party thereto (the "Term Loan Lenders"). The Term Loan Credit Agreement provides for a $30 million Term Loan Credit Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of November 8, 2024.

The obligations under the Term Loan Credit Facility are secured by a second-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory. As of the Petition Date, in the aggregate, approximately $31.5 million remains outstanding under the Term Loan Credit Facility. On December 17, 2020, following the payment in full of the Term Loan Credit Agreement the Debtors and the Term Loan Agent entered into a Termination Agreement terminating the Term Loan Credit Agreement and releasing liens over the Debtors' assets, subject to the satisfaction of certain continuing obligations.

3.    The Seller Note.

In addition to the ABL Credit Facility and Term Loan Credit Facility, Debtor Le Tote, Inc. issued the Seller Note, in aggregate principal amount of approximately $30 million, and an inventory note, in aggregate principal amount of approximately $27 million, to HBC Propco to partially finance the Acquisition and inventory in connection therewith. The inventory note was repaid in December 2019. The Seller Note bears 0% interest through November 8, 2021, and 12% per annum thereafter. The obligations under both notes are guaranteed by Debtors French Tote, L&T, LT Card, and Le Tote, LLC.

The obligation under the Seller Note are secured in favor of HBC Propco (in such capacity, the "Junior Creditor Representative") by a third-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory. As of the Petition Date, in the aggregate, approximately $35.2 million was outstanding under the Seller Note.

4.    The Transition Services Agreement Obligations.

To facilitate the integration of Lord & Taylor, Le Tote, HBC Holdings, and HBC Propco entered into the Transition Services Agreement, which obligates HBC Holdings and HBC Propco to provide certain transition services to Le Tote. Pursuant to the terms of the Transition Services Agreement, HBC Propco is required to provide monthly invoices to the Debtors, and the Debtors are required to pay such invoices within 30 days of receipt. The Transition Services Agreement provides for a grace period of 15 business days, with respect to the payment of obligations thereunder. The Debtors' obligations under the Transition Services Agreement are guaranteed by the Le Tote Loan Parties and are cross-securitized with the collateral that secures the Seller Note (such obligations, collectively, the "Secured Acquisition Obligations"). In connection with the investigation being undertaken by the Restructuring Committee as described below, the Debtors investigated certain claims and causes of action with respect to the Secured Acquisition Obligations, which claims are settled pursuant to the HBC Settlement.

On March 23, 2020, the Debtors elected to enter the 15 business day grace period provided under the Transition Services Agreement, with respect to approximately $4 million of obligations due thereunder. After suspending payments, the Debtors commenced renegotiation of the Transition Services Agreement in earnest. Subsequently, on April 10, 2020, the Debtors, HBC Holdings, and HBC Propco executed the Omnibus Agreement, subject to a reset to pre-Omnibus Agreement pricing for "fixed non-payroll costs related to technology" following October 31, 2021 and a global reset to pre-Omnibus Agreement pricing beginning on January 1, 2021. The Omnibus Agreement greatly reduced the Debtors' go-forward payments under the Transition Services Agreement.

In connection with the HBC Settlement, the Debtors and the HBC Parties have resolved certain disputes related to the calculation of "fixed non-payroll costs related to technology" under the Omnibus Agreement. Additionally, the HBC Settlement provides that the HBC Parties continue to provide services under the Transition Services Agreement in January and February 2021 for total discounted payments of $513,017 per month, thereby providing substantial value to the Debtors' estates by continuing access to transition services at a significantly reduced expense.

5.    The ABL Intercreditor Agreement.

The ABL Agent and Term Loan Agent, as representatives of the ABL Lenders and Term Loan Lenders, as applicable, are parties to that certain Intercreditor Agreement, dated as of November 8, 2019 (the "ABL Intercreditor Agreement"). The ABL Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders and the Term Loan Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions. As detailed in the ABL Intercreditor Agreement, the ABL Lenders have priority over, and are senior in all respects, to the Term Loan Lenders with respect to the Collateral (as defined therein).

Section 6.2 of the ABL Intercreditor Agreement provides that, in the event of a chapter 11 filing, if the ABL Lenders consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing secured by any portion of the Collateral, then the Term Loan Lenders agree not to raise any objection on the grounds of a failure to provide "adequate protection" for the liens in favor of the Term Loan Lenders or request adequate protection (except as provided below), so long as the Term Loan Lenders retain their liens on the Collateral with the same priority as existed before, the liens on the Collateral securing any such debtor in possession financing are senior to or pari with the liens on the Collateral securing the ABL Lenders, the size of the debtor in possession financing does not exceed the maximum size provided for in the ABL Intercreditor Agreement, and the debtor in possession financing does not require the Debtors to seek confirmation of a specific plan of reorganization. In addition, the same section of the ABL Intercreditor Agreement requires the ABL Lenders and the Term Loan Lenders to subordinate the Prepetition Liens under any debtor in possession financing facility as well as any "carveout" for professional or United States Trustee fees, in each case, with respect to the Collateral. Section 6.04 of the ABL Intercreditor Agreement also provides that if the ABL Lenders receive adequate protection with respect to the Collateral, then the Term Loan Lenders shall have the right to seek their own adequate protection; *provided that* such adequate protection is subordinate to any adequate protection provided to the ABL Lenders with respect to the Collateral.

6.      The Seller Intercreditor Agreement.

The ABL Agent, the Term Loan Agent (together with the ABL Agent, the "Senior Agents"), as representatives of the ABL Lenders, Term Loan Lenders, and the Junior Creditor Representative, as representative of HBC Propco, respectively, are parties to that certain Seller Intercreditor Agreement, dated as of November 8, 2019 (the "Seller Intercreditor Agreement").  The Seller Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders and Term Loan Lenders (collectively, the "Senior Creditors") and HBC Propco (the "Junior Creditor") relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Credit Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.  As detailed in the Seller Intercreditor Agreement, the Senior Creditors have priority over, and are senior to in all respects, to the Junior Creditor with respect to the Collateral (as defined in the Seller Intercreditor Agreement).

Section 5.2 of the Seller Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the Senior Creditors consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing, the Junior Creditor agrees not to raise any objection.  Section 5.4 of the Seller Intercreditor Agreement provides that if the Senior Creditors receive adequate protection in the form of additional or replacement liens on the Collateral or additional or replacement collateral, then the Junior Creditor shall have the right to seek its own adequate protection; *provided that* such adequate protection is subordinate to any adequate protection provided to the Senior Creditors.

**ARTICLE V.**
**EVENTS LEADING TO THESE CHAPTER 11 CASES & MATERIAL DEVELOPMENTS**

A.      *Market Distress.*

1.      Challenging Operating Environment and Transition Obligations.

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These include: (a) the general downturn in the retail industry and the shift away from shopping at brick-and-mortar stores, which has led to a decrease in sales; (b) a challenging commercial environment over the past several years brought on by increased competition from retailers like Walmart and Amazon; and (c) the enormous impact of the COVID-19 pandemic, which has forced retailers across the country to stomach the expense of brick-and-mortar assets which were rendered unusable for a prolonged period of time.  Over time, these factors tightened the Debtors' liquidity and complicated their vendor relationships, culminating in a liquidity crisis by the end of March 2020, when the Debtors faced dwindling cash flows, inaccessible inventory, and the inability to access even incremental liquidity.  The combination of the above factors precipitated these chapter 11 cases.

2.      The COVID-19 Pandemic.

Demand for discretionary retail products plummeted during the COVID-19 pandemic as consumers prioritize—with good reason—their health and maintaining a source of income.  In this environment, most discretionary retail products are an unnecessary luxury for many consumers.  To combat the unprecedented global spread of COVID-19, the majority of states, and many foreign governments, temporarily shuttered all "non-essential" businesses—stores that trade in discretionary (clothing, home furnishings, electronics, beauty) as opposed to life-preserving products (food, pharmacies, cleaning supplies).  Mass merchandisers, such as Walmart, which sell food and household supplies in addition to traditional retail items, were allowed to remain open—increasing the already extreme competition in the retail market.

In the wake of COVID-19, the Debtors placed all of their vendors (including the service providers under the Transition Services Agreement) on hold, laid off approximately 130 Le Tote Employees and approximately 980 Lord & Taylor Employees, furloughed a significant number of additional Employees, and temporarily closed all Lord & Taylor Stores.  Prior to the Petition Date, the Debtors reopened their Lord & Taylor locations and recalled certain furloughed Employees to operate the reopened Stores.  COVID-19 also caused a drop in subscriptions for Le Tote as the Company's subscriber base suffered from the wave of job losses gripping the country and the demand for

apparel diminished due to hundreds of millions of Americans being affected by stay-at-home orders.  As a result of these and other factors, the Debtors' revenue declined precipitously from forecasts.

      B.    *Prepetition Restructuring Efforts.*

      1.    <u>Efforts to Manage Liquidity</u>.

In response to the liquidity shortfall, the Debtors engaged Berkeley Research Group, LLC ("<u>BRG</u>") to act as their financial advisor, to assist in managing their cash flows in response to these unprecedented crises.  BRG and the Debtors' management analyzed the Debtors' cash flows and prepared "mothball" forecasts to manage the Debtors' liquidity despite a significant revenue decline.  As noted above, the Debtors significantly reduced their cash burn by suspending payments to vendors, furloughing Store employees, and initiating significant layoffs at their corporate office.  On March 29, 2020, in connection with the Debtors' restructuring efforts, Ed Kremer was appointed as Chief Restructuring Officer.

The Debtors also engaged in negotiations with the ABL Agent and the Term Loan Agent to continue operating their business in their "mothball" period notwithstanding the existence of several defaults under the ABL Credit Agreement and the Term Loan Credit Agreement.  On June 23, 2020, the Debtors entered into forbearance agreements (the "<u>Forbearance Agreements</u>") with each of the ABL Agent and the Term Loan Agent whereby the respective agents agreed to forbear from exercising remedies based on these defaults.  The Forbearance Agreements provided a bridge for the Debtors to reopen their Lord & Taylor locations in advance of the Petition Date, thereby enhancing the ability of the Debtors to maximize value for the benefit of all stakeholders.

      2.    <u>Negotiations with HBC</u>.

In response to liquidity pressures and increased costs under the Transition Services Agreement, the Debtors undertook multiple efforts to reach a mutually agreeable re-negotiation of certain terms (including payment and economic terms) of the Transition Services Agreement or a temporary deferral of payment under the Transition Services Agreement to ensure the continued provision of essential services.  On March 23, 2020, the Debtors elected to forego their payment obligations under the Transition Services Agreement and enter the 15 business day grace period thereunder.  HBC Holdings and HBC Propco promptly issued a notice of non-payment indicating the Transition Services Agreement would be terminated on April 13, 2020, unless the Debtors cured the payment default.  After suspending payments under the Transition Services Agreement, the Debtors and their advisors engaged in hard-fought negotiations with HBC and its affiliates in an effort to restructure the payment obligations under the Transition Services Agreement and limit go-forward services to only those services necessary in a post-COVID-19 world.

Consequently, on April 10, 2020, the Debtors, HBC Holdings, and HBC Propco executed the Omnibus Agreement, which withdrew the notice of non-payment and reset the balances owing under the Transition Services Agreement to zero.  Pursuant to the Term Sheet, HBC Holdings and HBC Propco committed to provide the Debtors with services relating to the operation of the Debtors' e-commerce platforms and certain financial and accounting functions, among others, through December 31, 2020 while agreeing to stop providing certain services that were no longer needed in light of the scaled-down nature of the Debtors' enterprise.  In consideration for such go-forward services, the Debtors agreed to pay HBC Holdings and HBC Propco approximately $550,000 per month, in advance, weekly variable payments, invoiced weekly in arrears, and weekly variable deposits, equal to 75% of such weekly variable payments as deposits against future invoices.  Beginning on January 1, 2021, absent the HBC Settlement, payments under the Transition Services Agreement will revert to the terms set forth in the Transition Services Agreement without giving effect to the modifications described in the Omnibus Agreement.  The Omnibus Agreement greatly reduced the size of the Debtors' go-forward payments under the Transition Services Agreement and resolved a potential cross-default under the Debtors' secured credit facilities.

      3.    <u>Store Closing Sales</u>.

The current Store footprint is unsustainable in light of the Debtors' strained liquidity.  Contemporaneously with the Plan, the Debtors have filed a motion requesting authority to market Le Tote and Lord & Taylor pursuant to certain bidding procedures and a motion requesting authority to implement customary Store closing procedures.  The

Debtors are committed to achieving the highest or otherwise best bid for Le Tote and/or Lord & Taylor by marketing those assets pursuant to the bidding procedures, and, if necessary, conducting an auction for such assets as well as any additional assets of the Debtors. The Debtors anticipate that any Stores which a potential purchaser does not seek to acquire will be wound down through Store closing sales. As discussed above, the Debtors entered into the Consultant Agreement with the Consultant to conduct these Store closing sales. The Debtors evaluated other national liquidation firms before selecting the Consultant and believe that that the terms set forth in the Consultant Agreement, including a percentage fee based on the proceeds from asset dispositions, are the best alternative for the conduct of asset sales and Store closures. The Debtors believe that utilizing the skills and resources of the Consultant to effectively and efficiently conduct the sales and Store closings will maximize value for all stakeholders.

## ARTICLE VI.
## EVENTS OF THE CHAPTER 11 CASES

A.    *First Day Relief.*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Ed Kremer, Chief Restructuring Officer, of Le Tote, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 15], filed on the Petition Date.

The First Day Motions, and all orders for interim and final relief granted in the chapter 11 cases can be viewed free of charge at https://cases.stretto.com/letote.

B.    *Approval of Use of Cash Collateral*

On August 28, 2020, the Bankruptcy Court entered the Cash Collateral Order approving the Debtors' use of cash collateral on a final basis [Docket No. 268]. The Cash Collateral Order authorized the Debtors, among other things, to use Cash Collateral and granted adequate protection to the Prepetition Agents and Prepetition Secured Parties and their interests in the prepetition collateral pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code.

On December 9, 2020, following the payment in full of the ABL and Term Loan Obligations, the Debtors filed a second cash collateral motion seeking approval of an agreed successor cash collateral order with the HBC Parties. [On December [●], 2020, the Bankruptcy Court entered the successor cash collateral order.]

C.    *Schedules and Statements*

On the Petition Date, the Debtors filed a motion [Docket No. 13] seeking entry of interim and final orders granting an extension of time through and including August 30, 2020 to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements"). On August 27, 2020, the Bankruptcy Court entered a final order approving this extension motion [Docket No. 264]. On August 30, 2020, the Debtors filed their Schedules and Statements.

D.    *Appointment of Official Committee*

On August 12, 2020, the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") filed the *Appointment of Unsecured Creditors Committee* [Docket No. 117], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors in the Chapter 11 Cases. The Committee is currently comprised of the following members: (a) The CIT Group/Commercial Services, Inc., (b) G-III Leather Fashions, Inc., and (c) Liquidity Capital II, L.P. The Committee retained Cooley LLP as its legal counsel and BDO

Consulting Group, LLC as their financial advisors.  The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on September 3, 2020.

E.    *Sale Process and Bidding Procedures*

In April 2020, the Debtors retained HMAdviseCo, LLC d/b/a Nfluence Partners ("Nfluence") to commence a prepetition marketing process of the Debtors' Le Tote business.  Shortly thereafter, the Debtors, in the exercise of their business judgment, determined to market the Lord & Taylor business in parallel.  With the assistance of Nfluence, the Debtors prepared a list of approximately 78 potential acquirers (including various financial sponsors and strategic buyers) that were considered likely participants in a sale process of both the Le Tote and Lord & Taylor business.  The Debtors also identified 30 additional parties that were considered potential acquirers of solely the Le Tote business and 15 additional parties that were considered potential acquirers of solely the Lord & Taylor business.  Following the initial outreach to the identified 128 parties, information was provided to these parties to gauge their interest prior to executing a non-disclosure agreement ("NDAs").  Of these 128 total parties, approximately 69 parties entered into confidentiality agreements with the Debtors (inclusive of several purchasers who signed NDAs for each of Lord & Taylor and Le Tote).  Several potential counterparties requested additional information and received access to a virtual data room and/or conducted in-person meetings with the Debtors' management or telephonic diligence meeting with Nfluence.  Through the course of the marketing process, the Debtors financial advisor BRG increased its responsibilities regarding the marketing of the Lord & Taylor assets by leveraging its unique experience in the retail restructuring sphere to supplement the work of Nfluence, as it related to the sale of Lord & Taylor assets.

On August 28, 2020, the Court entered the *Order (I) Establishing Bidding Procedures, (II) Scheduling Bid Deadlines and Auctions, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 269] (the "Bidding Procedures Order"), authorizing the Debtors to conduct an auction (the "Auction").  The Bidding Procedures also allowed substantial flexibility, with respect to the structure of any transaction and allowed the Debtors to select a party to serve as a stalking horse bidder.  On October 8, 2020, pursuant to and in accordance with paragraphs 16 and 17 of the Bidding Procedures Order, the Debtors selected ZG Apparel Group LLP to act as the stalking horse bidder (the "Stalking Horse Bidder").  The terms of the stalking horse bid provided for, among other things, (a) the acquisition of certain of the Le Tote Assets and Lord & Taylor Assets by the Stalking Horse Bidder and (b) a cash break-up fee equal to 3% of the cash payment of the purchase price.

On October 15, 2020, pursuant to the Bidding Procedures Order, the Debtors conducted the Auction, with respect to the Debtor's assets.  At the conclusion of the Auction, the Debtors, in consultation with their professionals, selected Saadia Group LLC's ("Saadia") $12 million bid—more than three times the purchase price of the Stalking Horse Bidder— for the Debtors' intellectual property and e-commerce assets as the successful bid and filed the *Notice of Successful Bidder and Backup Bidder with Respect to the Auction of the Debtors' Assets* [Docket No. 450].  On October 16, 2020, the Debtors and Saadia entered into an asset purchase agreement (the "APA") with the Saadia that called for a deadline to close the sale by November 23, 2020.  On October 22, 2020, the Court entered an order approving the APA [Docket No. 473].

On November 18, 2020, Debtors fulfilled their contractual obligations required to close the sale by the November 23 deadline.  Despite this, Saadia refused to commit to closing by November 23, 2020.  On November 21, 2020, Saadia moved for injunctive relief to prevent the Debtors from terminating the APA in the event that Saadia did not fulfil its contractual obligation to close the sale by the closing date [Docket No. 574].  After an expedited hearing on the matter on November 22, 2020, the Court denied the motion [Docket No. 585].  The sale closed on November 23, 2020.

The proceeds of the sale were distributed as follows, with a net to the estate of $130,362.95:

- $1,176,099.72 to Wells Fargo, N.A., in full satisfaction of outstanding amounts owed in connection with the ABL Facility;

- $9,831,037.33 to TCG BDC, Inc., in full satisfaction of outstanding amounts owed in connection with the Term Loan Facility;

- $112,500.00 to the Stalking Horse Bidder, on account of the Break-Up Fee owed in connection with the Bidding Procedures Order; and

- $750,000.00 to Nfluence, on account of the Success Fee owed in connection with their Engagement Letters and the retention order entered by the Court [Docket No. 392].

On December 7, 2020, the Debtors filed the *Debtors' Report for the Sale of the Acquired Assets Pursuant to Local Bankruptcy Rule* [Docket No. 645].

F.    *Store Closing Process*

Prior to the Petition Date, the Debtors commenced store closings and similar themed sales at their Lord & Taylor store locations and through their Lord & Taylor e-commerce platform.  On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Assume the Consulting Agreement, (B) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (C) Authorizing and Approving the Store Closing Procedures, (D) Authorizing Customary Bonuses for Employees of Closing Stores and (E) Granting Related Relief* [Docket No. 16], seeking approval to:  (i) assume the Letter Agreement Governing Inventory Disposition, dated April 17, 2020, by and between Le Tote and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Consultant"), as amended by the Consulting Agreement, (ii) approve the Store Closings, (iii) authorize the Store Closing Bonuses, (iv) approve the Store Closing Procedures, and (v) grant related relief.  On August 28, 2020, the Bankruptcy Court entered the final order approving the store closing motion [Docket No. 266].

G.    *Extension Order*

As discussed in the First Day Declaration, one of the principal terms of Le Tote's acquisition of Lord & Taylor from HBC under the APA is that under the APA the Debtors are not obligated to pay rent (other than common area maintenance and taxes) until November 2022.  Only thereafter is Le Tote obligated to pay rent.

As part of the Debtors' comprehensive efforts to respond to operational challenges imposed by COVID-19, on August 7, 2020, as well as the dispute with HBS, the Debtors filed a motion seeking an extension under section 365(d)(3) of the Bankruptcy Code of the time to pay certain, if any, monetary lease obligations (the "Lease Obligations") under their unexpired leases of nonresidential real property for 60 days, through and including October 1, 2020 [Docket No. 112].  The Bankruptcy Court entered an order granting the requested relief through October 1, 2020, on August 28, 2020 [Docket No. 264] (the "Extension Order").

H.    *Key Employee Incentive Program*

On August 31, 2020, the Debtors filed the *Debtors' Motion for* Entry *of an Order (A) Authorizing and Approving the Debtors' Key Employee Incentive Plan and (B) Granting Related Relief* (the "KEIP Motion") [Docket No. 276], seeking approving of the Debtors' Key Employee Incentive Plan ("KEIP").  Following negotiations with the Committee and secured creditor The Carlyle Group, the Debtors negotiated a revised KEIP order.  At a hearing held on September 23, 2020, Debtors' sought approval of the revised KEIP.  On September 29, 2020, the court entered an order [Docket No. 276] approving the KEIP over the U.S. Trustee's objection.

I.    *Wilmington Trust Litigation*

At the Debtors' first day hearing, Wilmington Trust, N.A. ("Wilmington Trust") as the Trustee-in-Trust for Holders of Hudson's Bay Simon JV Trust 2015- HBS, Commercial Mortgage Pass-Through Certificates, Series 2015-HBS (the "CMBS Trust"), asserted that the Debtors should be liable to pay rent directly to the CMBS Trust for 24 of the Debtors' 38 stores (the "Financed Stores") whose underlying fee interests are subject to security interests held by the CMBS Trust. The CMBS Trust has taken the position that it is entitled to receive directly from the Debtors rent and other operating costs owed to the Landlords.  The Debtors disputed these allegations as did the Debtors' actual landlord for the Financed Stores—a joint venture between HBC and the Simon Property Group ("HBS").  On September 4, 2020, Wilmington Trust moved to establish standing to compel payment of rent and to

assert related rights [Docket No. 299).  After extensive briefing and oral arguments, on October 30, 2020, the Court issued an order [Docket No. 497] and *Memorandum Opinion* [Docket No. 496], denying Wilmington Trust's motion.  On November 13, 2020, Wilmington Trust filed an appeal of the order and opinion [Docket No. 543].

J.        *Investigation of Estate Causes of Action by the Debtors.*

1.        Appointment of Restructuring Committee.

Prior to the Petition Date, in connection with their restructuring efforts, the Board of Directors (the "Board") of Le Tote, acting on behalf of itself and the other Debtor entities, established a special committee (the "Restructuring Committee") of independent directors to explore, review, evaluate and negotiate strategic restructuring alternatives and, as approved and directed by the Board, implement those strategic restructuring alternatives.  To that end, on April 16, 2020, the Debtors established the Restructuring Committee and appointed two independent directors, Pamela B. Corrie and Matthew R. Kahn, to serve on the Restructuring Committee.  In addition to their regular role as board members, the Restructuring Committee has conducted an independent investigation (the "Investigation") into certain potential claims and causes of action held by the Debtors' Estates.  The Investigation is focused on weighing the merits of any claims against insiders or third parties, including those arising in connection with the Acquisition.  To that end, the Restructuring Committee retained Katten Muchin Rosenman LLP ("Katten") as independent counsel, and BRG served as financial advisors to the Restructuring Committee.  Beginning in April 2020, the Restructuring Committee met regularly with the Debtors and their advisors to evaluate the merits of proposed transactions.

2.        Summary of the Investigation.

In the course of conducting the Investigation, Katten, on behalf of the Restructuring Committee, collected and reviewed documents and information from (among other sources) the Debtors, the Debtors' advisors, and HBC.  Katten reviewed tens of thousands of pages of documents and conducted interviews of six members of the Debtors' management team.  While the Committee conducted its own independent investigation, in order to minimize cost and avoid duplication of effort, Katten and BRG also collaborated with the Committee's advisors, sought and obtained input from the Committee's advisors concerning potential claims and matters of concern to the Investigation, and diligently pursued avenues of inquiry suggested by the Committee's advisors.

Katten, with the assistance of BRG, researched and analyzed the merits of potential claims held by the Debtors' Estates against HBC and certain other third parties.  In September 2020, Katten provided to the Restructuring Committee a comprehensive presentation regarding its preliminary findings and conclusions with respect to the Investigation, and thereafter has provided the Restructuring Committee with certain supplemental presentations and analyses.

3.        Claims Investigated.

In the Investigation, Katten analyzed potential estate causes of action relating to, among other things, the Acquisition and the Debtors' business relationship with HBC.  For example, the Investigation analyzed potential claims and causes of action held by the Debtors' Estates against HBC, such as:

(i)        Whether the entire Acquisition could be avoided as a constructive fraudulent transfer.  The Investigation concluded that a constructive fraudulent transfer claim with respect to the Acquisition is not colorable because, among other reasons, the Debtors could not credibly contend that Le Tote or its subsidiaries received less than reasonably equivalent value in the Acquisition.

(ii)        Whether Le Tote's prepayment of an inventory note (the "Inventory Note") on December 26, 2019, which resulted in Le Tote transferring approximately $26.6 million to the HBC Parties, could be avoided as an insider preference.  The Investigation concluded that Le Tote has a colorable claim to avoid the December 26, 2019 transfer as a preference under section 547 of the Bankruptcy Code, although the HBC Parties assert that they have affirmative defenses that could reduce or eliminate its exposure.

(iii)　　　Whether the Seller Note and the Inventory Note could be recharacterized from debt instruments into equity interests in the Debtors.  The Investigation concluded that the Debtors have a colorable claim to recharacterize the Seller Note as an equity interest, as certain elements of the Seller Note are, under applicable legal standards, are indicative of an equity investment rather than debt.  The Investigation concluded, however, that a claim to recharacterize the Inventory Note as an equity interest is not colorable.

(iv)　　　Whether the HBC Parties' conduct in business dealings with the Debtors, prior to and following the Acquisition, gave rise to a colorable claim to equitably subordinate the HBC Parties' claim against the Debtors' estates pursuant to section 510(c) of the Bankruptcy Code.  Because HBC Propco was, after the Acquisition and at the time of review in the Investigation a statutory insider of the Debtors, its conduct as to the Debtors would be subject to rigorous scrutiny.  After scrutinizing several aspects of the HBC Parties' business dealings with the Debtors, the Investigation concluded that there is evidence that HBC Propco engaged in some conduct that may have harmed the Debtors' other creditors.

(v)　　　Whether the HBC Parties' failure to pay rent for the Lord & Taylor physical locations gave rise to a breach of contract or indemnification claim.  The Investigation concluded that Le Tote has a colorable claim against the HBC Parties for breach of contract or indemnification to the extent Le Tote suffers any losses related to the HBC Parties' failure to pay rent as required by the APA, which may include legal fees incurred by Le Tote and any third-party claims asserted against Le Tote.

(vi)　　　Whether the Transition Services Agreement, and the services provided by the HBC Parties to Le Tote in pursuance thereof, gave rise to a breach of contract claim.  The Investigation concluded that Le Tote has colorable claims that the HBC Parties breached the Transition Services Agreement by (a) charging Le Tote for certain services in excess of contracted amounts or actual cost, and (b) failing to provide certain services to Le Tote in a manner consistent with the standard of care that the HBC Parties covenanted to observe as specified in the Transition Services Agreement.

The description of potential claims and causes and action examined as part of the Investigation is not exhaustive and the Restructuring Committee examined additional claims and causes and action against the HBC Parties and other parties.  The HBC Parties have asserted numerous defenses to the potential claims against the HBC Parties subject to the Investigation.  These defenses were taken into account by the Restructuring Committee when evaluating whether to recommend the HBC Settlement.

The Investigation into potential claims or causes of action that the Debtors' Estates could assert against parties other than the HBC Parties remains ongoing.  The Debtors expect that the Restructuring Committee will make a final recommendation regarding such other potential claims or causes of action in advance of the Debtors' proposed confirmation hearing.

        4.     <u>Cost and Delay of Litigation.</u>

The Restructuring Committee's Investigation also considered the costs of litigating the Debtors' causes of action to judgment, the potential delays associated with monetizing such litigation, the impact of litigation on the Debtors' operations, management, and employees, including the distraction to management caused by managing litigation rather than focusing on the business operations of the Debtors, the impact of the litigation on the company's restructuring, as well as the defendants' financial wherewithal to fund and engage in protracted litigation.  As discussed above, any such litigation would involve arguments on both sides of the issues, and the Restructuring Committee expected that any such litigation would require extensive document discovery, witness testimony, fact development, motion practice, and a trial.  In addition, commencing litigation against the HBC Parties would likely have resulted in negative impacts to the Debtors' business relationship with the HBC Parties and could have impaired the Debtors' ability to receive critical transition services from the HBC Parties under the Transition Services Agreement after the contractual obligation to provide such services at pre-Omnibus Agreement pricing expires on December 31, 2020, which would put the Debtors' ability to conduct their store closing sales at risk.  Affiliates of the HBC Parties are also the Debtors' landlords in 32 of the Debtors' 38 Lord & Taylor locations.  Accordingly, litigation against the HBC Parties would likely also have negative impact on the store closing sales to the detriment of all stakeholders.  Certain of the HBC Parties have also provided an indemnity to the Debtors for many liabilities under the APA, and litigation against the HBC Parties may impair the Debtors' ability to assume the APA and preserve these valuable

indemnification rights, thereby exposing the Debtors' estates to additional liability. Finally, as certain of the HBC Parties are secured creditors of the Debtors, commencing litigation against the HBC Parties would jeopardize the Debtors' ability to use cash collateral and would likely require additional litigation regarding the non-consensual use of cash collateral.

K.      *Settlement and Plan Negotiations.*

As discussed above, the goal of the Restructuring Committee's Investigation was to assess, and where applicable, maximize the value of potential litigation assets, either through pursuit of such claims or unlocking value through settlement. During the Reservation of Rights Period, the Debtors engaged in simultaneous negotiations with both the HBC Parties and the Committee, seeking to establish a plan framework that would resolve the causes of action examined pursuant to the Investigation, and avoid the need for costly (and inherently uncertain) litigation with the HBC Parties. To that end, on October 22, 2020, after consulting with the Committee and the Restructuring Committee, the Debtors distributed a proposed settlement term sheet setting forth the framework of a potential global plan settlement. The Debtors and the HBC Parties then traded numerous settlement proposals over the following several weeks in an attempt to reach an agreement on a consensual chapter 11 plan. During this time frame, the Debtors also encouraged the Committee to submit their own settlement proposal within the confines of the latest bid-ask between the Debtors and the HBC Parties in an effort to broker a global agreement. The Committee did not submit a proposal for many weeks. During these negotiations, the Debtors continued to advocate to obtain the highest possible recovery for unsecured creditors consistent with their role as fiduciaries for all creditors.

In early December, after repeated invitations from both the Debtors and the HBC Parties to participate in negotiations, the Committee finally submitted a proposal which, in the view of the HBC Parties, demanded value that far exceeded the value of any potential claims and was well outside the confines within which the Debtors and HBC Parties had been negotiating. Accordingly, the HBC Parties determined that the Committee proposal was unacceptable. The Debtors then continued negotiations with the HBC Parties and, following several additional days of hard-fought negotiations, reached an agreement in principle on the terms of the HBC Settlement on December 10, 2020. Following the recommendation of the Restructuring Committee, the Debtors' board of directors voted to approve the terms of the HBC Settlement and the Plan on the same day.

L.      *Evaluation of the Proposed HBC Settlement.*

Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Under Bankruptcy Rule 9019, the Bankruptcy Court may approve a settlement so long as it does not fall below the lowest point in the range of reasonableness. Settlements are appropriate in a chapter 11 plan when they constitute a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate.[11]

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits afforded under the terms of the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the HBC Settlement. The HBC Settlement settles the Debtors' claims against the HBC Parties and provides a mutual release by the Debtors and the HBC Parties. In exchange, pursuant to the Plan and the HBC Settlement, the HBC Parties agree to subordinate their claims to administrative and priority claims and allow unsecured creditors to receive $3 million of distributable cash, after the TSA Shortfall payment and an additional $8 million to the HBC Parties, with a 50/50 split in distributable cash thereafter. The HBC Parties have also agreed to allocate the *first* $1 million of Urban Proceeds to unsecured creditors and share in all proceeds thereafter 50/50. Taken together, these concessions can yield up to an expected $6.6 million recovery to unsecured creditors, exclusive of proceeds of the litigation against Urban Outfitters the value of which is not yet determined but the Debtors believe to be significant and other value described below. In addition, the HBC Parties have agreed to reduce the TSA Shortfall Claim by approximately $60,000 and continue to provide services under the Transition Services Agreement in January and February 2021 for total payments of $513,017 per month. As the Debtors continue to rely on the services provided under the Transition Services Agreement and the Omnibus Agreement will reset pricing to the

---

[11]     *See, e.g.*, *In re AppliedTheory Corp.*, Case No. 02-11868, 2008 WL 1869770, at *3 (Bankr. S.D.N.Y. April 24, 2008) (internal citations omitted).

higher pre-agreement levels as of January 1, 2021, this concession—potentially reducing ongoing Transition Services payments by up to eight times—provides significant value to the Debtors' estates by allowing the Debtors' to extend their store-closing sales at certain highly-performing locations. The HBC Settlement also facilitates disposition of 32 of the Debtors' 38 brick-and-mortal locations through the agreement of the HBC Parties to the assumption and assignment of two of the Debtors' master leases with no cash cure payments and the disallowance of all rejection damages for a third master lease. Finally, the HBC Settlement requires the HBC Parties to provide certain operational support integral to the Debtors as they wind down the estates and eliminates rejection damages claims for certain of the Debtors' locations, thereby reducing the unsecured claims pool and increasing recovery to unsecured creditors.

The Restructuring Committee, the Debtors, and their respective advisors devoted substantial time to evaluating the potential estate claims against the HBC Parties and the value achieved through the HBC Settlement and the Plan. Based on the information and analysis gathered during the Investigation, the Restructuring Committee concluded that the HBC Settlement produces substantial value to the Debtors' Estates that outweighs any value that would reasonably be obtained through costly and protracted litigation against the HBC Parties. In reaching this conclusion, the Restructuring Committee considered the likelihood of success on the merits of the Debtors' claims and the HBC Parties' defenses to those claims, the amount of potential damages available on those claims, the cost of litigation, the likelihood of recovery, the impact of litigation against the HBC Parties on the Debtors' business and restructuring efforts, the critical support from the HBC Parties for the completion of the Debtors' store closing sales and orderly wind-down of operations at a discount from the contractual costs under the Transition Services Agreement, the consent of the HBC Parties to the assumption of the Debtors' indemnification rights under the APA, and the value secured by the HBC Settlement for the Estates, among other things. The Restructuring Committee and the Debtors believe that the HBC Settlement incorporated in the Plan is fair, reasonable, and provides substantial value to the Debtors' Estates that exceeds the standards for settlement approval under the Bankruptcy Code.

M.      *The Committee's Standing Motion*

On December 17, 2020, the Committee filed a motion seeking standing to pursue certain estate claims related to the Acquisition and attacking the HBC Settlement as inadequate (the "Standing Motion"). While many of the details of the Standing Motion were included in the proposed complaint filed under seal, the Committee believes that the claims described therein are significant, identifiable, and material. These claims can generally be divided into six categories: (1) constructive fraudulent transfer claims based on the Acquisition; (2) recharacterization and avoidance action with respect to the prepayment of the Inventory Note; (3) recharacterization and equitable subordination with respect to the validity and priority of the Seller Note; (4) claims with respect to breaches of the Transition Services Agreement; (5) an avoidance action with respect to setoffs under the Omnibus Agreement; and (6) lien avoidance actions relating to alleged perfection issues impacting the extent and validity of the HBC Prepetition Liens and HBC Prepetition Collateral (each as defined in the Cash Collateral Order). The Committee believes these claims are colorable and could result in a significant recovery for the Debtors' Estates. The Standing Motion also constitutes the commencement of a "Challenge" as defined in the Cash Collateral Order, pursuant to which the Committee is challenging the liens and claims of the HBC Secured Parties.

The Debtors believe that they have pursued the putative estate claims identified in the Committee's Standing Motion through settlement under the HBC Settlement and that many of the claims identified in the Committee Standing Motion are not colorable. As discussed above, the Debtors further believe that the Plan and HBC Settlement deliver value to the Estates in general, and to unsecured creditors in particular, that far exceeds the value that might be obtained through protracted, expensive and uncertain litigation against the HBC Parties. The HBC Parties also dispute the allegations in the Committee's Standing Motion and have identified numerous defenses to such claims. Accordingly, the Debtors and the HBC Parties intend to oppose the Committee's Standing Motion.

N.      *Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement,

and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

O.    *Other Procedural and Administrative Motions*

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On August 24, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 190] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On September 21, 2020, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 363].

- Retention Applications. To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in these chapter 11 cases, the Debtors filed applications requesting that the Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327 and 328 of the Bankruptcy Code: (a) Kirkland & Ellis LLP as counsel to the Debtors; (b) Kutak Rock LLP as co-counsel to the Debtors; (c) Nfluence as investment banker to the Debtors; (d) BRG as restructuring advisor to the Debtors (e) Deloitte Tax LLP as tax advisor to the Debtors; and (f) Katten as independent counsel to the Restructuring Committee.

- Establishment of the Bar Date. On August 27, 2020, the Court entered an order setting the General Claims Bar Date at September 28, 2020, at 5:00 p.m., prevailing Eastern Time, as well as the Governmental Bars Date at January 29, 2020. [Docket No 256]. Further, all entities asserting claims arising from the rejection of executory contracts and unexpired leases of the Debtors shall file a Proof of Claim on account of such rejection by the later of (i) the General Claims Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m., prevailing Eastern time, on the date that is thirty (30) days following entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors (the "Rejection Damages Bar Date").

- Establishment of an Administrative Claims Bar Date. On November 24, 2020, the Court entered an order setting the Administrative Claims Bar Date, for any administrative claim arising on or prior to December 4, 2020, at January 4, 20201, at 4:00 p.m., prevailing Eastern Time [Docket No. 600].

- Claims Administration. On November 24, 2020, the Court entered orders approving procedures for filing omnibus objections to claims [Docket No. 598] and settlement of *de minimis* claims [Dockete No. 599].

- Exclusivity Extension. On December 2, 2020, the Court entered an order extending the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances of a chapter 11 plan for each Debtor through and including March 30, 2021 and including May 29, 2020, respectively.

- Lease Dispositions. On December 11, 2020, the Debtors filed two notices to assume and assign the Master Lease, dated July 22, 2015, related to 24 store locations and the Master Lease, dated July 22, 2015, related to 4 store locations to LT Propco LLC or such other entity as it may designate. The assumption and assignment of these two leases will not require the Debtors to pay any cure costs in cash. On December 11, 2020, the Debtors also filed a rejection notice related to the Amended and Restated Lease, dated November 6, 2019, relating to 4 store locations and three additional leases.

## ARTICLE VII.
## SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Classification and Treatment of Claims and Interests.*

1.    Classification of Claims and Interests.

The Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.    Confirmation Pursuant to 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

B.    *Means for Implementation of the Plan.*

1.    General Settlement of Claims.

Except as otherwise expressly provided in the Plan, pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion, proposed by the Debtors, to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable,

reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

2.       The HBC Settlement.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates and implements the HBC Settlement, a compromise and settlement of numerous issues and disputes between and among the Debtors and the HBC Parties designed to achieve a reasonable and effective resolution of the Chapter 11 Cases. Except as otherwise expressly set forth herein, the HBC Settlement constitutes a settlement of all potential issues and Claims between and among the Debtors and the HBC Parties.

3.       Cancellation of Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of any Debtor under the Credit Agreement Documents and any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be fully released, settled, and compromised.  Notwithstanding the foregoing, (i) no executory contract or unexpired lease that (x) has been, or will be, assumed pursuant to Section 365 of the Bankruptcy Code or (y) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (ii) the Seller Note shall continue in effect solely for the purpose of allowing the HBC Parties to receive the distributions provided for under the Plan, and (iii) the Le Tote APA shall continue in effect solely for the purpose of the continuing indemnification obligations as set forth in Article V.E of the Plan.

4.       Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

5.       Sources of Plan Consideration and Priority Waterfall.

Distributions to holders of Allowed General Unsecured Claims and the Seller Note Claim will be funded from Distributable Cash.  All Distributable Cash, other than any Urban Proceeds, shall be allocated as follows: (i) first, to holders of the Seller Note Secured Claim, until the such holders receive $8 million on account of the Seller Note Secured Claim; (ii) second, to holders of Allowed General Unsecured Claims, until such holders have received $3 million on account of such claims; (iii) third, split 50/50 between holders of the Seller Note Secured Claim and the holders of Allowed General Unsecured Claims until the Seller Note Secured Claim is paid in full; and (iv) fourth, to the holders of Allowed General Unsecured Claims.

The Urban Proceeds shall be allocated as follows: (i) first to holders of Allowed General Unsecured Claims until such holders have received $1 million on account of the Allowed General Unsecured Claims; (ii) second, split 50/50 between holders of the Seller Note Secured Claim and holders of Allowed General Unsecured Claims until the

Seller Note Claim is paid in full; and (iii) <u>third</u>, to holders of Allowed General Unsecured Claims (together with the immediately preceding paragraph, the "<u>Waterfall Recovery</u>").

Distributions on account of the Seller Note Secured Claim shall only be made from amounts allocated to the Seller Note Secured Claim pursuant to the Waterfall Recovery and not from amounts allocated to the holders of Allowed General Unsecured Claims therein.

In addition, all Residual Reserves shall become Distributable Cash and shall be distributed in accordance with the Waterfall Recovery.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Post-Effective Date Debtors and shall be subject to administration by the Plan Administrator, and the net proceeds thereof shall be Distributable Cash.

6.    <u>Restructuring Transactions</u>.

Before, on, and after the Effective Date, the Debtors or Post-Effective Date Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) such other transactions that are required to effectuate the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

7.    <u>Corporate Action</u>.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including all actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan or corporate structure of the Debtors or Post-Effective Date Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors. The authorizations and approvals contemplated by Article IV.G shall be effective notwithstanding any requirements under non bankruptcy law.

8.    <u>Post-Effective Date Debtors</u>.

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible including overseeing the Store Closing Sales in accordance with the Consultant Agreement as authorized by the Bankruptcy Court, in accordance with the Wind-Down Budget, (ii) resolving Disputed Claims, (iii) making distributions on account of Allowed Claims as provided hereunder, (iv) establishing and funding the Distribution Reserve Accounts in accordance with the Wind-Down Budget, (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits

of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (vi) filing appropriate tax returns, (vii) complying with any continuing obligations under the Asset Purchase Agreement and (viii) administering the Plan in an efficacious manner.  The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

        9.     <u>Plan Administrator</u>.

The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or sole director of the Post-Effective Date Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer.  The Debtors, after the Confirmation Date, and the Post-Effective Date Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall, subject to the powers and authority of the Plan Administrator Oversight Board, include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including:  (i) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (ii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts in accordance with the Wind-Down Budget; (iii) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (iv) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (v) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vi) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (vii) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.O of the Plan; (viii) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (ix) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (x) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

        (a)     Plan Administrator Oversight Board

On the Effective Date, the Plan Administrator Oversight Board shall be appointed.  The Plan Administrator Oversight Board shall consist of two members appointed by the HBC Parties and one member appointed by the Committee.  The members of the Plan Administrator Oversight Board shall not receive any additional compensation on account of serving in such capacity.

        (b)     Retention of Professionals.

The Plan Administrator shall have the right, subject to the Wind-Down Budget, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors.  The reasonable fees and expenses of such professionals shall be paid from the Wind-Down Reserve upon the monthly submission of

statements to the Plan Administrator to the extent set forth in the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Post-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

(c)  Compensation of the Plan Administrator.

The Plan Administrator's Compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expenses reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

(d)  Plan Administrator Expenses.

All costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, the Post-Effective Date Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Post-Effective Date Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget.  Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

(e)  Exculpation, Indemnification, Insurance & Liability Information.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors.  The Plan Administrator may obtain, at the expenses of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

(f)  Tax Returns.

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

(g)  Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or in any other jurisdiction.  The Plan Administrator, however, shall have

authority to take all necessary actions to dissolve the Post-Effective Date Debtors and withdraw the Post-Effective Date Debtors from applicable state(s).

        10.     Wind-Down.

On and after the Effective Date, the Plan Administrator will be authorized, subject to the authority of the Plan Administrator Oversight Board, to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator, subject to the authority of the Plan Administrator Oversight Board shall:  (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreements and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have cancelled pursuant to the Plan all Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

        11.     Continued HBC Support.

        (a)     Transition Services Agreement.

Notwithstanding anything to the contrary in the Plan, the Transition Services Agreement shall be deemed terminated as of February 28, 2021; *provided* that if for any reason one or more of the Debtors' stores remains open following February 28, 2021, a charge of $513,017 for March 2021 (and any subsequent months for which such stores remain open) would apply.  If no stores remain open following February 28, 2021, but the Debtors determine that other transition services are required after such date, the Debtors and the HBC Parties shall negotiate in good faith the cost of such service.

        (b)     HBC Operational Support

To the extent not already completed prior to the Effective Date, the HBC Parties shall ship Lord & Taylor-owned inventory located at the HBC Parties' Pottsville facility to brick and mortar Lord & Taylor stores, as the Debtors may reasonably request and at the Debtors' cost (a) at a cost per unit of $0.35 and (b) with shipping supplies and transportation costs passed through to Lord & Taylor at cost.

        (c)     Containers.

The Containers shall be deemed property of the HBC Parties, and title to such Containers, if in the name of any Debtor, shall be transferred to the HBC Parties at the HBC Parties' sole cost.  The Debtors shall provide such cooperation as may reasonably be required to implement such title transfers, including a limited power of attorney authorizing the HBC Parties to effect such title transfers.

(d)    Further Assurances.

The Debtors shall use commercially reasonably efforts to transfer certain utility accounts for non-Debtor locations to the HBC Parties identified on Annex A to the Settlement Term Sheet, and assist the HBC Parties as required with respect to the in the assumption and assignment and/or rejection of certain contracts pursuant to the HBC Settlement, in each case at the HBC Parties' sole cost and expense.

12.    Wind-Down Support.

In order to assist with the Wind Down, the HBC Parties will deliver the following information to Le Tote in exchange for an incremental payment of $115,000:    (a) trial balance as of December 31, 2020, including reconciliations by account; (b) accounts payable aging as of December 31, 2020; (c) the latest "Vendor Master" file; and (d) three years of historical data for (i) AP invoice detail, (ii) vendor payment/cash receipts detail, (iii) inventory receipts/proofs of delivery, and (iv) vendor allowance detail, to the extent such data is available.

The HBC Parties shall make commercially reasonable efforts to cooperate with requests, if any, from taxing authorities exercising audit rights with respect to historical Lord & Taylor audits at a reasonable rate based on hours incurred to procure and provide requested data during the Wind Down.

13.    Dissolution and Board of Directors.

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

14.    Management Payments.

Upon the Effective Date, the members of the Debtors' management team who are "KEIP Participants" as defined in the KEIP Order shall receive payments in the same proportion and amount as set forth in the "Plan Goals" of the KEIP Order.

15.    Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Post-Effective Date Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

16.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IV.O and Article VIII of the Plan, the Post-Effective Date Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan except for the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Post-Effective Date Debtors as of the Effective Date.

The Post-Effective Date Debtors, on and after the Effective Date, may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action (other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan), whether arising before or after the Petition Date, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Plan Administrator may, in its reasonable business judgment, subject to the authority of the Plan Administrator Oversight Board, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Post-Effective Date Debtors or the Plan Administrator will not pursue any and all available Causes of Action. Unless any Cause of Action against an Entity is waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Post-Effective Date Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  The Post-Effective Date Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The Post-Effective Date Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

17.    Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Le Tote, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Le Tote.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Le Tote in accordance with the Bankruptcy Code and the Bankruptcy Rules.

C.    *Treatment of Executory Contracts and Unexpired Leases.*

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases; (ii) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (iii) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Policy.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of:  (i) 30 days after the date of entry

of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (ii) 30 days after the Debtors provide notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (iii) 30 days after notice of any rejection that occurs after the Effective Date. **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (x) be treated as a creditor with respect to such Claim, (y) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (z) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Post-Effective Date Debtors, or the property for any of the foregoing without the need for any objection by the Debtors, Post-Effective Date Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

Notwithstanding anything to the contrary in the Plan, any Proof of Claim arising from the rejection of the Propco Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity and Holders of such Claims may not receive any distributions on account of such Claims.

       3.      <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>.

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (i) the amount of any Cure Claim; (ii) the ability of the Post-Effective Date Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Post-Effective Date Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court, if any, at least seven days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

4.        D&O Policies.

The D&O Policies shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, and nothing shall alter, modify, or amend, affect, or impair the terms and conditions of (or the coverage provided by) any of the D&O Policies including the coverage for defense and indemnity under any of the D&O Policies which shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

5.        Indemnification Obligations.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything herein to the contrary, the Post-Effective Date Debtors' obligation to fund such indemnification obligations shall be limited to the extent of coverage available under any insurance policy, including any D&O Policy.

Notwithstanding anything to the contrary in the Plan, the obligation of the HBC Parties to indemnify the Debtors pursuant to Section 9.02(a) of the Le Tote APA and the obligation of the Debtors to indemnify the HBC Parties pursuant to Section 9.02(b)(iii) of the Le Tote APA, as well as the relevant provisions of Section 9.01, 9.03, 9.04, and 9.05 of the Le Tote APA and any defined terms used therein shall survive Confirmation and Consummation and shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor.

6.        Termination Agreements.

Notwithstanding anything to the Contrary in the Plan, the Termination Agreements shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.

7.        Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

8.        Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or

rejection, the Debtors or the Plan Administrator, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

9.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

D.    *Provisions Governing Distributions.*

1.    Timing and Calculation of Amounts to be Distributed.

Unless otherwise provided in the Plan, on the Initial Distribution Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the next Quarterly Distribution Date after such Claim becomes Allowed or as soon as reasonably practicable thereafter) or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim against or Allowed Interest in, as applicable, the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors or the Disbursing Agent on behalf of the Debtors, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

2.    Rights and Powers of the Disbursing Agent.

(a)    Powers of the Debtors and the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

The Debtors and the Disbursing Agent, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Disbursing Agent is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash by the Debtors.

(b)    Fees of Disbursing Agent and Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Disbursing Agent in connection with such person's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash from the Wind-Down Amount.

3.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

(a)    Record Date for Distribution.

Except as provided in the Plan, on the Distribution Record Date, the Claims Register shall be closed and the Debtors and the Disbursing Agent, or any other party responsible for making distributions, shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

(b)    Delivery of Distributions in General.

(i)    Payments and Distributions on Disputed Claims.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims or Disputed Interests that are not Allowed Interests, as applicable, as of the Effective Date but which later become Allowed Claims, or Allowed Interests, as applicable, shall, in the reasonable discretion of the Disbursing Agent, be deemed to have been made on the Effective Date unless the Disbursing Agent and the Holder of such Claim agree otherwise.

(ii)    Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors or the Disbursing Agent, as applicable, on the one hand, and the Holder of a Disputed Claim or Disputed Interest, as applicable, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Disputed Interest, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim or Disputed Interest have become Allowed Claims or Allowed Interests or have otherwise been resolved by settlement or Final Order.

(c)    Initial Distribution Date.

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' books and records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided, further*, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.

(d)    Quarterly Distribution Date.

Except as otherwise determined by the Plan Administrator, subject to the oversight of the Plan Administrator Oversight Board, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date. Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed. Subject to Article VI.E of the Plan, no interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date pursuant to the Plan.

(e)    Minimum; *De Minimis* Distributions.

No Cash payment of less than $100, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim, and each Claim to which this limitation applies shall be satisfied pursuant to Article VIII of the Plan, and its Holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against the Post-Effective Date Debtors or their property.

(f)    Undeliverable Distributions and Unclaimed Property.

With respect to any Undeliverable Distribution, no distribution to the relevant Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws to the contrary) to the Post-Effective Date Debtors and shall become Distributable Cash, automatically and without need for a further order by the Bankruptcy Court and the Claim or Interest of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

        4.      <u>Setoffs and Recoupment</u>.

Except as otherwise expressly provided herein, the Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim it may have against the Holder of such Claim.

        E.      *Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.*

        1.      <u>Allowance of Claims and Interests</u>.

On and after the Effective Date, and except with respect to Claims that are Allowed pursuant to the Plan, the Debtors or Post-Effective Date Debtors, as applicable, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

        2.      <u>Claims and Interests Administration Responsibilities</u>.

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Debtors or Post-Effective Date Debtors, as applicable, by order of the Bankruptcy Court, shall have the sole authority with regard to all Claims and Interests: (i) to File, withdraw, or litigate to judgment objections to Claims and Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

        3.      <u>Estimation of Claims and Interests</u>.

As of the Effective Date, the Post-Effective Date Debtors or the Plan Administrator, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order,

shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim or Interest is estimated. Each of the foregoing Claims or Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims or Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.    Adjustment to Claims or Interests Without Objection.

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. The Debtors shall provide any Holder of such a Claim or Interest with fourteen (14) days' notice prior to the Claim or Interest being adjusted or expunged from the Claims Register as the result as the result of a Claim or Interest being paid, satisfied, amended or superseded.

5.    Time to File Objections to Claims.

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

6.    Disallowance of Claims.

Other than with respect to Claims Allowed under the Plan, no Claim of any Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Allowed, unless and until such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided in the Plan or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

7.    Amendments to Claims.

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the Debtors and any such new or amended Claim or Interest Filed shall automatically be deemed disallowed in full and expunged without any further action; *provided that* a Claim may be Filed after the Effective Date if the Bankruptcy Court enters an order permitting such late filing.

8.    No Distributions Pending Allowance.

If an objection to a Claim or Interest or any portion thereof is Filed as set forth in Article VII of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or any portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

9.    Distributions After Allowance.

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions, if any, shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution, if any, that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy Law or as otherwise provided in Article III.B of the Plan.

F.    *Settlement, Release, Injunction, and Related Provisions.*

1.    Settlement, Compromise, and Release of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.    Term of Injunctions or Stays.

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

3.    Release of Liens.

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the ABL Agent, the Term Loan Agent, and the HBC Parties shall execute and deliver all documents reasonably requested by the Debtors, Post-Effective Date Debtors, or the Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

4.    Releases by the Debtors.

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, the Post-Effective Date Debtors, and the Plan Administrator from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, or their Estates, the Post-Effective Date Debtors, or the Plan Administrator would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in a Debtor, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Le Tote APA, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Asset Sale, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Chapter 11 Cases, the Asset Purchase Agreement, the Asset Sale, the Le Tote APA, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order to constitute willful misconduct, fraud or gross negligence. Notwithstanding the inclusion of any Released Parties as a potential party to any Retained Causes of Action, such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, (iii) release any Claims or Causes of Action against any non-Released Party, or (iv) release the Debtors or the HBC Parties from the mutual indemnification obligations as set forth in Article V.E of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the releases herein; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties

5.    Releases by Holders of Claims and Interests.

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Le Tote APA, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Asset Sale, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the

47

Disclosure Statement, or the Plan, the Chapter 11 Cases, the Asset Purchase Agreement, the Asset Sale, the Le Tote APA, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order to constitute willful misconduct, fraud or gross negligence.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, (iii) release any Claims or Causes of Action against any non-Released Party, or (iv) release the Debtors or the HBC Parties from the mutual indemnification obligations as set forth in Article V.E of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the Releasing Parties; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after notice and opportunity for hearing; and (vi) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

      6.    <u>Exculpation</u>.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Asset Purchase Agreement, the Asset Sale, the Investigation, or any Restructuring Transaction, contract, instrument, release or other agreement or document  (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the Asset Purchase Agreement, the Asset Sale, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary herein, nothing in Article VIII.F of the Plan shall release or exculpate any Exculpated Party for any act or omission arising before the Petition Date or after the Effective Date.

      7.    <u>Injunction</u>.

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released or discharged pursuant to the Plan or are subject to Exculpation pursuant to

the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors until the closing of these Chapter 11 Cases.

        8.    <u>Limited Substantive Consolidation</u>.

    The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating each of the Estates of the Debtors into a single consolidated Estate solely for purposes of voting, Confirmation, and distribution. For the avoidance of doubt, the Plan shall not serve as a motion by the Debtors seeking entry of an order substantively consolidating the Debtors for any other purposes. Notwithstanding anything in Article VIII.H of the Plan, all distributions under the Plan shall be made in accordance with Article VI of the Plan.

    If the Debtors' Estates are substantively consolidated in accordance with t Article VIII.H of the Plan then, on and after the Effective Date, all assets and liabilities (including Allowed Claims) of the Debtors shall be treated as though they were merged into one Estate solely for purposes of voting, Confirmation, and distribution. The limited substantive consolidation described herein shall not affect the legal and organizational structure of the Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, with respect to Executory Contracts or Unexpired Leases that were assumed or entered into during the Chapter 11 Cases, if any. **Moreover, any alleged defaults under any applicable agreement with the Debtors or their respective Affiliates arising from substantive consolidation under the Plan shall be deemed waived or otherwise cured as of the Effective Date.**

    If the Debtors' Estates are not substantively consolidated in accordance with Article VIII.H of the Plan, then the Plan shall constitute a motion to approve a 9019 settlement with respect to the distributions on account of General Unsecured Claims (the "<u>9019 Settlement</u>"), which reflects a compromise and settlement of Claims that such creditors may hold against the respective Debtors. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the 9019 Settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the 9019 Settlement is in the best interests of the Debtors and their Estates. If the Effective Date does not occur, the 9019 Settlement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

    If the 9019 Settlement is approved pursuant to the Confirmation Order, then, on and after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive it Pro Rata share of the portion of Distributable Cash allocated to holders of Allowed General Unsecured Claims in accordance with Article IV.E of the Plan without giving effect to the proportion that the amount of Allowed Claims against any one Debtor bears to the aggregate amount of Allowed Claims against all of the Debtors.

    Notwithstanding the substantive consolidation provided for herein, nothing shall affect the obligation of each and every Debtor to pay the quarterly fees to the U.S. Trustee until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

9.      Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors or another Entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

10.      Recoupment.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

11.      Subordination Rights.

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

G.      *Conditions Precedent to Effective Date.*

1.      Conditions Precedent to the Effective Date.

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

(a)      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the Restructuring Transactions;

(b)      all allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

(c)      the Distribution Reserve Amounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind-Down Amount;

(d)      the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan;

(e)      the Bankruptcy Court shall have entered the Confirmation Order and which shall have become a Final Order that has not been stayed or modified or vacated and shall:

50

(i)  authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan;

(ii)  decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii)  authorize the implementation of the Plan in accordance with its terms; and

(iv)  provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(f)  with respect to all actions, documents and agreements necessary to implement the Plan: (a) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (b) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (c) such documents and agreements shall have been effected or executed, and in each case all such actions, documents and agreements shall be consistent with the terms of the Plan.

2.  Waiver of Conditions.

The conditions to Consummation set forth in Article IX.A of the Plan may be waived by the Debtors at any time with the consent of the HBC Parties, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan.

3.  Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in section 1102(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date.

4.  Effect of Non-Occurrence of Conditions to the Effective Date.

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

**ARTICLE VIII.**
**STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

A.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The Bankruptcy Court has scheduled the Confirmation Hearing for [February 22], 2021, at 1:00 p.m., prevailing Eastern Time.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures.  Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Eastern District of Virginia; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties as required by the Case Management Order no later than the Plan Objection Deadline.  **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court**.

B.    *Confirmation Standards.*

1.    Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

2.    Best Interests of Creditors.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Interests under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Asset Sales and the Plan effects the monetization of the Debtors' remaining assets not otherwise acquired in the Asset Sales. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of General Unsecured Claims than would a chapter 7 liquidation. Monetizing the Debtors' Estates under the Plan likely provides Holders of General Unsecured Claims with a larger, more timely recovery, primarily due to expected materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' businesses that the Debtors had when they proposed to sell their assets and commence the Wind-Down. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' assets, and these specific Chapter 11 Cases, in order to complete the administration of the Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

The Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

3.      Financial Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. The Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. The Debtors are confident that they will have sufficient means to provide for the distributions under the Plan and therefore believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

C.      *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in

that class, counting only those claims that have actually voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

D.    *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    Fair and Equitable Test.

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**ARTICLE IX.**
**CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**

Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to

accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.      *Risks Related to the Confirmation and Consummation of the Plan.*

1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met and not waived, the Effective Date will not take place.

3.      The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

4.      The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan, with the consent of the HBC Parties, not to be unreasonably withheld, as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5.        Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.        Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as delays in the resolution of the Causes of Action on the Schedule of Retained Causes of Action and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of these chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors obtained the exclusive right to propose the Plan upon filing their petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

7.        These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.        The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.        Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.     <u>Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan</u>.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11.     <u>The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved</u>.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, Released Parties, or Exculpated Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

12.     <u>The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated By the Debtors</u>.

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

13.     <u>The Total Amount of Allowed Administrative and Priority Claims May Be Higher and/or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtors</u>.

The amount of Cash the Debtors' ultimately receive prior to and following the Effective Date may be lower than anticipated.  Additionally, Allowed Administrative Claims and Allowed Priority Claims maybe higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

14.     <u>The Committee's Standing Motion May Be Granted</u>

If the Committee's Standing Motion is granted, the Plan may require material revision and may require resolicitation.  Among other revisions, the Plan's release, injunction, and exculpation provisions may need to be revised or removed, and the proposed distributions to the Holders of Other Secured Claims, the Seller Note Secured Claim, and the TSA Shortfall Claim may either need to be circumscribed or escrowed pending resolution of the estate claims authorized by the Standing Motion post-Confirmation.

B.     *Risks Related to the Debtors' Businesses.*

1.     <u>The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness</u>.

The Debtors' ability to make scheduled payments depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to

maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness.

2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.    Results of Store Closing Sales May Not Meet Projections.

The store closing sales may fail to meet projections due to the economic uncertainty surrounding the continued spread of COVID-19, which has had a significant impact on the Debtors' business in the context of consumer demand. On a macro level, this pandemic has dampened global growth and could ultimately lead to an economic recession. If this occurs, demand for retail and consumer goods will continue to decline. Significantly, such a continued decline during the Wind-Down and over the next several months could greatly impact the Debtors' sales at their remaining stores. Such a scenario would negatively impact the ability of the Debtors to sell inventory and complete the Wind-Down.

4.    The Wind-Down Budget May Change Materially.

The Wind-Down Budget is the Debtors' best estimates of actual expenses and revenues during the remainder of the chapter 11 cases. Creditors should be aware that such numbers may change, potentially materially, and any changes to the actual expenses and revenues will ultimately impact the amount of Distributable Proceeds available to be paid to creditors under the Plan.

5.    Renewed Shelter-in-Place Orders May Interrupt Going Out of Business Sales.

Renewed government lockdowns and employee infections could both inhibit the Debtors' ability to wind down their businesses. The inability to remain open to the public during the Wind-Down would materially impact the ability of the Debtors to facilitate an Asset Sale Transaction and liquidate inventory at store locations. The inherent risk that state governments may again shut down non-essential businesses plays a significant role in the success of the Plan.

58

6.      <u>The Debtors Rely on Services Provided By HBC Which May Be Interrupted</u>.

The Debtors rely on certain mission-critical services provided by HBC pursuant to the Transition Services Agreement and its amendments.  HBC has also agreed to pay the majority of the Debtors' obligations to its landlords along with various indemnification obligations thereto in accordance with the asset purchase agreement entered into in connection with the Acquisition.  To the extent HBC discontinues services under the Transition Services Agreement or fails to make timely postpetition payments to landlords, the ability of the Debtors to conduct the store closing may be impaired.  The Debtors could be required to find replacement services or make additional payments not contemplated under their budget, which could ultimately impact the amount of Distributable Proceeds available to be paid to creditors under the Plan.

C.      *Disclosure Statement Disclaimer.*

1.      <u>Information Contained in this Disclosure Statement is for Soliciting Votes</u>.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.      <u>This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission</u>.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

3.      <u>No Legal or Tax Advice Is Provided to You by this Disclosure Statement</u>.

**This Disclosure Statement is not legal advice to you**.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4.      <u>No Admissions Made</u>.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

5.      <u>Failure to Identify Litigation Claims or Projected Objections</u>.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.      <u>No Waiver of Right to Object or Right to Recover Transfers and Assets</u>.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether

any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

7.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

8.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.      No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, these chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE X.
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A.      *Introduction.*

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, or the Medicare tax imposed on certain net investment income, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims, persons using a mark-to-market method of accounting, and Holders of Claims who are

themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (2) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      *Certain U.S. Federal Income Tax Consequences to the Debtors.*

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic. The CARES Act contains certain tax law changes designed to provide relief to businesses, and the Debtors are currently evaluating the impact of the CARES Act on their net operating losses ("NOLs").

1.      Tax Consequences of the Asset Sales.

The Plan provides for Asset Sales. Pursuant to the Asset Sales, Debtors would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets sold and the Debtors' tax basis in such assets. To the extent any gain is recognized, such gain may be able to be offset, in whole or in part, by the Debtors' available tax attributes. If the Debtors were to recognize gain in connection with the Asset Sales and such gain could not be entirely offset with available tax attributes, a cash tax liability would arise.

2.      <u>COD Income</u>.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income (the "<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "<u>Bankruptcy Exception</u>"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "<u>Insolvency Exception</u>").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule described in the preceding sentence.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the Debtors with respect to the sale of their assets).  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

As a general matter, the rules related to COD Income will only be relevant to the Debtors to the extent that taxable income is realized following the conclusion of the current tax year.  In that case, the Debtors' existing tax attributes would, to the extent they are subject to reduction as a result of the rules described above, be unavailable.

C.      *Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims Entitled to Vote.*

The following discussion assumes that the Debtors will undertake the Asset Sales.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Asset Sales.

1.      <u>U.S. Federal Income Tax Consequences for Holders of Allowed Class 4 Claims</u>.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 4 Claims, each Holder thereof will receive its Pro Rata share of the Distributable Cash pursuant to the Waterfall Recovery.

Each such Holder will be treated as exchanging such Claim in a taxable exchange under section 1001 of the Tax Code for the Distributable Cash.  Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Distributable Cash received, as applicable, in exchange for such Claim, and (2) such Holder's adjusted basis, if any, in such Claim.

The character of any such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange.

2.      <u>Accrued but Untaxed Interest</u>.

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder).

Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims are urged to consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

3.    Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument immediately after such acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

4.    Character of Gain or Loss With Respect to Impaired Claims.

Generally, the gain or loss recognized by a U.S. Holder with respect to a Claim will be a capital gain or loss unless the Claim was acquired at a market discount (as discussed above), and depending on whether and the extent to which the Holder previously claimed a bad debt deduction.  Any such capital gain or loss generally should be long-term if the U.S. Holder's holding period in the Claim is more than one year and otherwise should be short-term.  Under current U.S. federal income tax law, certain non-corporate U.S. Holders (including individuals) are eligible for preferential rates of U.S. federal income tax on long-term capital gains.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (x) $3,000 ($1,500 for married individuals filing separate returns) or (y) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

5.      Distribution Reserve Accounts and Delayed Equity Distributions.

The Plan provides that certain distributions may be delayed while contingent, unliquidated, or disputed Claims are addressed.  Pending the resolution of such Claims, a portion of the property to be received by Holders of Claims may be deposited into the various Claim distribution accounts described in the Plan (including the Priority Claims Reserve).  The property that is subject to delayed distribution will be subject to "disputed ownership fund" treatment under Treasurey Regulations section 1.468B-9.  Pursuant to such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts.  Such accounts will be liable, as an entity, for taxes, including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution.  Such taxes shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to such accounts, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

D.      *Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims.*

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex.  Each non-U.S. Holder is urged to consult its tax advisor regarding the U.S. federal, state, local and foreign tax consequences of the consummation of the Plan to such non-U.S. Holder.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

1.      Gain Recognition.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount, if any), any gain realized by a non-U.S. Holder on the exchange of its Claim pursuant to the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise).  In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      Accrued Interest.

Subject to the discussion of FATCA below, payments to a non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

64

(a)     the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Le Tote's stock entitled to vote;

(b)     the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Le Tote (each, within the meaning of the Tax Code);

(c)     the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

(d)     such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "*Accrued but Untaxed Interest*," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

3.    FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each non-U.S. Holder is urged to consult its tax advisor regarding the possible impact of these rules on such non-U.S. Holder's exchange of its Claim.

E.    *Information Reporting and Back-Up Withholding.*

The Debtors will withhold all amounts required by law to be withheld from any distributions made under the Plan. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a

properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XI.
## RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Holders of Allowed Claims and Allowed Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Interests than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated:  December 21, 2020                    LE TOTE, INC.
                                             on behalf of itself and all other Debtors


                                             _/s/ Ed Kremer_
                                             Ed Kremer
                                             Chief Restructuring Officer
                                             Le Tote, Inc.

**EXHIBIT A**

**First Amended Plan**

**[Intentionally Omitted]**

**EXHIBIT B**

**Corporate Structure Chart**

**Lord & Taylor | LE TOTE**
**Corporate and Capital Structure Chart**

**ABL Credit Agreement**
**Amt. Oustanding:** $77.2 M  |  **Commitment Amt.:** $225.0 M
**Int. Rate:** ~1.75-2.65%

*General Provisions*
**Agent:** Wells Fargo, N.A.  |  **Maturity:** Nov. 8, 2024
**Collateral:** Substantially all assets

**Term Loan Credit Agreement**
**Amt. Outstanding:** $31.5 M  |  **Commitment Amt.:** $30.0 M
**Int. Rate:** LIBOR + 6.75%

*General Provisions*
**Agent:** TCG BDC, Inc.  |  **Maturity:** Nov. 8, 2024
**Collateral:** Substantially all assets

**APA Seller Note**
**Amt. Outstanding:** $29.2 M  |  **Amt. Issued:** ~$30.0 M
**Int. Rate:** 0% through Nov. 8, 2021, then 12%

*General Provisions*
**Payee:** HBC US Propco Holdings LLC  |  **Maturity:** Nov. 8, 2021
**Collateral:** Substantially all assets

| Capital Structure | |
|---|---|
| ABL Credit Agreement | $77.2 M |
| Term Loan Credit Agreement | $31.5 M |
| APA Seller Note | $29.2 M |
| Total Secured Debt | $137.9 M |

**Key**

| | | | |
|---|---|---|---|
| Domestic Entity | | Term Loan Borrower | |
| Foreign Entity | | Term Loan Guarantor | |
| ABL Borrower | | APA Seller Note Issuer | |
| ABL Guarantor | | APA Seller Note Guarantor | |
| Non-Debtor Entity | | | |

**Various Shareholders**

**Fundamental Forces Limited**

**Le Tote, Inc. (DE)**

20%    <80%

**French Tote LLC (DE)**

**Le Tote Venture Limited (Cayman)**

**Lord & Taylor LLC (DE)**

**Le Tote, LLC (DE)**

**Le Tote (Hong Kong) Limited (HK)**

**LT Card Company LLC (VA)**

**Le Tote (Shenzhen) Technology Limited (PRC)**

**EXHIBIT C**

**Disclosure Statement Order**

**[Intentionally Omitted]**

**EXHIBIT D**

**Settlement Term Sheet**

SETTLEMENT TERMS

| Issue | Terms |
|---|---|
| **Parties** | Le Tote, Inc. and each of its subsidiaries that has commenced a chapter 11 restructuring case (the "**Debtors**" or "**Le Tote**"), HBC US Holdings LLC and HBC US Propco Holdings LLC (together, "**HBC**"). |
| **Allocation of proceeds of Le Tote bankruptcy cases following payment of Carlyle** | Recoveries from the Debtors' estates following satisfaction of Carlyle's claims (other than proceeds of Urban Outfitters litigation, which shall be allocated as set forth below) would be allocated as follows: <u>first</u> to cover administrative expenses and priority claims; <u>second</u>, in payment of the TSA Shortfall Claim; <u>third</u>, to HBC on account of the Seller Note, until HBC receives $8 million on account of the Seller Note; <u>fourth</u>, to the Debtors' estates, until the Debtors' estates have received $3 million; <u>fifth</u>, split 50/50 between HBC and the Debtors' estates until the Seller Note claim (including unreimbursed prepetition CAM and Tax payments made on the Debtors' behalf) is paid in full; and <u>sixth</u>, to the Debtors' estates.<br><br>Following payment of administrative expenses and priority claims, proceeds of the Urban Outfitters litigation shall be split as follows: <u>first</u>, $1 million to the Debtors' estates; <u>second</u>, shared 50/50 between the Debtors' estates and HBC until the Seller Note claim (including unreimbursed prepetition CAM and Tax payments made on the Debtors' behalf) is paid in full; and <u>third</u>, to the Debtors' estates.<br><br>Payments on account of the Seller Note shall only be made from amounts allocated to HBC as set forth in this section, and not from amounts allocated to the Debtors' estates in this section. |
| **Mutual Release** | All Parties to exchange mutual and general releases pursuant to the Plan or other settlement documentation, for themselves and affiliates (including current and former directors, officers, employees, agents, attorneys, and other related parties) including, without limitation, with respect to preference, breach of contract, fraudulent transfer, recharacterization, subordination, and other claims under investigation by the independent restructuring committee of Le Tote and the Committee; provided, however, that certain indemnification obligations of the parties under the APA, as set forth in more detail below, shall not be released. |
| **Cash Collateral** | Pursuant to the Final Cash Collateral Order, the Debtors and HBC have agreed on the terms of an amended order governing the use of cash collateral (the "<u>Successor Cash Collateral Order</u>"), which has been submitted to the court for approval.  Except as otherwise agreed between the Debtors and HBC, the Successor Cash Collateral Order shall contain, inter alia, a budget consistent with the Approved Budget then in effect at |

| | |
|---|---|
| | the time of the indefeasible payment in full of the ABL Obligations and the Term Loan Obligations and a carve out on the same or substantially similar terms as the Carve Out in the Final Order.[1] |
| **Treatment of Leases** | The Debtors, HBC and the HBS Landlords have agreed that the Debtors shall continue to pay CAM and taxes with respect to all of their store leases; HBC shall pay base and percentage rent with respect to third-party leases; and the HBS Landlords shall waive, or forbear from collecting, as applicable, base and percentage rent with respect to store leases between the Debtors and the HBS Landlords. |
| | The Debtors agree to assume and assign the Financed Master Lease, and the Non-Financed Master Lease dated July 22, 2015, to HBC or its designee in December, 2020, with the actual dates for the transfer of possession of individual stores to be agreed between the Debtors and HBC, but in no event later than February 28, 2021. In lieu of payment of cure amounts with respect to such leases, and in satisfaction of all cure obligations with respect to such lease, the Debtors would assign, to the relevant landlords, their rights under the APA to seek payment of the relevant rent amounts from HBS and upon such assignment. |
| | The Debtors will reject the Amended and Restated Lease Agreement, dated November 6, 2019 (the "Propco Lease"), effective as of no later than February 28, 2021; *provided* that the Debtors shall not be responsible for payments of CAM and real estate taxes for periods after the date of delivery of properties governed by the Propco lease to the lessor thereunder. The chapter 11 plan will provide for the waiver or disallowance of all rejection damages under the Propco Lease. |
| | The Debtors' other store leases would be rejected, if not previously assigned to a third party on terms acceptable to HBC. The effective dates of such rejection would be December 31, 2020 (Albany, Salem and Yonkers), January 31, 2021 (Bala Cynwyd), and February 28, 2021 (Boca Raton), respectively. |
| | The December 31, 2020, January 31, 2021 and February 28, 2021 dates referenced above may be extended in the event that COVID-19-related governmental orders mandate the closure of the Debtors' stores, but in no event shall any such extension exceed the lesser of a) the number of days a particular store is mandated to be closed, and b) one month. |
| **Continued TSA Support** | The Debtors have paid an incremental $935,000 (above the immediately prior TSA amount) each for November and December. The parties agree that the appropriate incremental amount was $1,707,881 for November and $1,646,881 for December, leaving a shortfall of $772,881 for November and $711,881 for December. The combined shortfall amount of $1,484,762 is referred to as the "TSA Shortfall Claim." |

---

[1]    Each as defined in the *Final Order (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; and (III) Granting Related Relief* [Docket No. 268].

|  | |
|---|---|
|  | - TSA payments for January and February, 2021 shall be $513,017 per month.  The parties acknowledge that the Omnibus Term Sheet requires TSA pricing to return to its original level as of January 1, 2021, and therefore HBC's agreement to accept these reduced amounts constitutes additional consideration provided by HBC under the parties' agreement.<br><br>-The TSA would be terminated as of February 28, 2021.  If for any reason one or more of the Debtors' stores remain open following February 28, 2021, similar charges for March, 2021 (and any subsequent months for which such stores remain open) would apply.  If no stores remain open following February 28, 2021 but the Debtors determine that other transition services are required after such date, the parties shall negotiate in good faith the cost of such services. |
| **Estate Wind-Down** | Following the sale or liquidation of all of the inventory at their stores, the Debtors will enter the wind-down phase of their operations (the "**Wind-down Period**"), which may involve reconciling claims, filing taxes, and performing other wind-down work.  In order to assist with this work, HBC will deliver the following information to Le Tote, in exchange for an incremental payment of $115,000:<br><br>• Trial balance as of 1/2/2021 including reconciliations by account<br>• Accounts payable aging as of 1/2/2021<br>• Latest "Vendor Master" file<br>• Historical data from 11/9/2019 for (i) AP invoice detail, (ii) vendor payment/cash receipts detail, (iii) inventory receipts/proofs of delivery, (iv) vendor allowance detail<br><br>HBC shall make commercially reasonable efforts to cooperate with requests, if any, from taxing authorities exercising audit rights with respect to historical Lord & Taylor audits at a reasonable rate based on hours incurred to procure and provide requested data. |
| **HBC Operational Support** | HBC agrees to ship Lord & Taylor-owned inventory located at HBC's Pottsville facility to brick and mortar Lord & Taylor stores, as the Debtors may reasonably request and at the Debtors' cost as follows:<br><br>• cost per unit: $0.35<br>• shipping supplies and transportation costs passed through to L&T at cost |

3

| Asset Disposition and Ownership | There are numerous trailers and other pieces of other trucking equipment located outside certain of the Debtors' stores (the "**Equipment**"), and the parties dispute whether such Equipment was transferred to Le Tote under the APA. All such Equipment will remain property of HBC, and title to such Equipment shall be transferred to HBC at HBC's sole cost. The Debtors shall use commercially reasonable efforts to provide such cooperation as may be required to implement such title transfers. |
|---|---|
| Further Assurances | The Debtors shall use commercially reasonably efforts to transfer certain utility accounts for non-Debtor locations to HBC, and assist HBC as required with respect to the assignment and/or termination of the contracts set forth on **Annex A** hereto, in each case at HBC's sole cost and expense. |
| Indemnification | HBC shall continue to indemnify the Company pursuant to Section 9.02(a) of the APA, and the Debtors shall continue to indemnify HBC under 9.02(b)(iii) of the APA. Any claim by HBC for indemnification shall be added to the balance of the Seller Note. |
| Implementation | The Parties shall implement the remaining terms of this Term Sheet connection with confirmation of a chapter 11 plan consistent with this Term Sheet in all material respects. |
| Public Disclosure | Neither Le Tote nor HBC shall issue any statement or communication to any third party (other than to its legal and accounting advisors) regarding the transactions contemplated hereby without the consent of the other party, subject to customary exceptions for securities law compliance reasons, required disclosures to lenders or the unsecured creditors committee, and required disclosures in connection with the Bankruptcy Cases. |
| Expenses and Fees | All fees and expenses of the Debtors in connection with the transactions contemplated hereby will be paid by the Debtors.  Under the Successor Cash Collateral Order, all fees and expenses of HBC in connection with the Debtors' bankruptcy cases from and after December 7, 2020 will be paid by the Debtors. |
| Governing Law/Consent to Jurisdiction | This Term Sheet shall be governed by New York law without regard to that state's choice of law provisions; *provided* that the Bankruptcy Court shall have exclusive jurisdiction regarding implementation and enforcement of this Term Sheet. |
| Support for Term Sheet | The parties agree to support and take all steps reasonably necessary and desirable to consummate the transactions and undertakings contained herein. This Term Sheet is not a solicitation of acceptances within the meaning of section 1125 of the Bankruptcy Code.  Any such solicitation will comply with all applicable provisions of the Bankruptcy Code. |

4

## **Annex A**

[TO BE SUPPLIED]

## **Exhibit B**

## **Redline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LE TOTE, INC., *et al.*,[1] | ) | Case No. 20-33332 |
| | ) | |
| ————————————Debtors. | ) | (Joint Administration Requested)(Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE AMENDED JOINT
CHAPTER 11 PLAN OF LE TOTE, INC. AND ITS DEBTOR AFFILIATES**

Steven N. Serajeddini, P.C. (admitted *pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

David L. Eaton (admitted *pro hac vice* admission pending)
Jaimie Fedell (admitted *pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  August 2December 21, 2020

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE DISCLOSURE STATEMENT IS**

---

[1] The    A complete list of each of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in may be obtained on the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases*website of the Debtors' claims and *(II) Granting Related Relief* filed contemporaneously herewith. noticing agent at https://cases.stretto.com/letote/.  The location of the Debtors' service address is 250 Vesey Street, 22nd Floor, New York, New York 10281.

**SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF LE TOTE, INC. AND ITS DEBTOR AFFILIATES.[2]

**THE DEBTORS URGE HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.**

NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THESE CHAPTER 11 CASES.   ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.   THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Amended Joint Chapter 11 Plan of Le Tote, Inc. and its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "Plan"), attached hereto as **Exhibit A**.

REGARDING THE DEBTORS' BUSINESSES.   WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.   THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  THE DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.   INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.   THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF CONFIRMATION OR EFFECTIVENESS OF THE PLAN DOES NOT OCCUR, THE PLAN SHALL ACT AS A MOTION SEEKING A DISMISSAL OF THE CHAPTER 11 CASES IN ACCORDANCE WITH THE BANKRUPTCY CODE.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## TABLE OF CONTENTS

**Page**

**ARTICLE I. INTRODUCTION**..................................................................................................1

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT**................3

    A.    What is Chapter 11?........................................................................................3
    B.    Why are the Debtors sending me this Disclosure Statement?..................................3
    C.    Am I entitled to vote on the Plan?......................................................................4
    D.    What will I receive from the Debtors if the Plan is consummated?..........................4
    E.    What happens to my recovery if the Plan is not confirmed or does not go effective?....7
    F.    What is the deadline to vote on the Plan?...........................................................7
    G.    How do I vote for or against the Plan?................................................................7
    H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?..........................................................................................7
    I.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim?...............................................................8
    J.    Will the final Amount of General Unsecured Claims affect my recovery under the Plan?....9
    K.    Will there be releases and exculpation granted to parties in interest as part of the Plan?....10
    L.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?..................................................................10
    M.    What is the purpose of the Confirmation Hearing?..............................................11
    N.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?...............................................................................................11
    O.    Do the Debtors recommend voting in favor of the Plan?.......................................11

**ARTICLE III. SOLICITATION AND VOTING PROCEDURES**..........................................................12

    A.    Holders of Claims Entitled to Vote on the Plan...................................................12
    B.    Voting Record Date.......................................................................................12
    C.    Voting on the Plan........................................................................................12
    D.    Ballots Not Counted......................................................................................13
    E.    Confirmation Hearing....................................................................................13

**ARTICLE IV. THE DEBTORS' BACKGROUND**..........................................................................14

    A.    Corporate History and Business Operations.......................................................14
    B.    The Debtors' Prepetition Corporate and Capital Structure....................................16

**ARTICLE V. EVENTS LEADING TO THESE CHAPTER 11 CASES & MATERIAL DEVELOPMENTS**..........................................................................................19

    A.    Market Distress............................................................................................19
    B.    Prepetition Restructuring Efforts.....................................................................20
    C.    First Day Relief............................................................................................22

**ARTICLE VI. SUMMARY OF THE PLAN**.................................................................................22

    A.    Classification and Treatment of Claims and Interests...........................................23
    B.    Means for Implementation of the Plan..............................................................23
    C.    Treatment of Executory Contracts and Unexpired Leases.....................................28
    D.    Provisions Governing Distributions..................................................................31

i

E.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims. ........................32
F.      Settlement, Release, Injunction, and Related Provisions. ............................................34
G.      Conditions Precedent to Effective Date. ................................................38

ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .......................39

A.      Confirmation Hearing. ................................................39
B.      Confirmation Standards. ................................................40
C.      Acceptance by Impaired Classes. ................................................41
D.      Confirmation Without Acceptance by All Impaired Classes. ............................42

ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.......................42

A.      Risks Related to the Confirmation and Consummation of the Plan. ................42
B.      Risks Related to the Debtors' Businesses. ................................................45
C.      Disclosure Statement Disclaimer. ................................................46

ARTICLE IX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN ..............................................................................................................................48

A.      Introduction. ................................................48
B.      Certain U.S. Federal Income Tax Consequences to the Debtors. ...............49
C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed
        Claims Entitled to Vote. ................................................50
D.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims. ...........51
E.      Information Reporting and Back-Up Withholding. ................................53

ARTICLE X. RECOMMENDATION OF THE DEBTORS ....................................................53

ARTICLE I. INTRODUCTION.................................................................................................1

A.      Introduction. ...............................................................................................1
B.      Plan and Settlement Overview. ..............................................................1
C.      The Debtors' Businesses, Prepetition Negotiations, and Chapter 11 Filing.............2
D.      The 363 Process. .......................................................................................3
E.      Postpetition Negotiations. .......................................................................3
F.      Recommendation. .....................................................................................4

ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT.................5

A.      What is Chapter 11? ................................................................................5
B.      Why are the Debtors sending me this Disclosure Statement?.......................5
C.      Am I entitled to vote on the Plan?..........................................................5
D.      What will I receive from the Debtors if the Plan is consummated?..............6
E.      Are any regulatory approvals required to consummate the Plan?.................8
F.      What happens to my recovery if the Plan is not confirmed or does not go effective? ........8
G.      What is the deadline to vote on the Plan?...............................................8
H.      How do I vote for or against the Plan?....................................................8
I.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
        Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
        "Consummation"?..................................................................................9
J.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority
        Tax Claim, or Professional Fee Claim? ..................................................9
        1.      Administrative Claims and Priority Tax Claims................................9
        2.      Professional Compensation.............................................................10

ii

|  |  | 3. | Statutory Fees. | 11 |
|  |  | 4. | TSA Shortfall Claim. | 11 |
|  | K. | Will the final Amount of General Unsecured Claims affect my recovery under the Plan? | | 11 |
|  | L. | Will there be releases and exculpation granted to parties in interest as part of the Plan? | | 11 |
|  | M. | Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur? | | 12 |
|  | N. | What is the purpose of the Confirmation Hearing? | | 12 |
|  | O. | Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | | 13 |
|  | P. | Do the Debtors recommend voting in favor of the Plan? | | 13 |

**ARTICLE III. SOLICITATION AND VOTING PROCEDURES** ...................................... 13

|  | A. | Holders of Claims Entitled to Vote on the Plan. | 13 |
|  | B. | Voting Record Date. | 14 |
|  | C. | Voting on the Plan. | 14 |
|  | D. | Ballots Not Counted. | 14 |
|  | E. | Confirmation Hearing. | 15 |

**ARTICLE IV. THE DEBTORS' BACKGROUND** ...................................... 15

|  | A. | Corporate History and Business Operations. | | 15 |
|  |  | 1. | Le Tote Corporate History. | 15 |
|  |  | 2. | Le Tote China. | 16 |
|  |  | 3. | Lord & Taylor Corporate History. | 16 |
|  |  | 4. | Critical Components of Le Tote's Cost Structure. | 17 |
|  | B. | The Debtors' Prepetition Corporate and Capital Structure. | | 18 |
|  |  | 1. | The ABL Credit Facility. | 20 |
|  |  | 2. | The Term Loan Credit Facility. | 20 |
|  |  | 3. | The Seller Note. | 20 |
|  |  | 4. | The Transition Services Agreement Obligations. | 21 |
|  |  | 5. | The ABL Intercreditor Agreement. | 21 |
|  |  | 6. | The Seller Intercreditor Agreement. | 22 |

**ARTICLE V. EVENTS LEADING TO THESE CHAPTER 11 CASES & MATERIAL DEVELOPMENTS** ...................................... 22

|  | A. | Market Distress. | | 22 |
|  |  | 1. | Challenging Operating Environment and Transition Obligations. | 22 |
|  |  | 2. | The COVID-19 Pandemic. | 22 |
|  | B. | Prepetition Restructuring Efforts. | | 23 |
|  |  | 1. | Efforts to Manage Liquidity. | 23 |
|  |  | 2. | Negotiations with HBC. | 23 |
|  |  | 3. | Store Closing Sales. | 23 |

**ARTICLE VI. EVENTS OF THE CHAPTER 11 CASES** ...................................... 24

|  | A. | First Day Relief. | 24 |
|  | B. | Approval of Use of Cash Collateral | 24 |
|  | C. | Schedules and Statements | 24 |
|  | D. | Appointment of Official Committee | 24 |
|  | E. | Sale Process and Bidding Procedures | 25 |
|  | F. | Store Closing Process. | 26 |
|  | G. | Extension Order | 26 |
|  | H. | Key Employee Incentive Program | 26 |
|  | I. | Wilmington Trust Litigation | 26 |

J.       Investigation of Estate Causes of Action by the Debtors........................................................27
      1.      Appointment of Restructuring Committee.................................................27
      2.      Summary of the Investigation........................................................................27
      3.      Claims Investigated.......................................................................................27
      4.      Cost and Delay of Litigation.........................................................................28
K.      Settlement and Plan Negotiations..........................................................................................29
L.      Evaluation of the Proposed HBC Settlement..........................................................................29
M.     The Committee's Standing Motion........................................................................................30
N.      Litigation Matters................................................................................................................30
O.      Other Procedural and Administrative Motions......................................................................31

ARTICLE VII SUMMARY OF THE PLAN ............................................................................................31

A.      Classification and Treatment of Claims and Interests...........................................................32
      1.      Classification of Claims and Interests...........................................................32
      2.      Confirmation Pursuant to 1129(a)(10) and 1129(b) of the Bankruptcy Code....32
B.      Means for Implementation of the Plan...................................................................................32
      1.      General Settlement of Claims.........................................................................32
      2.      The HBC Settlement.......................................................................................32
      3.      Cancellation of Securities and Agreements...................................................33
      4.      Exemption from Certain Taxes and Fees.......................................................33
      5.      Sources of Plan Consideration and Priority Waterfall..................................33
      6.      Restructuring Transactions.............................................................................34
      7.      Corporate Action............................................................................................34
      8.      Post-Effective Date Debtors...........................................................................34
      9.      Plan Administrator.........................................................................................35
      10.     Wind-Down....................................................................................................36
      11.     Continued HBC Support................................................................................37
      12.     Wind-Down Support......................................................................................38
      13.     Dissolution and Board of Directors...............................................................38
      14.     Management Payments...................................................................................38
      15.     Effectuating Documents; Further Transactions.............................................38
      16.     Preservation of Causes of Action..................................................................38
      17.     Closing the Chapter 11 Cases.......................................................................39
C.      Treatment of Executory Contracts and Unexpired Leases.....................................................39
      1.      Assumption and Rejection of Executory Contracts and Unexpired Leases.......39
      2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.......39
      3.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases........40
      4.      D&O Policies..................................................................................................40
      5.      Indemnification Obligations...........................................................................41
      6.      Termination Agreements.................................................................................41
      7.      Modifications, Amendments, Supplements, Restatements, or Other Agreements........41
      8.      Reservation of Rights.....................................................................................41
      9.      Nonoccurrence of Effective Date...................................................................42
D.      Provisions Governing Distributions.......................................................................................42
      1.      Timing and Calculation of Amounts to be Distributed..................................42
      2.      Rights and Powers of the Disbursing Agent.................................................42
      3.      Delivery of Distributions and Undeliverable or Unclaimed Distributions........42
      4.      Setoffs and Recoupment.................................................................................44
E.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims...........................44
      1.      Allowance of Claims and Interests................................................................44
      2.      Claims and Interests Administration Responsibilities...................................44
      3.      Estimation of Claims and Interests................................................................44
      4.      Adjustment to Claims or Interests Without Objection...................................45
      5.      Time to File Objections to Claims.................................................................45
      6.      Disallowance of Claims.................................................................................45

7.        Amendments to Claims. ..............................................................................45
8.        No Distributions Pending Allowance. .........................................................45
9.        Distributions After Allowance. ...................................................................46
F.        Settlement, Release, Injunction, and Related Provisions. ......................................46
1.        Settlement, Compromise, and Release of Claims and Interests. ...............46
2.        Term of Injunctions or Stays. .....................................................................46
3.        Release of Liens. .........................................................................................46
4.        Releases by the Debtors. .............................................................................46
5.        Releases by Holders of Claims and Interests. .............................................47
6.        Exculpation. ................................................................................................48
7.        Injunction. ...................................................................................................48
8.        Limited Substantive Consolidation. ............................................................49
9.        Protection Against Discriminatory Treatment. ...........................................50
10.       Recoupment. ...............................................................................................50
11.       Subordination Rights. ..................................................................................50
G.        Conditions Precedent to Effective Date. ..............................................................50
1.        Conditions Precedent to the Effective Date. ..............................................50
2.        Waiver of Conditions. .................................................................................51
3.        Substantial Consummation. .........................................................................51
4.        Effect of Non-Occurrence of Conditions to the Effective Date. ................51

ARTICLE VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.......................51

A.        Confirmation Hearing. .........................................................................................52
B.        Confirmation Standards. ......................................................................................52
1.        Requirements for Confirmation of the Plan. ...............................................52
2.        Best Interests of Creditors. ..........................................................................52
3.        Financial Feasibility. ...................................................................................53
C.        Acceptance by Impaired Classes. .........................................................................53
D.        Confirmation Without Acceptance by All Impaired Classes. ................................54
1.        No Unfair Discrimination. ...........................................................................54
2.        Fair and Equitable Test. ..............................................................................54

ARTICLE IX. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING............................54

A.        Risks Related to the Confirmation and Consummation of the Plan. .......................55
1.        Parties in Interest May Object to the Plan's Classification of Claims and
          Interests. ......................................................................................................55
2.        The Conditions Precedent to the Effective Date of the Plan May Not Occur. ...................55
3.        The Debtors May Fail to Satisfy Vote Requirements. .................................55
4.        The Debtors May Not Be Able to Secure Confirmation of the Plan. ...........55
5.        Nonconsensual Confirmation. .....................................................................56
6.        Continued Risk Upon Confirmation. ...........................................................56
7.        These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the
          Bankruptcy Code. ........................................................................................56
8.        The Debtors May Object to the Amount or Classification of a Claim. .........56
9.        Risk of Non-Occurrence of the Effective Date. ..........................................56
10.       Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the
          Plan. .............................................................................................................57
11.       The Plan's Release, Injunction, and Exculpation Provisions May Not Be
          Approved. ....................................................................................................57
12.       The Total Amount of Allowed Unsecured Claims May Be Higher Than
          Anticipated By the Debtors. .........................................................................57
13.       The Total Amount of Allowed Administrative and Priority Claims May Be
          Higher and/or the Amount of Distributable Cash May Be Lower Than
          Anticipated by the Debtors. .........................................................................57

v

14.       The Committee's Standing Motion May Be Granted .......................... 57
B.     Risks Related to the Debtors' Businesses. ........................................................ 57
1.     The Debtors May Not Be Able to Generate Sufficient Cash to Service All of
Their Indebtedness. ........................................................................... 57
2.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the
Chapter 11 Cases. ............................................................................ 58
3.     Results of Store Closing Sales May Not Meet Projections. ....................... 58
4.     The Wind-Down Budget May Change Materially. ................................. 58
5.     Renewed Shelter-in-Place Orders May Interrupt Going Out of Business Sales. ... 58
6.     The Debtors Rely on Services Provided By HBC Which May Be Interrupted ..... 59
C.     Disclosure Statement Disclaimer. .................................................................. 59
1.     Information Contained in this Disclosure Statement is for Soliciting Votes. ....... 59
2.     This Disclosure Statement Was Not Approved by the United States Securities
and Exchange Commission. .................................................................. 59
3.     No Legal or Tax Advice Is Provided to You by this Disclosure Statement. ......... 59
4.     No Admissions Made. ........................................................................ 59
5.     Failure to Identify Litigation Claims or Projected Objections. .................... 59
6.     No Waiver of Right to Object or Right to Recover Transfers and Assets. .......... 59
7.     Information Was Provided by the Debtors and Was Relied Upon by the Debtors'
Advisors. ........................................................................................ 60
8.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. ...... 60
9.     No Representations Outside this Disclosure Statement Are Authorized. .......... 60

ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN ..................................................................................................... 60

A.     Introduction. ............................................................................................ 60
B.     Certain U.S. Federal Income Tax Consequences to the Debtors. ............................ 61
1.     Tax Consequences of the Asset Sales. ..................................................... 61
2.     COD Income. ................................................................................... 62
C.     Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed
Claims Entitled to Vote. ............................................................................. 62
1.     U.S. Federal Income Tax Consequences for Holders of Allowed Class 4 Claims. .... 62
2.     Accrued but Untaxed Interest. .............................................................. 62
3.     Market Discount. .............................................................................. 63
4.     Character of Gain or Loss With Respect to Impaired Claims. ........................ 63
5.     Distribution Reserve Accounts and Delayed Equity Distributions. ................. 64
D.     Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims. ... 64
1.     Gain Recognition. ............................................................................. 64
2.     Accrued Interest. .............................................................................. 64
3.     FATCA. ......................................................................................... 65
E.     Information Reporting and Back-Up Withholding. ............................................. 65

ARTICLE XI. RECOMMENDATION OF THE DEBTORS ........................................ 66

**EXHIBITS**

Exhibit A          Plan

Exhibit B          Corporate Structure Chart

Exhibit C          Disclosure Statement Order


Exhibit D          Settlement Term Sheet

## ARTICLE I.
## INTRODUCTION

A.        *Introduction.*

Le Tote, Inc. ("Le Tote") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan.[3]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

B.        *Plan and Settlement Overview.*

The proposed Plan achieves an orderly wind-down of the Debtors' estates that maximizes the value of all estate assets, including the Debtors' remaining inventory and certain potential litigation assets stemming from the 2019 acquisition (the "Acquisition") of Lord & Taylor LLC from HBC US Holdings Inc. ("HBC Holdings"), a subsidiary of Hudson's Bay Company ULC (f/k/a Hudson's Bay Company) ("HBC"), and HBC US Propco Holdings LLC ("HBC Propco" and together with HBC Holdings and Hudson's Bay, the "HBC Parties"), a subsidiary of HBC Holdings, and certain post-Acquisition transactions, and certain other litigation claims.  The proposed Plan is the culmination of more than six months of successful going-out-of-business sales, asset sales outside of the ordinary course business, investigations and related diligence into the Debtors' assets by the Debtors' independent directors and their advisors, and approximately three months of hard-fought post-petition negotiations with HBC. Importantly, the proposed Plan incorporates an integrated settlement of claims and causes of action among the Debtors and HBC. Through this settlement, the Plan provides the ability of the Debtors to satisfy administrative and priority claims in full and to make a significant distribution to unsecured creditors who likely otherwise would receive minimal and substantially delayed, if any, recovery.

The Plan provides this value by settling estate claims and causes of action against HBC Holdings and HBC Propco on account of the Acquisition and the parties' subsequent business dealings and other potential claims arising on or before the effective date of the Plan (the "HBC Settlement"), the terms of which are encompassed in the term sheet attached to this Disclosure Statement as **Exhibit D**.  In exchange, the HBC Parties have, among other things, agreed to subordinate their secured claims under their seller note to administrative and priority claims and split recoveries on account of the Debtors' remaining assets with unsecured creditors as set forth below.  The HBC Parties have also agreed to provide key operational support, enabling the Debtors to extend their store-closing sales and deliver additional value.  Finally, the HBC Parties have consented to the disallowance of certain rejection damages claims on account of a master lease held by an affiliate of the HBC Parties and to certain pricing reductions for the Debtors' critical transition services agreement with certain of the HBC Parties.  The HBC Settlement provides the Debtors a path forward to exit these chapter 11 cases while delivering significant value to unsecured creditors—an outcome that would be fraught with significant uncertainty and litigation risk, and likely not achievable at all, absent the HBC Settlement.  As of the date of this Disclosure Statement, the official committee of unsecured creditors (the "Committee") disagrees and believes that the HBC Settlement falls below the lowest point in the range of reasonableness.

The Plan provides the following recoveries to stakeholders:

- Administrative Claims and other Priority Claims will be paid in full in cash or otherwise unimpaired except to the extent that an individual holder agrees to less favorable treatment.

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

1

- Allowed Other Secured Claims will receive, at the election of the Debtors: (a) payment in full in Cash; (b) the Collateral securing such Allowed Other Secured Claim; (c) reinstatement of such Allowed Other Secured Claim; or (d) such other treatment rendering such Allowed Other Secured Claim Unimpaired.

- Holders of the Seller Note Secured Claim and General Unsecured Claims will receive their *pro rata* share of Distributable Cash pursuant to the Waterfall Recovery. The Waterfall Recovery establishes the following recoveries following payment in full of Administrative Claims (other than the TSA Shortfall Claim) and Priority Claims:

  - Distributable Cash other than Urban Proceeds is allocated as follows: (i) first, to holders of the TSA Shortfall Claim; (ii) second, to holders of the Seller Note Secured Claim, until such holders receive $8 million on account of the Seller Note Secured Claim; (iii) third, to holders of Allowed General Unsecured Claims, until such holders have received $3 million on account of such claims; (iv) fourth, split 50/50 between holders of the Seller Note Secured Claim and the holders of Allowed General Unsecured Claims until the Seller Note Secured Claim is paid in full; and (v) fifth, to the holders of Allowed General Unsecured Claims.

  - The Urban Proceeds are allocated as follows: (i) first to holders of Allowed General Unsecured Claims until such holders have received $1 million on account of the Allowed General Unsecured Claims; (ii) second, split 50/50 between holders of the Seller Note Secured Claim and holders of Allowed General Unsecured Claims; and (iii) third, to holders of Allowed General Unsecured Claims.

The Plan maximizes creditor recoveries, provides the Debtors a path forward to quickly and efficiently complete these chapter 11 cases while extending their store closing sales to further increase recoveries, and has the support of the HBC Parties and the Debtors' independent directors. The Debtors encourage you to vote to accept the Plan.

C.    *The Debtors' Businesses, Prepetition Negotiations, and Chapter 11 Filing.*

The Debtors are the combination of Le Tote—a venture-backed fashion rental subscription service founded in 2012 in San Francisco—and Lord & Taylor LLC ("Lord & Taylor")—the iconic luxury retailer which traces its origins to 1826 in New York. Through Le Tote and Lord & Taylor, the Debtors operate both an online, subscription-based clothing rental service and a full-service fashion retailer with 38 brick-and-mortar locations (the "Stores") with a robust e-commerce platform. Through multiple business channels, the Debtors offer more than 150 brands of clothing and accessories for rental or sale. Le Tote acquired Lord & Taylor from HBC ~~US~~ Holdings ~~Inc. ("HBC Holdings"), a subsidiary of Hudson's Bay Company ULC (f/k/a Hudson's Bay Company) ("HBC"),~~ and HBC ~~US~~ Propco ~~Holdings LLC ("HBC Propco"), a subsidiary of HBC Holdings,~~ pursuant to an asset purchase agreement (as amended from time to time, the "APA") in a transaction which closed in November 2019 (the "Acquisition"). The Acquisition was premised on providing Le Tote access to brand recognition through the iconic Lord & Taylor name and access to new customers through Lord & Taylor's preexisting customer base, while providing Lord & Taylor access to Le Tote's proprietary technology and the ability to break into the rental market during a time of declining sales at traditional retailers. In connection with the Acquisition, Le Tote entered into a Transition Services Agreement (the "Transition Services Agreement") with certain affiliates of HBC to facilitate a smooth transition of the Lord ~~&~~ & Taylor assets into the Le Tote organization. The Transition Services Agreement obligates HBC Propco and certain of its affiliates to provide mission-critical services necessary to the functioning of Lord ~~&~~ & Taylor, such as accounting, human resources, IT services, and merchant support. Under the APA and as one of its primary benefits, HBC Propco is also obligated to pay rent for the Lord ~~&~~ & Taylor physical locations (excluding common area maintenance, real estate taxes, and other similar charges).

Even before the emergence of the COVID-19 pandemic, like many other retail companies, the Debtors were under significant pressure from adverse macro-trends, including increased competition among both online retailers and established brick-and-mortar retailers that have less leveraged capital structures and greater economies of scale. These factors have been greatly compounded by the devastating impact of COVID-19 that has caused retailers throughout the country to close their doors. As states across the country ordered all "non-essential" businesses closed,

**Field Code Changed**

the Debtors temporarily closed all retail locations in March 2020.  ~~Recently, the Debtors have slowly begun to reopen stores~~Although all of the Debtors' locations ultimately reopened as states and local jurisdictions have begun to relax stay-at-home orders.  Nevertheless, foot traffic has declined significantly compared to pre-COVID levels.  COVID-19 ~~has~~ also caused a drop in subscriptions for Le Tote, as the Company's subscriber base ~~has~~ suffered from the wave of job losses gripping the country and the demand for apparel ~~has~~ diminished due to hundreds of millions of Americans affected by stay-at-home orders.

As a result of these factors, the Debtors' revenue ~~has~~ declined precipitously from prior years and from pre-COVID forecasts.  More specifically, with increased debt following the Acquisition and the prolonged closure of the majority of the Debtors' recently acquired Stores due to the COVID-19 pandemic only months after they were acquired, the Debtors ~~are carrying~~carried the increased expenses associated with the Acquisition and brick-and-mortar assets that were unusable for a substantial period of time.  These unprecedented market developments, compounded by lower-than-expected financial results and burdensome Transition Services Agreement charges, adversely impacted liquidity and left the Debtors overleveraged.  To preserve liquidity in the months preceding this filing, the Debtors made the difficult decision to suspend the majority of their vendor payments and to furlough or lay off approximately 4,690 employees.  As the ~~Debtors have slowly begun to reopen Stores~~Debtors' location reopened, they ~~have~~ recalled approximately [400] furloughed employees.

Faced with diminished liquidity, the Debtors and their advisors also engaged in vigorous negotiations with HBC and its affiliates in an effort to restructure the Transition Services Agreement payment obligations and limit go-forward services to only those services necessary in a post-COVID-19 world.  As a result of these efforts, the Debtors, HBC Holdings, and HBC Propco executed an Omnibus Agreement Term Sheet (the "~~Term Sheet~~Omnibus Agreement") on April 10, 2020, which, among other things, offset certain amounts owed under the Transition Services Agreement against certain amounts owed by HBC to the Debtors, and also restructured go-forward services under the Transition Services Agreement to reflect the Debtors' scaled-down enterprise.  ~~The Term Sheet~~, subject to a reset to pre-Omnibus Agreement pricing for "fixed non-payroll costs related to technology" following October 31, 2021 and a global reset to pre-Omnibus Agreement pricing beginning on January 1, 2021.  The Omnibus Agreement greatly reduced the Debtors' go-forward payments under the Transition Services Agreement.

Simultaneously, the Debtors engaged in arm's-length negotiations with their prepetition secured lenders for continued funding during the store closures and throughout the pendency of these chapter 11 cases.  Following extensive negotiations, the Debtors and their prepetition secured lenders came to an agreement regarding the consensual use of cash collateral during these proceedings that will provide the Debtors with the breathing room necessary to continue retail sales while they market the valuable Le Tote and Lord & Taylor brands and proprietary technology in a process that the Debtors believe will maximize value for all stakeholders.  On August 2, 2020 (the "Petition Date"), the Debtors commenced these chapter 11 cases with the goal of maximizing the value of all estate assets for the benefit of creditors.

~~The Debtors believe there remains value in their businesses as a going-concern, and have explored potential transactions surrounding Le Tote and Lord & Taylor in the preceding months.  Accordingly, the Debtors intend to continue marketing the Le Tote and Lord & Taylor assets to maximize the value of their estates.  Nonetheless, the Debtors recognize that they are beset by a perfect storm and cannot continue to operate Lord & Taylor in a business as usual fashion in the current environment.  Recognizing this reality,~~To further this goal, prior to the commencement of the chapter 11 cases the Debtors entered into a store closing agreement (as amended from time to time, the "Consultant Agreement") with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Consultant") to conduct store closing sales at their Lord & Taylor locations.  The Debtors commenced storewide sales at some of their locations prepetition~~and will commence~~, with the remaining stores commencing store closing sales ~~in earnest in all stores throughout the chapter 11 process~~following the Petition Date.

~~Recognizing the challenges that have beset many of their peers in the retail space who have filed for chapter 11 only to be unable to reorganize or confirm a plan without lengthy and expensive in-court proceedings, the Debtors have filed the Plan on the first day of these chapter 11 cases.  The Plan sets forth the key goals of the Debtors in these chapter 11 cases: (1) to swiftly and efficiently monetize the value of the Debtors' estates and (2) to distribute estate assets in accordance with the priorities of the Bankruptcy Code.~~

Field Code Changed

Pursuant to the Plan, Holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holders' Claims and Interests:

- Holders of Allowed Other Priority Claims will receive payment in full in Cash of such Holder's Allowed Other Priority Claim or other treatment rendering such Claim Unimpaired.

- Holders of Allowed Other Secured Claims will receive, at the election of the Debtors: (a) payment in full in Cash of such Allowed Other Secured Claim; (b) the Collateral securing such Allowed Other Secured Claim; (c) reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy Law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or (d) such other treatment rendering such Allowed Other Secured Claim Unimpaired.

- To the extent not already indefeasibly paid in full in Cash, Holders of Allowed ABL Secured Claims will receive payment in full in Cash of such Holder's Allowed ABL Secured Claim.

- To the extent not already indefeasibly paid in full in Cash, Holders of Allowed Term Loan Secured Claims will receive payment in full in Cash of such Holder's Allowed Term Loan Secured Claim.

- Holders of Allowed Secured HBC Claims will receive payment in full in Cash of such Holder's Allowed Secured HBC Claim.

- Holders of Allowed General Unsecured Claims will receive their Pro Rata share of the Distributable Cash, if any, pursuant to the Waterfall Recovery.

- Holders of Le Tote Interests will not receive any recovery or distribution under the Plan on account of such Le Tote Interests.

D.    *Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.  The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist.* The 363 Process.

In addition to the store closing sales, in April 2020, the Debtors commenced a prepetition marketing process for their Le Tote business, which process was later expanded to include the Lord & Taylor business in the summer of 2020.  Following a robust marketing process, on October 8, 2020, the Debtors selected ZG Apparel Group LLP to act as stalking horse bidder with respect to both the Le Tote and Lord & Taylor intellectual property and e-commerce assets.  Following a competitive auction, the Debtors' selected Saadia Group LLC's ("Saadia") $12 million bid (more than three times the size of the stalking horse bid) as the winning bidder.  The sale to Saadia closed on November 23, 2020.  The Debtors used the sale proceeds to pay down significant amounts of their senior secured debt, allowing the Debtors to repay their term loan obligations in full.

E.    *Postpetition Negotiations.*

The Debtors have sought to create consensus regarding the path forward for the Debtors' two remaining main assets—their potential litigation claims and their remaining inventory.  To that end, the Debtors funded an extensive investigation by their independent directors and (following the Petition Date) the Committee into the Acquisition and related potential estate claims.  The Debtors' cash collateral orders negotiated with their senior secured lenders and the HBC Parties at the outset of these chapter 11 cases provided that the customary stipulations as to the validity of the HBC Parties' secured claims remained subject to these investigations until October 17, 2020 (the "Reservation of Rights Period").  As of the date of this Disclosure Statement, the Committee extended their Reservation of Rights Period by filing a motion to seek standing to prosecute certain estate claims, discussed later in this Disclosure Statement.  The Debtors' Reservation of Rights Period has been extended through January 7, 2021.

Field Code Changed

During the Reservation of Rights Period, the Debtors engaged in simultaneous negotiations with both the HBC Parties and the Committee, seeking to establish a plan framework that would resolve several long-standing business disputes between the Debtors and the HBC Parties, provide meaningful recovery to unsecured creditors, and avoid the need for costly (and inherently uncertain) litigation with the HBC Parties.  To that end, on October 22, 2020, after consulting with the Committee and the independent directors, the Debtors distributed a proposed settlement term sheet setting forth the framework of a potential global plan settlement.  Following delivery of this initial term sheet, the Debtors, the independent directors, and the HBC Parties engaged in more than a month of hard-fought negotiations regarding the potential settlement.  The Debtors also encouraged the Committee to participate in these negotiations including by providing regular updates as to the status of negotiations, sharing with the Committee a recovery model that would allow the Committee to evaluate potential distributions to both the HBC Parties and unsecured creditors, and sharing the Debtors' views as to how the Committee could constructively engage in direct negotiations with the HBC Parties.

Despite these efforts, the Debtors were unable to broker a global settlement between the Debtors, the HBC Parties, and the Committee.  It became apparent that the Debtors faced two alternative paths with respect to these chapter 11 cases.  First, the Debtors could pursue a chapter 11 plan premised on a value-maximizing settlement with the HBC Parties that maintained the valuable go-forward business relationship with the HBC Parties until the conclusion of the Debtors' store closing sales, while extracting valuable concessions from the HBC Parties to subordinate their secured claims in part to ensure payment of administrative and priority claims in full, a commitment to provide continued transition services at greatly discounted rates to the contractual amount, and an assurance that the Debtors' could extend their store closing sales to maximize distributable cash and provide a meaningful recovery to unsecured creditors.  In the alternative, the Debtors could pursue litigation against the HBC Parties, which would require the Debtors to either obtain the non-consensual use of cash collateral or pursue the litigation entirely on contingency and would significantly jeopardize the Debtors' ability to confirm a chapter 11 plan.

The Debtors, at the direction of their independent directors and in consultation with advisors, ultimately determined that the first path represented the superior outcome for all stakeholders, and will provide meaningful recovery to unsecured creditors.  Accordingly, the Debtors and their independent directors continued negotiations with the HBC Parties and reached an agreement in principle on the terms of the HBC Settlement on December 10, 2020.  The Debtors, at the direction of their independent directors, encouraged the Committee to engage further with the HBC Parties and join the HBC Settlement, but the Committee declined to do so.  Following the recommendation of the Debtors' independent directors, the Debtors' board of directors voted to approve the terms of the HBC Settlement on the same day.

A.F.    *Recommendation.*

The Debtors seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Stretto, the Debtors' Notice and Claims Agent (the "Notice and Claims Agent"), no later than ~~October 13,~~ **[February 12],** 2020, at 5:00 p.m., prevailing Eastern Time (the "Voting Deadline").  The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing (as defined herein).

~~The Plan provides the best available alternative for the Debtors' estates and creditor recoveries.  If the Debtors' business were liquidated in a chapter 7 process, store closing processes likely would be stopped in their tracks, forcing locations to go dark and terminate employees until a trustee could turn the lights back on.  Even then, important employees with institutional knowledge will be gone for good, leaving an extremely large and complex liquidation to be managed by new hires unfamiliar with the Debtors' business.  The needless loss of value to creditors and the Debtors' estates would be enormous.  Creditors would receive lower recoveries in chapter 7 because the Debtors' estates necessarily would bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.~~

Field Code Changed

## ARTICLE II.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

A.      *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.      *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan provides for the sale of assets (if not completed prior to Plan confirmation), the wind-down and dissolution of the Debtors' Estates, and for the making of distributions to Holders of Claims and Interests.  This Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.      *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | ~~ABL~~Seller Note Secured Claims | ~~Uni~~Impaired | ~~Deemed~~Entitled to ~~Accept~~Vote |
| ~~4~~ | ~~Term Loan Secured Claims~~ | ~~Unimpaired~~ | ~~Deemed to Accept~~ |
| ~~5~~ | ~~Secured HBC Claims~~ | ~~Unimpaired~~ | ~~Deemed to Accept~~ |
| ~~6~~4 | General Unsecured Claims | Impaired | Entitled to Vote |
| ~~7~~5 | Intercompany Claims | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| ~~8~~6 | Intercompany Interests | Unimpaired | Deemed to Accept |
| ~~9~~7 | Le Tote Interests | Impaired | Deemed to Reject |
| ~~10~~8 | Section 510(b) Claims | Impaired | Deemed to Reject |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, and Priority Tax Claims)

Field Code Changed

are classified into Classes for all purposes, including voting, Confirmation, and distributions.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan.  As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

D.      *What will I receive from the Debtors if the Plan is consummated?*

The table below summarizes the treatment and projected recovery of all classified Claims and Interests against each Debtor (as applicable) under the Plan.  **The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change.  In particular, recoveries available to the Holders of General Unsecured Claims against various Debtors entities are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided below.  In such an instance, the recoveries available to the Holders of General Unsecured Claims could be materially lower when compared to the estimates provided below.**  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| SUMMARY OF EXPECTED RECOVERIES[4] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[5] | Projected Recovery |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired. | ~~$[●]~~$3.6 million | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors: (i) payment in full in Cash of such Allowed Other Secured | ~~$[●]~~$0 | 100% |

---

[4]  The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code.  Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

[5]  These amounts reflect estimates as of the date hereof and may ultimately be higher or lower depending on, among other things, timely Filed Proofs of Claim.

Field Code Changed

| SUMMARY OF EXPECTED RECOVERIES[4] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[5] | Projected Recovery |
| | | Claim; (ii) the Collateral securing such Allowed Other Secured Claim; (iii) Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy Law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired. | | |
| 3 | ~~ABL~~Seller Note Secured Claims | ~~Except~~On the Effective Date, except to the extent that ~~a Holder of an Allowed ABL Secured Claim agrees~~the HBC Parties agree to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for ~~each~~the Allowed ~~ABL~~Seller Note Secured Claim, ~~to the extent not already indefeasibly paid in full in Cash,~~ each Holder of an Allowed ~~ABL Secured~~Seller Note Claim shall receive payment ~~in full in Cash~~ of ~~such Holder's Allowed ABL~~its Pro Rata share of the Distributable Cash allocated to the Seller Note Secured Claim, if any, pursuant to the Waterfall Recover. | $~~[●]~~$35.2 million | ~~100%~~32%[6] |
| ~~4~~ | ~~Term Loan Secured Claims~~ | ~~Except to the extent that a Holder of an Allowed Term Loan Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Term Loan Secured Claim, to the extent not already indefeasibly paid in full in Cash, each Holder of an Allowed Term Loan Secured Claim shall receive payment in full in Cash of such Holder's Allowed Term Loan Secured Claim.~~ | ~~$[●]~~ | ~~100%~~ |
| ~~5~~ | ~~Secured HBC Claims~~ | ~~On the Effective Date, except to the extent that the HBC Secured Parties agree to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for the Allowed Secured HBC Claims, each Holder of an Allowed Secured HBC Claim shall receive payment in full in Cash of such Holder's Allowed Secured HBC Claim.~~ | ~~$[●]~~ | ~~To be determined~~ |

---

[6]    The projected recovery to holders of the Class 3 Seller Note Secured Claim does not include potential recoveries on account of proceeds of the litigation against Urban Outfitters, the value of which is not yet determined but the Debtors believe to be significant.

Field Code Changed

| SUMMARY OF EXPECTED RECOVERIES[4] |
|---|

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims[5] | Projected Recovery |
|---|---|---|---|---|
| ~~6~~4 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Distributable Cash allocated to Allowed General Unsecured Claims, if any, pursuant to the Waterfall Recovery. | ~~$[●]~~$82.8 million | ~~To be determined~~8 %[7] |
| ~~7~~5 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan ~~and subject to the Description of Transaction Steps~~, will either be Reinstated, distributed, contributed, set off, settled, cancelled and released or otherwise addressed at the option of the Debtors; provided, that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |
| ~~8~~6 | Intercompany Interests | In full and final satisfaction of each Allowed Intercompany Interest~~, subject to the Description of Transaction Steps,~~ each Intercompany Interest shall be Reinstated solely to maintain the Debtors' corporate structure. | N/A | N/A |
| ~~9~~7 | Le Tote Interests | Each Allowed Le Tote Interest shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Le Tote Interests shall be entitled to any recovery or distribution under the Plan on account of such Interests. | N/A | N/A |
| ~~10~~8 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist. | N/A | 0% |

Based on the foregoing, (i) Holders of Claims in Class ~~6~~3 and Class 4 are impaired under the Plan, and, therefore, are entitled to vote, (ii) Holders of Claims and Interests in Class 1, Class 2, ~~Class 3, Class 4, Class 5,~~ and Class ~~8~~6 are not impaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan, (iii)

---

[7]  The projected recovery to holders of Class 4 General Unsecured Claims does not include potential recoveries on account of proceeds of the litigation against Urban Outfitters, the value of which is not yet determined but the Debtors believe to be significant.

9

Field Code Changed

Holders of Claims and Interests in Class 9̶7 and Class 1̶0̶8 are receiving no distribution under the Plan and, therefore, are deemed to reject the Plan, and (iv) Holders of Claims a̶n̶d̶ ̶I̶n̶t̶e̶r̶e̶s̶t̶s̶ in Class 7̶5 are either impaired or unimpaired and will be presumed to accept or deemed to reject the Plan.

> ### *E.        Are any regulatory approvals required to consummate the Plan?*
>
> There are no known U.S. regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

> ### *E̶.F̶.      What happens to my recovery if the Plan is not confirmed or does not go effective?*

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article VIII of this Disclosure Statement, entitled "*Statutory Requirements for Confirmation of the Plan.*"

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a distinctly possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan.  Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority.

> ### *F̶.G̶.      What is the deadline to vote on the Plan?*

The Voting Deadline is O̶c̶t̶o̶b̶e̶r̶ ̶1̶3̶,̶ ̶2̶0̶2̶0̶[January 4], 2021, at 5:00 p.m., prevailing Eastern Time.

> ### *G̶.H̶.      How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must submit your Ballot in accordance with the instructions provided in Article III of this Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

> ### *H̶.I̶.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims can only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article VI.G of this Disclosure Statement, entitled "*Conditions Precedent to Effective Date,*" for a discussion of the conditions precedent to consummation of the Plan.

"Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means: (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan. Note that Holders of certain types of Claims, such as General Unsecured Claims, may not receive any distributions until the Debtors or Wind-Down Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

Field Code Changed

1. ~~I.~~  *What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1. Administrative Claims and Priority Tax Claims.

Except as otherwise provided in Article II.A of the Plan and except with respect to the TSA Shortfall Claim, Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Plan Administrator and/or Post-Effective Date Debtors no later than the applicable Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date**. Objections to such requests, if any, must be Filed and served on the Plan Administrator and/or Post-Effective Date Debtors and the requesting party on or before the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except with respect to the TSA Shortfall Claim, Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the Priority Claims Reserve the unpaid portion of its Allowed Administrative Claim on the latest of:  (i)  the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (ii) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable, or with respect to a Holder of a Priority Tax Claim, treated in accordance with section 1129(a)(C) of the Bankruptcy Code; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or a Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

2. Professional Compensation.

(a)  Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the [Confirmation] Date shall be Filed no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Post-Effective Date Debtors or the Plan Administrator, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

Field Code Changed

11

(b)    Professional Fee Escrow Account.

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Post-Effective Date Debtors without any further action or order of the Bankruptcy Court.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims will be paid by the Post-Effective Date Debtors or the Plan Administrator, as applicable, and shall thereupon become Distributable Cash.

(c)    Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Post-Effective Date Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)    Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Post-Effective Date Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

(e)    Substantial Contribution.

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors, the Committee, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

3.    Statutory Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors.  On and after the Effective Date, to the extent applicable, the Post- Effective Date Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Post-Effective Date Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

4.    TSA Shortfall Claim.

The TSA Shortfall Claim is Allowed.  On the Effective Date, and following the funding of the Priority Claim Reserve, the TSA Shortfall Claim shall be paid in full in Cash.

Field Code Changed

J.K.    *Will the final Amount of General Unsecured Claims affect my recovery under the Plan?*

Holders of General Unsecured Claims will receive their Pro Rata share of the Distributable Cash, if any, pursuant to the Waterfall Recovery. In addition, Holders of General Unsecured Claims that (i) vote to accept the Plan, (ii) abstain from voting on the Plan and who do not affirmatively opt-out of the third-party releases contained in the Plan, or (iii) vote to reject the Plan and who do not affirmatively opt-out of the third-party releases contained in the Plan shall be deemed a Released Party for all purposes under the Plan. Although the Debtors' estimate of General Unsecured Claims is ongoing, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided in the Plan, which difference could be material.

The projected amount of Allowed General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

K.L.    *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (i) all Holders of Claims or Interests that are deemed to accept the Plan <u>and</u> who do not opt out of the releases provided by the Plan, (ii) all Holders of Claims and Interests who vote to accept the Plan, and (iii) all Holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fourth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in <u>Article VI.F</u> of this Disclosure Statement, entitled "*Settlement, Release, Injunction and Related Provisions.*"

L.M.    *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

Field Code Changed

The Bankruptcy Court has scheduled the Confirmation Hearing for ~~October 20, 2020~~[February 22], 2021, at [●] [a.m./]1:00 p.m.[,]., prevailing Eastern Time.  The Confirmation Hearing may be adjourned from time to time without further notice.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

~~M.~~N.    *What is the purpose of the Confirmation Hearing?*

At the Confirmation Hearing, the Bankruptcy Court will determine if the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan.  Some of the key requirements for confirmation of a chapter 11 plan are that (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of creditors.  A plan is typically considered not to "discriminate unfairly" if similarly situated creditors do not received disparate recoveries without reasonable justification.  A plan will generally be considered "fair and equitable" with regards to unsecured creditors if it satisfies the absolute priority rule, meaning if a senior class of creditors rejects the plan, a more junior class of creditors cannot receive a recovery until the senior class is paid in full.  Finally, the "best interests" of creditors test means that a voting creditor must either accept the plan or receive more than they would in a hypothetical chapter 7 liquidation.  For a more detailed discussion of the Confirmation Hearing and the confirmation requirements, *see* Article VII of this Disclosure Statement.

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose prior to the effective date of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is ~~October 13, 2020~~[February 12], 2021, at 5:00 p.m., prevailing Eastern Time.

~~N.~~O.    *Who~~m~~ do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Stretto:

*By Regular mail, hand delivery or overnight mail at:*

Le Tote Inc.
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

~~c/o Stretto~~
~~410 Exchange, Suite 100~~
~~Irvine, CA 92602~~

*By electronic mail at:*
~~TeamLeTote@Stretto.com~~

Field Code Changed

_____ TeamLeTote@Stretto.com
_____ *By telephone:*

_____ (855) 217-8030 (Toll Free)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at https://cases.stretto.com/letote (free of charge) or the Bankruptcy Court's website at https://ecf.deb.uscourts.gov (for a fee).

O.P.    *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which provides for the wind–down and dissolution of the Debtors' Estates and for distributions to Holders of Claims and Interests, is in the best interests of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

**ARTICLE III.**
**SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement is being distributed to the Holders of Claims in those Classes that are entitled to vote or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS**
> **DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE
> COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.    *Holders of Claims Entitled to Vote on the Plan.*

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in Article II of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 6Classes 3 and 4 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims and Interests in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, and 108.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.    *Voting Record Date.*

15

Field Code Changed

The Voting Record Date is ~~September 11, 2020,~~[January 4], 2021.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.    *Voting on the Plan.*

The Voting Deadline is ~~October 13,~~[February 12], **2020, at 5:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Notice and Claims Agent on or before the Voting Deadline:

<div style="border:1px solid black; text-align:center;">

**DELIVERY OF BALLOTS**

**Le Tote Inc. Balloting Processing Center**
**c/o Stretto**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

**and/or**

**To submit your Ballot to the Notice and Claims Agent via electronic mail:**
**LeToteBallots@Stretto.com.**

</div>

D.    *Ballots Not Counted.*

**No ballot will be counted toward Confirmation if, among other things**:  (1) any ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (2) any ballot cast by any Entity that does not hold a Claim in a Voting Class; (3) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (4) any unsigned ballot or ballot lacking an original signature (for the avoidance of doubt, a ballot submitted via the Notice and Claims Agent online balloting portal shall be deemed an original signature); (5) any ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (6) any ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

<div style="border:1px solid black; text-align:center;">

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT**

**(855) 217-8030 (Toll Free)**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

</div>

E.    *-Confirmation Hearing.*

The Bankruptcy Court has scheduled the Confirmation Hearing for ~~October 20, 2020, [●] [a.m. /~~[February 22], 2021, 1:00 p.m.], (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than ~~October 13, 2020~~[February 12], 2021, at 5:00 p.m. (prevailing Eastern Time) in accordance with the

<div style="border:1px solid black; text-align:center;">Field Code Changed</div>

16

notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *New York Times* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

## ARTICLE IV.
## THE DEBTORS' BACKGROUND

A.    *Corporate History and Business Operations.*

    1.    Le Tote Corporate History.

Conceived in 2012 when Brett Northart and Rakesh Tondon noticed that their wives had to constantly buy new clothes for maternity, work, events, and other occasions, the two co-founders aimed to answer a simple question: why should consumers pay full price to own clothes that they won't wear again? The original concept, which launched in 2012, allowed customers to subscribe to a "tote" that included three garments and two accessories for one low monthly price. Consumers received their totes in the mail and could return the items when they were ready for a new tote, with the option to purchase items at 20%-70% off retail price. The Company, which operated out of Mr. Tondon's home during its first year, has grown from a small San Francisco-based start up to a market-leading fashion rental subscription service. From 2014 to 2018, the Company grew at a compound annual growth rate of approximately 122% and increased revenue from $2.5 million to $60.8 million, before experiencing a decline in 2019. Now with an advanced personalization algorithm and offerings from more than 150 brands, including French Connection, Vince Camuto, BCBGeneration, Sanctuary, Kate Spade, Rebecca Minkoff, Cole Haan, and Nike, Le Tote has been described as the "Netflix of fashion."

In March 2015, following two initial years of explosive growth, Le Tote introduced the "tote swap" personalization feature to its rental subscription platform, which increased interface functionality by allowing customers to view a snapshot of the five pieces that would be contained in their totes and swap items for 24 hours. Shortly thereafter, prompted by high customer demand, the Company expanded its rental subscription offerings to include maternity clothing. Based on customer feedback, the Company opened a waitlist to allow its customer base, including approximately 30% of customers who were mothers, to enroll in early access to Le Tote's maternity offerings. As 2015 progressed, it became clear that Le Tote was "infectiously changing how consumers look[ed] at shopping." In October of the same year, the Company debuted its mobile app, which provided customers with direct access to rent more than 150,000 pieces of clothing and accessories.

    2.    Le Tote China.

In 2017, just five years after the launch of the original "tote" concept, Le Tote became the first U.S. fashion rental subscription service to enter the Chinese market—the world's largest e-commerce market. Through a joint venture with an executive of China's largest shoe retailer, the Company launched Le Tote China (the "Joint Venture"). Before opening to the general public, the Joint Venture admitted a select group of 3,000 women for "beta" testing, which provided the admitted customers with premier access to Le Tote China's fashion rental subscription service and allowed the Joint Venture partners to navigate the Chinese consumer landscape. Le Tote China opened to the general public in the winter of 2017.

The Joint Venture provides the same service as its U.S. counterpart to Chinese consumers: the ability to rent unlimited clothing and accessories for a flat monthly fee. Le Tote China is currently headquartered in Shenzhen, with satellite offices in Beijing, Shanghai, and Hong Kong and distribution centers in Dongguan, Beijing, and Shanghai. Le Tote is a direct, minority equity holder in Le Tote Venture Limited and thereby an indirect, minority equity holder in Le Tote (Hong Kong) Limited and Le Tote (Shenzhen) Technology Limited. The entities that comprise the Joint Venture are not Debtors in these chapter 11 cases.

Field Code Changed

3.      Lord & Taylor Corporate History.

In 1824, Samuel Lord started a dry goods business in New York and, in 1826, opened the nation's first department store. George Washington Taylor joined Samuel Lord in the enterprise in 1834, and the two renamed the store Lord & Taylor. Lord & Taylor opened its second store in 1859 in New York's modern-day SoHo neighborhood and, by 1894, was growing quickly. It would open stores on Fifth Avenue in 1903 and 1906 and become a publicly traded entity in 1904. The Lord & Taylor Building, which housed Lord & Taylor's premier department store and corporate headquarters, opened in February of 1914 and, when Samuel Reyburn became president of Lord & Taylor in 1916, began the tradition of holiday window displays. In 2007, the Lord & Taylor Building became a New York City Landmark. Also in 1916, Lord & Taylor became a founding member of Associated Dry Goods Company (later Corporation), an association of independent department stores, and was considered to be its "crown jewel."

In the years following World War II, Lord & Taylor thrived, led by company president Dorothy Shaver, the first woman to head a major retail establishment in the United States. Under Shaver, Lord & Taylor launched its first suburban branch stores, introduced the concept of personal shoppers, and commissioned Lord & Taylor's iconic logo. In 1986, the May Department Stores Company acquired Associated Dry Goods, including Lord & Taylor and other retail chains, in what was considered the largest ever retail acquisition at the time. Federated Department Stores (now Macy's) later acquired May Department Stores Company in 2005, and, in 2006, sold Lord & Taylor to National Retail and Development Company Equity Partners ("NRDC"), which held it privately. In 2008, NRDC acquired HBC and positioned Lord & Taylor under the HBC umbrella in 2012.

(a)      Le Tote's Acquisition of Lord & Taylor.

In November 2019, Le Tote completed the Acquisition of certain assets comprising the Lord & Taylor business from HBC Holdings and HBC Propco, including an online retail platform, leases for 38 brick-and-mortar Stores situated throughout the United States, the inventory located at the Stores (or in HBC's distribution centers and available for sale in the Stores), and Lord & Taylor intellectual property. The Acquisition expanded the range of clothing styles offered by Le Tote in its subscription-based service and represented the first acquisition of a long-standing brick-and-mortar retailer by a "digitally native" brand.[8] Further, Le Tote hired the vast majority of Lord & Taylor's Store employees and entered into the Transition Services Agreement, pursuant to which HBC Holdings and HBC Propco must provide certain general and administrative functions related to the Lord & Taylor business to Le Tote through 2021 (subject to extension in accordance with the terms of the Transition Services Agreement) to assist with integration of the Lord & Taylor business into Le Tote.

~~The APA sets forth a complex arrangement with respect to the Stores.~~ Pursuant to the APA, HBC Propco is obligated to pay fixed and percentage rent (excluding common area maintenance and other similar charges) (the "Operating Rent") from November 8, 2019, until November 8, 2022 (the "Rent Payment Period"). Only thereafter is Le Tote obligated to pay Operating Rent. The Stores are also subject to certain "Put" (by Le Tote) and "Call" (by HBC) rights under the APA. Upon the exercise of a "Put" or "Call" after the expiration of the Rent Payment Period, Le Tote has no obligation to pay Operating Rent for the applicable Store, the lease with respect to which would be transferred back to affiliates of HBC. During the Rent Payment Period and thereafter, unless a "Put" or a "Call" has been exercised and effectuated, Le Tote is obligated to pay all other amounts related to the operation of the Stores due under any lease with respect to any Store, including all common area maintenance and similar charges (*e.g.*, insurance, utilities and services, and real estate taxes).

As discussed in further detail herein, Le Tote financed the purchase price of the Acquisition through: (a) $75 million in cash (subject to adjustments as specified in the APA), including cash borrowed under a senior secured asset-based revolving credit facility (the "ABL Credit Facility") and a secured term loan credit facility (the "Term Loan Credit Facility"), (b) issuing two secured promissory notes to HBC Propco in the original principal amount of approximately $~~30~~57 million in the aggregate, and (c) issuing preferred shares, convertible into approximately 25% of Le Tote's post-closing issued and outstanding equity on a fully diluted basis, to HBC Propco. In connection with the Acquisition, HBC Propco also received the right to designate two seats to Le Tote's board of

---

[8]      Digitally native brands are companies that have only existed in the digital world, transacting primarily online with little or no brick-and-mortar presence.

| Field Code Changed |

directors.  Both of HBC Propco's designees to the board resigned in March 2020 and HBC Propco no longer has any voting securities or other equity securities of the Debtors.

(b)    The Transition Services Agreement.

Le Tote, HBC Holdings, and HBC Propco, are also party to the Transition Services Agreement, dated as of November 8, 2019, pursuant to which Le Tote receives a wide variety of services, including accounting, human resources, IT services, and merchant support, among others, from HBC Holdings and HBC Propco on a transitional basis in connection with the Acquisition.

Since the Acquisition, certain service categories under the Transition Services Agreement have already been terminated, but with the majority of the Stores closed due to the COVID-19 pandemic, certain services under the Transition Services Agreement remain mission-critical, specifically those services that support the Lord & Taylor e-commerce operations.  As discussed above, in April 2020 Le Tote successfully renegotiated the Transition Services Agreement, resulting in a reduced array of services and greatly reducing their go-forward payment obligations.

4.    Critical Components of Le Tote's Cost Structure.

(a)    Supply Chain.

The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise for Le Tote's fashion rental subscription service, the Lord & Taylor e-commerce website, and the brick-and-mortar Lord & Taylor locations.  Generally, the Debtors contract with various domestic vendors to design and source the merchandise from foreign manufacturers.  In limited circumstances, the Debtors contract with foreign manufacturers directly.  Depending on the nature of the Debtors' arrangement with a given vendor or manufacturer, the Debtors ship the merchandise to a domestic warehouse that serves as the Debtors' distribution center.

(b)    Employee Compensation and Benefits.

The Debtors currently employ approximately 651 employees (collectively, the "Employees"), including approximately 480 salaried Employees and approximately 170 hourly Employees.  Prior to the Petition Date, the Debtors made the difficult decision to lay off approximately 130 Le Tote Employees and approximately 980 Lord & Taylor Employees due to the COVID-19 pandemic.  The Debtors furloughed a significant number of additional Employees, recalling such Employees throughout the incremental reopening of the Stores.

(c)    Digital Service Expenses.

As an internet based "digitally native" brand, the Debtors incur significant digital expenses on account of the Le Tote rental subscription service and, now, the Lord & Taylor e-commerce website.  Services related to these two e-commerce platforms include information technology, marketing, photo studio, creative, site merchandising, labor and fulfillment, shipping, and credit card processing.  Under normal volumes, the Debtors would expect to spend approximately $5 million per month on account of expenses relating to the Le Tote and Lord & Taylor digital platforms.  Many of these services are delivered pursuant to the Transition Services Agreement.  Consequently, the costs of such services have been reduced in connection with the renegotiation of the Transition Services Agreement and as a result of reduced volume due to the COVID-19 pandemic.

B.    The Debtors' Prepetition Corporate and Capital Structure.

The Debtors' corporate enterprise consists of Debtor entities Le Tote, Inc., French Tote LLC, a Delaware limited liability company ("French Tote"), Le Tote, LLC, a Delaware limited liability company, Lord & Taylor LLC, a Delaware limited liability company ("L&T"), and LT Card Company LLC, a Virginia limited liability company ("LT Card"), and non-Debtor entities, related to the operations of Le Tote China, Le Tote Venture Limited, an exempted company incorporated with limited liability in the Cayman Islands, Le Tote (Hong Kong) Limited, a company incorporated in Hong Kong with registered number 2534318, and Le Tote (Shenzhen) Technology Limited,

Field Code Changed

a company incorporated in the People's Republic of China.  A simplified illustration of the Company's corporate structure is set forth below.[9]



---

[9]    A more detailed capital structure, attached hereto as **Exhibit B**, depicts the Debtors' corporate structure, as well as the Debtors' various debt obligations.



As of the Petition Date, the Debtors have outstanding secured debt obligations in the aggregate principal amount of approximately $137.9 million under: (a) the ABL Credit Facility; (b) the Term Loan Credit Facility; and (c) a promissory note, dated as of November 8, 2019, issued to HBC Propco with a maturity of November 8, 2021 (the "Seller Note"). The Debtors' aggregate prepetition secured debt obligations are depicted in the table below.

| Secured Debt | Agent / Beneficiary | Maturity | Commitment / Original Principal Amount | Outstanding Principal Amount |
|---|---|---|---|---|
| ABL Credit Facility | Wells Fargo, N.A. | Nov. 8, 2024 | $225 million | $77.2 million |
| Term Loan Credit Facility | TCG BDC, Inc. | Nov. 8, 2024 | $30 million | $31.5 million |
| Seller Note | HBC US Propco Holdings LLC | Nov. 8, 2021 | $30.4 million | $~~29~~35.2 million[10] |
| **Total Secured Debt** | | | | **$1~~37~~34.9 million** |

---

[10]    The Seller Note balance includes approximately $4.7 million in obligations related to the Debtors' unpaid prepetition common area maintenance and real estate tax liabilities.

1.    The ABL Credit Facility.

The Debtors are party to that certain Credit Agreement, dated as of November 8, 2019 (as amended by Amendment No. 1 to the Credit Agreement, dated as of January 9, 2020, and Amendment No. 2 to the Credit Agreement, dated as of March 23, 2020, and as further amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "ABL Credit Agreement"), by and among Le Tote, Inc., as lead borrower, French Tote, Le Tote, LLC and L&T, as additional borrowers, LT Card, as guarantor party thereto (collectively, the "Le Tote Loan Parties"), Wells Fargo Bank, National Association ("Wells Fargo"), in its capacity as administrative and collateral agent (the "ABL Agent"), and each of the lenders from time to time party thereto (the "ABL Lenders"). The ABL Credit Agreement provides for commitments of $225 million under the ABL Credit Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of November 8, 2024.

The obligations under the ABL Credit Facility are secured by a first-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory.  As of the Petition Date, in the aggregate, approximately $77.2 million ~~remains outstanding under the ABL Credit Facility~~remained outstanding under the ABL Credit Facility.  On December [●], 2020, following the payment in full of the ABL Credit Agreement the Debtors and the ABL Agent entered into a Termination Agreement terminating the ABL Credit Agreement and releasing liens over the Debtors' assets, subject to the satisfaction of certain continuing obligations.

2.    The Term Loan Credit Facility.

The Le Tote Loan Parties are also party to that certain Term Loan Agreement, dated as of November 8, 2019 (as amended by Amendment No. 1 to the Term Loan Agreement, dated as of January 9, 2020, and Amendment No. 2 to the Term Loan Agreement, dated as of March 23, 2020, and as further amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Term Loan Credit Agreement"), by and among the Le Tote Loan Parties, TCG BDC, Inc. ("Carlyle"), in its capacity as administrative agent and collateral agent (the "Term Loan Agent"), and each of the lenders from time to time party thereto (the "Term Loan Lenders").  The Term Loan Credit Agreement provides for a $30 million Term Loan Credit Facility (subject to a borrowing base composed primarily of inventory and credit card receivables) with a maturity date of November 8, 2024.

The obligations under the Term Loan Credit Facility are secured by a second-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory.  As of the Petition Date, in the aggregate, approximately $31.5 million remains outstanding under the Term Loan Credit Facility.  On December 17, 2020, following the payment in full of the Term Loan Credit Agreement the Debtors and the Term Loan Agent entered into a Termination Agreement terminating the Term Loan Credit Agreement and releasing liens over the Debtors' assets, subject to the satisfaction of certain continuing obligations.

3.    The Seller Note.

In addition to the ABL Credit Facility and Term Loan Credit Facility, Debtor Le Tote, Inc. issued the Seller Note, in aggregate principal amount of approximately $30 million, and an inventory note, in aggregate principal amount of approximately $27 million, to HBC Propco to partially finance the Acquisition and inventory in connection therewith.  The inventory note was repaid in December 2019.  The Seller Note bears 0% interest through November 8, 2021, and 12% per annum thereafter.  The obligations under both notes are guaranteed by Debtors French Tote, L&T, LT Card, and Le Tote, LLC.

The obligation under the Seller Note are secured in favor of HBC Propco (in such capacity, the "Junior Creditor Representative") by a third-priority lien in substantially all of the Le Tote Loan Parties' assets, including, among other things, all accounts, equipment and fixtures, intellectual property, and goods and inventory.  As of the Petition Date, in the aggregate, approximately $~~29~~35.2 million ~~remains~~was outstanding under the Seller Note.

Field Code Changed

4. The Transition Services Agreement Obligations.

To facilitate the integration of Lord & Taylor, Le Tote, HBC Holdings, and HBC Propco entered into the Transition Services Agreement, which obligates HBC Holdings and HBC Propco to provide certain transition services to Le Tote. Pursuant to the terms of the Transition Services Agreement, HBC Propco is required to provide monthly invoices to the Debtors, and the Debtors are required to pay such invoices within 30 days of receipt. The Transition Services Agreement provides for a grace period of 15 business days, with respect to the payment of obligations thereunder. The Debtors' obligations under the Transition Services Agreement are guaranteed by the Le Tote Loan Parties and are cross-securitized with the collateral that secures the Seller Note (such obligations, collectively, the "Secured Acquisition Obligations"). In connection with the investigation being undertaken by the Restructuring Committee as described below, the Debtors ~~are investigating~~investigated certain claims and causes of action with respect to the Secured Acquisition Obligations ~~and the Debtors reserve all their rights to bring in the future any such~~, which claims ~~and/or causes of action~~are settled pursuant to the HBC Settlement.

On March 23, 2020, the Debtors elected to enter the 15 business day grace period provided under the Transition Services Agreement, with respect to approximately $4 million of obligations due thereunder. After suspending payments, the Debtors commenced renegotiation of the Transition Services Agreement in earnest. Subsequently, on April 10, 2020, the Debtors, HBC Holdings, and HBC Propco executed the ~~Term Sheet, which, among other things,~~Omnibus Agreement, subject to a reset ~~to pre-Omnibus Agreement pricing for "fixed non-payroll costs related to technology" following October 31, 2021 and a global reset to pre-Omnibus Agreement pricing beginning on January 1, 2021. The Omnibus Agreement greatly reduced~~ the ~~obligations owing~~Debtors' go-forward payments under the Transition Services Agreement ~~to zero~~.

In connection with the HBC Settlement, the Debtors and the HBC Parties have resolved certain disputes related to the calculation of "fixed non-payroll costs related to technology" under the Omnibus Agreement. Additionally, the HBC Settlement provides that the HBC Parties continue to provide services under the Transition Services Agreement in January and February 2021 for total discounted payments of $513,017 per month, thereby providing substantial value to the Debtors' estates by continuing access to transition services at a significantly reduced expense.

5. The ABL Intercreditor Agreement.

The ABL Agent and Term Loan Agent, as representatives of the ABL Lenders and Term Loan Lenders, as applicable, are parties to that certain Intercreditor Agreement, dated as of November 8, 2019 (the "ABL Intercreditor Agreement"). The ABL Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders and the Term Loan Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions. As detailed in the ABL Intercreditor Agreement, the ABL Lenders have priority over, and are senior in all respects, to the Term Loan Lenders with respect to the Collateral (as defined therein).

Section 6.2 of the ABL Intercreditor Agreement provides that, in the event of a chapter 11 filing, if the ABL Lenders consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing secured by any portion of the Collateral, then the Term Loan Lenders agree not to raise any objection on the grounds of a failure to provide "adequate protection" for the liens in favor of the Term Loan Lenders or request adequate protection (except as provided below), so long as the Term Loan Lenders retain their liens on the Collateral with the same priority as existed before, the liens on the Collateral securing any such debtor in possession financing are senior to or pari with the liens on the Collateral securing the ABL Lenders, the size of the debtor in possession financing does not exceed the maximum size provided for in the ABL Intercreditor Agreement, and the debtor in possession financing does not require the Debtors to seek confirmation of a specific plan of reorganization. In addition, the same section of the ABL Intercreditor Agreement requires the ABL Lenders and the Term Loan Lenders to subordinate the Prepetition Liens under any debtor in possession financing facility as well as any "carveout" for professional or United States Trustee fees, in each case, with respect to the Collateral. Section 6.04 of the ABL Intercreditor Agreement also provides that if the ABL Lenders receive adequate protection with respect to the Collateral, then the Term Loan Lenders shall have the right to seek their own adequate protection; *provided that* such adequate protection is subordinate to any adequate protection provided to the ABL Lenders with respect to the Collateral.

Field Code Changed

6.        The Seller Intercreditor Agreement.

The ABL Agent, the Term Loan Agent (together with the ABL Agent, the "<u>Senior Agents</u>"), as representatives of the ABL Lenders, Term Loan Lenders, and the Junior Creditor Representative, as representative of HBC Propco, respectively, are parties to that certain Seller Intercreditor Agreement, dated as of November 8, 2019 (the "<u>Seller Intercreditor Agreement</u>").  The Seller Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders and Term Loan Lenders (collectively, the "<u>Senior Creditors</u>") and HBC Propco (the "<u>Junior Creditor</u>") relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Credit Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.  As detailed in the Seller Intercreditor Agreement, the Senior Creditors have priority over, and are senior to in all respects, to the Junior Creditor with respect to the Collateral (as defined in the Seller Intercreditor Agreement).

Section 5.2 of the Seller Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the Senior Creditors consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing, the Junior Creditor agrees not to raise any objection.  Section 5.4 of the Seller Intercreditor Agreement provides that if the Senior Creditors receive adequate protection in the form of additional or replacement liens on the Collateral or additional or replacement collateral, then the Junior Creditor shall have the right to seek its own adequate protection; *provided that* such adequate protection is subordinate to any adequate protection provided to the Senior Creditors.

**ARTICLE V.**
**EVENTS LEADING TO THESE CHAPTER 11 CASES & MATERIAL DEVELOPMENTS**

A.        *Market Distress.*

1.        Challenging Operating Environment and Transition Obligations.

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These include: (a) the general downturn in the retail industry and the shift away from shopping at brick-and-mortar stores, which has led to a decrease in sales; (b) a challenging commercial environment over the past several years brought on by increased competition from retailers like Walmart and Amazon; and (c) the enormous impact of the COVID-19 pandemic, which has forced retailers across the country to stomach the expense of brick-and-mortar assets which were rendered unusable for a prolonged period of time.  Over time, these factors ~~have~~ tightened the Debtors' liquidity and complicated their vendor relationships, culminating in a liquidity crisis by the end of March 2020, when the Debtors faced dwindling cash flows, inaccessible inventory, and the inability to access even incremental liquidity.  The combination of the above factors precipitated these chapter 11 cases.

2.        The COVID-19 Pandemic.

Demand for discretionary retail products ~~has~~ plummeted during the COVID-19 pandemic as consumers prioritize—with good reason—their health and maintaining a source of income.  In this environment, most discretionary retail products are an unnecessary luxury for many consumers.  To combat the unprecedented global spread of COVID-19, the majority of states, and many foreign governments, ~~have~~<u>temporarily</u> shuttered all "non-essential" businesses—stores that trade in discretionary (clothing, home furnishings, electronics, beauty) as opposed to life-preserving products (food, pharmacies, cleaning supplies).  Mass merchandisers, such as Walmart, which sell food and household supplies in addition to traditional retail items, ~~have been~~<u>were</u> allowed to remain open—increasing the already extreme competition in the retail market.

In the wake of COVID-19, the Debtors placed all of their vendors (including the service providers under the Transition Services Agreement) on hold, laid off approximately 130 Le Tote Employees and approximately 980 Lord & Taylor Employees, furloughed a significant number of additional Employees, and temporarily closed all Lord & Taylor Stores. ~~As of~~<u>Prior to</u> the Petition Date, the Debtors ~~have~~ reopened their Lord & Taylor locations~~. The Debtors have~~ <u>and</u> recalled certain furloughed Employees to operate the reopened Stores.  COVID-19 ~~has~~ also caused a drop in subscriptions for Le Tote as the Company's subscriber base ~~has~~ suffered from the wave of job losses gripping the country and the demand for apparel ~~has~~ diminished due to hundreds of millions of Americans being affected by

stay-–at-–home orders.  As a result of these and other factors, the Debtors' revenue ~~has~~ declined precipitously from forecasts.

>    B.    *Prepetition Restructuring Efforts.*

>       1.    <u>Efforts to Manage Liquidity.</u>

In response to the liquidity shortfall, the Debtors engaged Berkeley Research Group, LLC ("<u>BRG</u>") to act as their financial advisor, to assist in managing their cash flows in response to these unprecedented crises.  BRG and the Debtors' management analyzed the Debtors' cash flows and prepared "mothball" forecasts to manage the Debtors' liquidity despite a significant revenue decline.  As noted above, the Debtors significantly reduced their cash burn by suspending payments to vendors, furloughing Store employees, and initiating significant layoffs at their corporate office.  On March 29, 2020, in connection with the Debtors' restructuring efforts, Ed Kremer was appointed as Chief Restructuring Officer.

The Debtors also engaged in negotiations with the ABL Agent and the Term Loan Agent to continue operating their business in their "mothball" period notwithstanding the existence of several defaults under the ABL Credit Agreement and the Term Loan Credit Agreement.  On June 23, 2020, the Debtors entered into forbearance agreements (the "<u>Forbearance Agreements</u>") with each of the ABL Agent and the Term Loan Agent whereby the respective agents agreed to forbear from exercising remedies based on these defaults.  The Forbearance Agreements provided a bridge for the Debtors to reopen their Lord & Taylor locations in advance of the Petition Date, thereby enhancing the ability of the Debtors to maximize value for the benefit of all stakeholders.

>       ~~1.        Appointment of Restructuring Committee.~~

~~In connection with their restructuring efforts, the Board of Directors (the "Board") of Le Tote, acting on behalf of itself and the other Debtor entities, established a special committee (the "Restructuring Committee") of independent directors to explore, review, evaluate and negotiate strategic restructuring alternatives and, as approved and directed by the Board, implement those strategic restructuring alternatives.  To that end, on April 16, 2020, the Debtors established the Restructuring Committee and appointed two independent directors, Pamela B. Corrie and Matthew R. Kahn, to serve on the Restructuring Committee.  Beginning in April 2020, the Restructuring Committee met regularly with the Debtors and their advisors to evaluate the merits of proposed transactions.~~

~~The Restructuring Committee is conducting an independent investigation into certain potential claims and causes of action held by the Debtors' Estates.  The Restructuring Committee's investigation is focused on weighing the merits of any claims against insiders or third parties, including those arising in connection with the Acquisition.  To that end, Katten Muchin Rosenman LLP has been retained as independent counsel to the Restructuring Committee.  In addition, the Restructuring Committee is investigating whether the releases by the Debtors provided for in the Plan are proper under the circumstances and are being given in exchange for adequate consideration.  The investigation is ongoing, and the Debtors reserve all rights, in the reasonable exercise of their business judgment, to prosecute, settle, release, abandon, or otherwise resolve any potential colorable claims that are identified in connection with the investigation.~~

>       2.    <u>Negotiations with HBC.</u>

In response to liquidity pressures and increased costs under the Transition Services Agreement, the Debtors undertook multiple efforts to reach a mutually agreeable re-negotiation of certain terms (including payment and economic terms) of the Transition Services Agreement or a temporary deferral of payment under the Transition Services Agreement to ensure the continued provision of essential services.  On March 23, 2020, the Debtors elected to forego their payment obligations under the Transition Services Agreement and enter the 15 business day grace period thereunder.  HBC Holdings and HBC Propco promptly issued a notice of non-payment indicating the Transition Services Agreement would be terminated on April 13, 2020, unless the Debtors cured the payment default.  After suspending payments under the Transition Services Agreement, the Debtors and their advisors engaged in hard-fought negotiations with HBC and its affiliates in an effort to restructure the payment obligations under the Transition Services Agreement and limit go-forward services to only those services necessary in a post-COVID-19 world.

**Field Code Changed**

Consequently, on April 10, 2020, the Debtors, HBC Holdings, and HBC Propco executed the ~~Term Sheet~~Omnibus Agreement, which withdrew the notice of non-payment and reset the balances owing under the Transition Services Agreement to zero. Pursuant to the Term Sheet, HBC Holdings and HBC Propco committed to provide the Debtors with services relating to the operation of the Debtors' e-commerce platforms and certain financial and accounting functions, among others, through December 31, 2020 while agreeing to stop providing certain services that were no longer needed in light of the scaled-down nature of the Debtors' enterprise. In consideration for such go-forward services, the Debtors agreed to pay HBC Holdings and HBC Propco approximately $550,000 per month, in advance, weekly variable payments, invoiced weekly in arrears, and weekly variable deposits, equal to 75% of such weekly variable payments as deposits against future invoices. Beginning on January 1, 2021, absent the HBC Settlement, payments under the Transition Services Agreement will revert to the terms set forth in the Transition Services Agreement without giving effect to the modifications described in the ~~Term Sheet.~~Omnibus Agreement. The ~~Term Sheet~~Omnibus Agreement greatly reduced the size of the Debtors' go-forward payments under the Transition Services Agreement and resolved a potential cross-default under the Debtors' secured credit facilities.

~~2.      Prepetition Marketing Efforts.~~

~~In April 2020, the Debtors retained Nfluence Partners ("Nfluence") to commence a prepetition marketing process of the Debtors' Le Tote business. Shortly thereafter, the Debtors, in the exercise of their business judgment, determined to market the Lord & Taylor business in parallel. With the assistance of Nfluence, the Debtors prepared a list of approximately 78 potential acquirers (including various financial sponsors and strategic buyers) that were considered likely participants in a sale process of both the Le Tote and Lord & Taylor business. The Debtors also identified 30 additional parties that were considered potential acquirers of solely the Le Tote business and 15 additional parties that were considered potential acquirers of solely the Lord & Taylor business. Following the initial outreach to the identified 128 parties, information was provided to these parties to gauge their interest prior to executing a non-disclosure agreement ("NDAs"). Of these 128 total parties, approximately 13 parties entered into confidentiality agreements with the Debtors. Several potential counterparties requested additional information and received access to a virtual data room and/or conducted in-person meetings with the Debtors' management or telephonic diligence meeting with Nfluence. The Debtors are engaged in active dialogue with several potential bidders with respect to both Le Tote and Lord & Taylor and will continue this dialogue postpetition. The Debtors have filed a motion seeking approval of Bidding Procedures setting out the process pursuant to which parties can submit bids for the Debtors' Le Tote and Lord & Taylor Assets. Under the Bidding Procedures, the deadline for parties to submit Qualified Bids (as defined in the Bidding Procedures) for the Le Tote Assets is September 21, 2020 and the deadline for parties to submit Qualified Bids for the Lord & Taylor Assets is October 6, 2020. Qualified Bids must meet the requirements set forth in the Bidding Procedures. A Le Tote Auction, if any, will occur on September 24, 2020 and a Lord & Taylor auction, if any, will occur on October 9, 2020.~~

3.      Store Closing Sales.

The current Store footprint is unsustainable in light of the Debtors' strained liquidity. Contemporaneously with the Plan, the Debtors have filed a motion requesting authority to market Le Tote and Lord & Taylor pursuant to certain bidding procedures and a motion requesting authority to implement customary Store closing procedures. The Debtors are committed to achieving the highest or otherwise best bid for Le Tote and/or Lord & Taylor by marketing those assets pursuant to the bidding procedures, and, if necessary, conducting an auction for such assets as well as any additional assets of the Debtors. The Debtors anticipate that any Stores which a potential purchaser does not seek to acquire will be wound down through Store closing sales. As discussed above, the Debtors entered into the Consultant Agreement with the Consultant to conduct these Store closing sales. The Debtors evaluated other national liquidation firms before selecting the Consultant and believe that that the terms set forth in the Consultant Agreement, including a percentage fee based on the proceeds from asset dispositions, are the best alternative for the conduct of asset sales and Store closures. The Debtors believe that utilizing the skills and resources of the Consultant to effectively and efficiently conduct the sales and Store closings will maximize value for all stakeholders.

Field Code Changed

~~article VI.~~CHAPTER 11 PLAN.

ARTICLE VI.
EVENTS OF THE CHAPTER 11 CASES

~~It is critical that the Debtors consummate a sale, liquidation, or other asset disposition as soon as possible to maximize recoveries to all stakeholders and reduce the administrative expense of these chapter 11 cases. The Debtors' prepetition secured lenders support the marketing of Le Tote and Lord & Taylor and have conditioned the use of cash collateral on certain sale process milestones, including, among others, that the Court (a) enter an order approving the sale of Le Tote no later than October 5, 2020, and (b) unless the Debtors have not received one or more binding bids in form and substance satisfactory to the prepetition agents, approving the sale of Lord & Taylor no later than October 20, 2020. Accordingly, the Debtors have filed a Plan on the first day of these chapter 11 cases which will efficiently monetize their assets and utilize proceeds from asset sales, Store closing sales, and any other asset dispositions to pay their secured lenders in accordance with their respective priorities and distribute any remaining value to general unsecured creditors. The Debtors intend to swiftly proceed with a fair and efficient process to preserve and maximize value for enterprise-wide stakeholders.~~

A.    *First Day Relief.*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors ~~intend to file~~filed several motions (the "First Day Motions") designed to facilitate the administration of the ~~c~~Chapter 11 ~~c~~Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the ~~chapter 11 cases. The First Day Motions, and all orders for relief granted in the chapter 11 cases, can be viewed free of charge at https://cases.stretto.com/letote~~Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Ed Kremer, Chief Restructuring Officer, of Le Tote, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 15], filed on the Petition Date.

The First Day Motions, and all orders for interim and final relief granted in the chapter 11 cases can be viewed free of charge at https://cases.stretto.com/letote.

B.    *Approval of Use of Cash Collateral*

On August 28, 2020, the Bankruptcy Court entered the Cash Collateral Order approving the Debtors' use of cash collateral on a final basis [Docket No. 268]. The Cash Collateral Order authorized the Debtors, among other things, to use Cash Collateral and granted adequate protection to the Prepetition Agents and Prepetition Secured Parties and their interests in the prepetition collateral pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code.

On December 9, 2020, following the payment in full of the ABL and Term Loan Obligations, the Debtors filed a second cash collateral motion seeking approval of an agreed successor cash collateral order with the HBC Parties. [On December [●], 2020, the Bankruptcy Court entered the successor cash collateral order.]

C.    *Schedules and Statements*

On the Petition Date, the Debtors filed a motion [Docket No. 13] seeking entry of interim and final orders granting an extension of time through and including August 30, 2020 to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements"). On August 27, 2020, the Bankruptcy Court entered a final order approving this extension motion [Docket No. 264]. On August 30, 2020, the Debtors filed their Schedules and Statements.

D.    *Appointment of Official Committee*

Field Code Changed

27

On August 12, 2020, the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") filed the *Appointment of Unsecured Creditors Committee* [Docket No. 117], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors in the Chapter 11 Cases.  The Committee is currently comprised of the following members: (a) The CIT Group/Commercial Services, Inc., (b) G-III Leather Fashions, Inc., and (c) Liquidity Capital II, L.P.  The Committee retained Cooley LLP as its legal counsel and BDO Consulting Group, LLC as their financial advisors.  The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on September 3, 2020.

E.        *Sale Process and Bidding Procedures*

In April 2020, the Debtors retained HMAdviseCo, LLC d/b/a Nfluence Partners ("Nfluence") to commence a prepetition marketing process of the Debtors' Le Tote business.  Shortly thereafter, the Debtors, in the exercise of their business judgment, determined to market the Lord & Taylor business in parallel.  With the assistance of Nfluence, the Debtors prepared a list of approximately 78 potential acquirers (including various financial sponsors and strategic buyers) that were considered likely participants in a sale process of both the Le Tote and Lord & Taylor business.  The Debtors also identified 30 additional parties that were considered potential acquirers of solely the Le Tote business and 15 additional parties that were considered potential acquirers of solely the Lord & Taylor business.  Following the initial outreach to the identified 128 parties, information was provided to these parties to gauge their interest prior to executing a non-disclosure agreement ("NDAs").  Of these 128 total parties, approximately 69 parties entered into confidentiality agreements with the Debtors (inclusive of several purchasers who signed NDAs for each of Lord & Taylor and Le Tote).  Several potential counterparties requested additional information and received access to a virtual data room and/or conducted in-person meetings with the Debtors' management or telephonic diligence meeting with Nfluence.  Through the course of the marketing process, the Debtors financial advisor BRG increased its responsibilities regarding the marketing of the Lord & Taylor assets by leveraging its unique experience in the retail restructuring sphere to supplement the work of Nfluence, as it related to the sale of Lord & Taylor assets.

On August 28, 2020, the Court entered the *Order (I) Establishing Bidding Procedures, (II) Scheduling Bid Deadlines and Auctions, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 269] (the "Bidding Procedures Order"), authorizing the Debtors to conduct an auction (the "Auction").  The Bidding Procedures also allowed substantial flexibility with respect to the structure of any transaction and allowed the Debtors to select a party to serve as a stalking horse bidder.  On October 8, 2020, pursuant to and in accordance with paragraphs 16 and 17 of the Bidding Procedures Order, the Debtors selected ZG Apparel Group LLP to act as the stalking horse bidder (the "Stalking Horse Bidder").  The terms of the stalking horse bid provided for, among other things, (a) the acquisition of certain of the Le Tote Assets and Lord & Taylor Assets by the Stalking Horse Bidder and (b) a cash break-up fee equal to 3% of the cash payment of the purchase price.

On October 15, 2020, pursuant to the Bidding Procedures Order, the Debtors conducted the Auction, with respect to the Debtor's assets.  At the conclusion of the Auction, the Debtors, in consultation with their professionals, selected Saadia Group LLC's ("Saadia") $12 million bid—more than three times the purchase price of the Stalking Horse Bidder— for the Debtors' intellectual property and e-commerce assets as the successful bid and filed the *Notice of Successful Bidder and Backup Bidder with Respect to the Auction of the Debtors' Assets* [Docket No. 450].  On October 16, 2020, the Debtors and Saadia entered into an asset purchase agreement (the "APA") with the Saadia that called for a deadline to close the sale by November 23, 2020.  On October 22, 2020, the Court entered an order approving the APA [Docket No. 473].

On November 18, 2020, Debtors fulfilled their contractual obligations required to close the sale by the November 23 deadline.  Despite this, Saadia refused to commit to closing by November 23, 2020.  On November 21, 2020, Saadia moved for injunctive relief to prevent the Debtors from terminating the APA in the event that Saadia did not fulfil its contractual obligation to close the sale by the closing date [Docket No. 574].  After an expedited hearing on the matter on November 22, 2020, the Court denied the motion [Docket No. 585].  The sale closed on November 23, 2020.

The proceeds of the sale were distributed as follows, with a net to the estate of $130,362.95:

Field Code Changed

- $1,176,099.72 to Wells Fargo, N.A., in full satisfaction of outstanding amounts owed in connection with the ABL Facility;

- $9,831,037.33 to TCG BDC, Inc., in full satisfaction of outstanding amounts owed in connection with the Term Loan Facility;

- $112,500.00 to the Stalking Horse Bidder, on account of the Break-Up Fee owed in connection with the Bidding Procedures Order; and

- $750,000.00 to Nfluence, on account of the Success Fee owed in connection with their Engagement Letters and the retention order entered by the Court [Docket No. 392].

On December 7, 2020, the Debtors filed the *Debtors' Report for the Sale of the Acquired Assets Pursuant to Local Bankruptcy Rule* [Docket No. 645].

F.      *Store Closing Process*

Prior to the Petition Date, the Debtors commenced store closings and similar themed sales at their Lord & Taylor store locations and through their Lord & Taylor e-commerce platform.  On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Assume the Consulting Agreement, (B) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (C) Authorizing and Approving the Store Closing Procedures, (D) Authorizing Customary Bonuses for Employees of Closing Stores and (E) Granting Related Relief* [Docket No. 16], seeking approval to:  (i) assume the Letter Agreement Governing Inventory Disposition, dated April 17, 2020, by and between Le Tote and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Consultant"), as amended by the Consulting Agreement, (ii) approve the Store Closings, (iii) authorize the Store Closing Bonuses, (iv) approve the Store Closing Procedures, and (v) grant related relief.  On August 28, 2020, the Bankruptcy Court entered the final order approving the store closing motion [Docket No. 266].

G.      *Extension Order*

As discussed in the First Day Declaration, one of the principal terms of Le Tote's acquisition of Lord & Taylor from HBC is that under the APA the Debtors are not obligated to pay rent (other than common area maintenance and taxes) until November 2022.  Only thereafter is Le Tote obligated to pay rent.

As part of the Debtors' comprehensive efforts to respond to operational challenges imposed by COVID-19, on August 7, 2020, as well as the dispute with HBS, the Debtors filed a motion seeking an extension under section 365(d)(3) of the Bankruptcy Code of the time to pay certain, if any, monetary lease obligations (the "Lease Obligations") under their unexpired leases of nonresidential real property for 60 days, through and including October 1, 2020 [Docket No. 112].  The Bankruptcy Court entered an order granting the requested relief through October 1, 2020, on August 28, 2020 [Docket No. 264] (the "Extension Order").

H.      *Key Employee Incentive Program*

On August 31, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing and Approving the Debtors' Key Employee Incentive Plan and (B) Granting Related Relief* (the "KEIP Motion") [Docket No. 276], seeking approval of the Debtors' Key Employee Incentive Plan ("KEIP").  Following negotiations with the Committee and secured creditor The Carlyle Group, the Debtors negotiated a revised KEIP order.  At a hearing held on September 23, 2020, Debtors' sought approval of the revised KEIP.  On September 29, 2020, the court entered an order [Docket No. 276] approving the KEIP over the U.S. Trustee's objection.

I.      *Wilmington Trust Litigation*

At the Debtors' first day hearing, Wilmington Trust, N.A. ("Wilmington Trust") as the Trustee-in-Trust for Holders of Hudson's Bay Simon JV Trust 2015- HBS, Commercial Mortgage Pass-Through Certificates,

Field Code Changed

Series 2015-HBS (the "CMBS Trust"), asserted that the Debtors should be liable to pay rent directly to the CMBS Trust for 24 of the Debtors' 38 stores (the "Financed Stores") whose underlying fee interests are subject to security interests held by the CMBS Trust.  The CMBS Trust has taken the position that it is entitled to receive directly from the Debtors rent and other operating costs owed to the Landlords.  The Debtors disputed these allegations as did the Debtors' actual landlord for the Financed Stores—a joint venture between HBC and the Simon Property Group ("HBS").  On September 4, 2020, Wilmington Trust moved to establish standing to compel payment of rent and to assert related rights [Docket No. 299].  After extensive briefing and oral arguments, on October 30, 2020, the Court issued an order [Docket No. 497] and *Memorandum Opinion* [Docket No. 496], denying Wilmington Trust's motion.  On November 13, 2020, Wilmington Trust filed an appeal of the order and opinion [Docket No. 543].

J.       *Investigation of Estate Causes of Action by the Debtors.*

1.       Appointment of Restructuring Committee.

Prior to the Petition Date, in connection with their restructuring efforts, the Board of Directors (the "Board") of Le Tote, acting on behalf of itself and the other Debtor entities, established a special committee (the "Restructuring Committee") of independent directors to explore, review, evaluate and negotiate strategic restructuring alternatives and, as approved and directed by the Board, implement those strategic restructuring alternatives.  To that end, on April 16, 2020, the Debtors established the Restructuring Committee and appointed two independent directors, Pamela B. Corrie and Matthew R. Kahn, to serve on the Restructuring Committee.  In addition to their regular role as board members, the Restructuring Committee has conducted an independent investigation (the "Investigation") into certain potential claims and causes of action held by the Debtors' Estates.  The Investigation is focused on weighing the merits of any claims against insiders or third parties, including those arising in connection with the Acquisition.  To that end, the Restructuring Committee retained Katten Muchin Rosenman LLP ("Katten") as independent counsel, and BRG served as financial advisors to the Restructuring Committee.  Beginning in April 2020, the Restructuring Committee met regularly with the Debtors and their advisors to evaluate the merits of proposed transactions.

2.       Summary of the Investigation.

In the course of conducting the Investigation, Katten, on behalf of the Restructuring Committee, collected and reviewed documents and information from (among other sources) the Debtors, the Debtors' advisors, and HBC.  Katten reviewed tens of thousands of pages of documents and conducted interviews of six members of the Debtors' management team.  While the Committee conducted its own independent investigation, in order to minimize cost and avoid duplication of effort, Katten and BRG also collaborated with the Committee's advisors, sought and obtained input from the Committee's advisors concerning potential claims and matters of concern to the Investigation, and diligently pursued avenues of inquiry suggested by the Committee's advisors.

Katten, with the assistance of BRG, researched and analyzed the merits of potential claims held by the Debtors' Estates against HBC and certain other third parties.  In September 2020, Katten provided to the Restructuring Committee a comprehensive presentation regarding its preliminary findings and conclusions with respect to the Investigation, and thereafter has provided the Restructuring Committee with certain supplemental presentations and analyses.

3.       Claims Investigated.

In the Investigation, Katten analyzed potential estate causes of action relating to, among other things, the Acquisition and the Debtors' business relationship with HBC.  For example, the Investigation analyzed potential claims and causes of action held by the Debtors' Estates against HBC, such as:

(i)       Whether the entire Acquisition could be avoided as a constructive fraudulent transfer.  The Investigation concluded that a constructive fraudulent transfer claim with respect to the Acquisition is not colorable because, among other reasons, the Debtors could not credibly contend that Le Tote or its subsidiaries received less than reasonably equivalent value in the Acquisition.

Field Code Changed

(ii)    Whether Le Tote's prepayment of an inventory note (the "Inventory Note") on December 26, 2019, which resulted in Le Tote transferring approximately $26.6 million to the HBC Parties, could be avoided as an insider preference. The Investigation concluded that Le Tote has a colorable claim to avoid the December 26, 2019 transfer as a preference under section 547 of the Bankruptcy Code, although the HBC Parties assert that they have affirmative defenses that could reduce or eliminate its exposure.

(iii)    Whether the Seller Note and the Inventory Note could be recharacterized from debt instruments into equity interests in the Debtors. The Investigation concluded that the Debtors have a colorable claim to recharacterize the Seller Note as an equity interest, as certain elements of the Seller Note are, under applicable legal standards, are indicative of an equity investment rather than debt. The Investigation concluded, however, that a claim to recharacterize the Inventory Note as an equity interest is not colorable.

(iv)    Whether the HBC Parties' conduct in business dealings with the Debtors, prior to and following the Acquisition, gave rise to a colorable claim to equitably subordinate the HBC Parties' claim against the Debtors' estates pursuant to section 510(c) of the Bankruptcy Code. Because HBC Propco was, after the Acquisition and at the time of review in the Investigation a statutory insider of the Debtors, its conduct as to the Debtors would be subject to rigorous scrutiny. After scrutinizing several aspects of the HBC Parties' business dealings with the Debtors, the Investigation concluded that there is evidence that HBC Propco engaged in some conduct that may have harmed the Debtors' other creditors.

(v)    Whether the HBC Parties' failure to pay rent for the Lord & Taylor physical locations gave rise to a breach of contract or indemnification claim. The Investigation concluded that Le Tote has a colorable claim against the HBC Parties for breach of contract or indemnification to the extent Le Tote suffers any losses related to the HBC Parties' failure to pay rent as required by the APA, which may include legal fees incurred by Le Tote and any third-party claims asserted against Le Tote.

(vi)    Whether the Transition Services Agreement, and the services provided by the HBC Parties to Le Tote in pursuance thereof, gave rise to a breach of contract claim. The Investigation concluded that Le Tote has colorable claims that the HBC Parties breached the Transition Services Agreement by (a) charging Le Tote for certain services in excess of contracted amounts or actual cost, and (b) failing to provide certain services to Le Tote in a manner consistent with the standard of care that the HBC Parties covenanted to observe as specified in the Transition Services Agreement.

The description of potential claims and causes and action examined as part of the Investigation is not exhaustive and the Restructuring Committee examined additional claims and causes and action against the HBC Parties and other parties. The HBC Parties have asserted numerous defenses to the potential claims against the HBC Parties subject to the Investigation. These defenses were taken into account by the Restructuring Committee when evaluating whether to recommend the HBC Settlement.

The Investigation into potential claims or causes of action that the Debtors' Estates could assert against parties other than the HBC Parties remains ongoing. The Debtors expect that the Restructuring Committee will make a final recommendation regarding such other potential claims or causes of action in advance of the Debtors' proposed confirmation hearing.

4.    Cost and Delay of Litigation.

The Restructuring Committee's Investigation also considered the costs of litigating the Debtors' causes of action to judgment, the potential delays associated with monetizing such litigation, the impact of litigation on the Debtors' operations, management, and employees, including the distraction to management caused by managing litigation rather than focusing on the business operations of the Debtors, the impact of the litigation on the company's restructuring, as well as the defendants' financial wherewithal to fund and engage in protracted litigation. As discussed above, any such litigation would involve arguments on both sides of the issues, and the Restructuring Committee expected that any such litigation would require extensive document discovery, witness testimony, fact development, motion practice, and a trial. In addition, commencing litigation against the HBC Parties would likely have resulted in negative impacts to the Debtors' business relationship with the HBC Parties and could have impaired the Debtors' ability to receive critical transition services from the HBC Parties under the Transition Services Agreement after the

Field Code Changed

contractual obligation to provide such services at pre-Omnibus Agreement pricing expires on December 31, 2020, which would put the Debtors' ability to conduct their store closing sales at risk. Affiliates of the HBC Parties are also the Debtors' landlords in 32 of the Debtors' 38 Lord & Taylor locations. Accordingly, litigation against the HBC Parties would likely also have negative impact on the store closing sales to the detriment of all stakeholders. Certain of the HBC Parties have also provided an indemnity to the Debtors for many liabilities under the APA, and litigation against the HBC Parties may impair the Debtors' ability to assume the APA and preserve these valuable indemnification rights, thereby exposing the Debtors' estates to additional liability. Finally, as certain of the HBC Parties are secured creditors of the Debtors, commencing litigation against the HBC Parties would jeopardize the Debtors' ability to use cash collateral and would likely require additional litigation regarding the non-consensual use of cash collateral.

K.    *Settlement and Plan Negotiations.*

As discussed above, the goal of the Restructuring Committee's Investigation was to assess, and where applicable, maximize the value of potential litigation assets, either through pursuit of such claims or unlocking value through settlement. During the Reservation of Rights Period, the Debtors engaged in simultaneous negotiations with both the HBC Parties and the Committee, seeking to establish a plan framework that would resolve the causes of action examined pursuant to the Investigation, and avoid the need for costly (and inherently uncertain) litigation with the HBC Parties. To that end, on October 22, 2020, after consulting with the Committee and the Restructuring Committee, the Debtors distributed a proposed settlement term sheet setting forth the framework of a potential global plan settlement. The Debtors and the HBC Parties then traded numerous settlement proposals over the following several weeks in an attempt to reach an agreement on a consensual chapter 11 plan. During this time frame, the Debtors also encouraged the Committee to submit their own settlement proposal within the confines of the latest bid-ask between the Debtors and the HBC Parties in an effort to broker a global agreement. The Committee did not submit a proposal for many weeks. During these negotiations, the Debtors continued to advocate to obtain the highest possible recovery for unsecured creditors consistent with their role as fiduciaries for all creditors.

In early December, after repeated invitations from both the Debtors and the HBC Parties to participate in negotiations, the Committee finally submitted a proposal which, in the view of the HBC Parties, demanded value that far exceeded the value of any potential claims and was well outside the confines within which the Debtors and HBC Parties had been negotiating. Accordingly, the HBC Parties determined that the Committee proposal was unacceptable. The Debtors then continued negotiations with the HBC Parties and, following several additional days of hard-fought negotiations, reached an agreement in principle on the terms of the HBC Settlement on December 10, 2020. Following the recommendation of the Restructuring Committee, the Debtors' board of directors voted to approve the terms of the HBC Settlement and the Plan on the same day.

L.    *Evaluation of the Proposed HBC Settlement.*

Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Under Bankruptcy Rule 9019, the Bankruptcy Court may approve a settlement so long as it does not fall below the lowest point in the range of reasonableness. Settlements are appropriate in a chapter 11 plan when they constitute a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate.[11]

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits afforded under the terms of the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the HBC Settlement. The HBC Settlement settles the Debtors' claims against the HBC Parties and provides a mutual release by the Debtors and the HBC Parties. In exchange, pursuant to the Plan and the HBC Settlement, the HBC Parties agree to subordinate their claims to administrative and priority claims and allow unsecured creditors to receive $3 million of distributable cash, after the TSA Shortfall payment and an additional $8 million to the HBC Parties, with a 50/50 split in distributable cash thereafter. The HBC Parties have also agreed to allocate the *first* $1 million of Urban Proceeds to unsecured creditors and share in all proceeds thereafter

---

[11]    *See, e.g., In re AppliedTheory Corp.*, Case No. 02-11868, 2008 WL 1869770, at *3 (Bankr. S.D.N.Y. April 24, 2008) (internal citations omitted).

Field Code Changed

50/50.  Taken together, these concessions can yield up to an expected $6.6 million recovery to unsecured creditors, exclusive of proceeds of the litigation against Urban Outfitters the value of which is not yet determined but the Debtors believe to be significant and other value described below.  In addition, the HBC Parties have agreed to reduce the TSA Shortfall Claim by approximately $60,000 and continue to provide services under the Transition Services Agreement in January and February 2021 for total payments of $513,017 per month.  As the Debtors continue to rely on the services provided under the Transition Services Agreement and the Omnibus Agreement will reset pricing to the higher pre-agreement levels as of January 1, 2021, this concession—potentially reducing ongoing Transition Services payments by up to eight times—provides significant value to the Debtors' estates by allowing the Debtors' to extend their store-closing sales at certain highly-performing locations.  The HBC Settlement also facilitates disposition of 32 of the Debtors' 38 brick-and-mortal locations through the agreement of the HBC Parties to the assumption and assignment of two of the Debtors' master leases with no cash cure payments and the disallowance of all rejection damages for a third master lease.  Finally, the HBC Settlement requires the HBC Parties to provide certain operational support integral to the Debtors as they wind down the estates and eliminates rejection damages claims for certain of the Debtors' locations, thereby reducing the unsecured claims pool and increasing recovery to unsecured creditors.

The Restructuring Committee, the Debtors, and their respective advisors devoted substantial time to evaluating the potential estate claims against the HBC Parties and the value achieved through the HBC Settlement and the Plan.  Based on the information and analysis gathered during the Investigation, the Restructuring Committee concluded that the HBC Settlement produces substantial value to the Debtors' Estates that outweighs any value that would reasonably be obtained through costly and protracted litigation against the HBC Parties.  In reaching this conclusion, the Restructuring Committee considered the likelihood of success on the merits of the Debtors' claims and the HBC Parties' defenses to those claims, the amount of potential damages available on those claims, the cost of litigation, the likelihood of recovery, the impact of litigation against the HBC Parties on the Debtors' business and restructuring efforts, the critical support from the HBC Parties for the completion of the Debtors' store closing sales and orderly wind-down of operations at a discount from the contractual costs under the Transition Services Agreement, the consent of the HBC Parties to the assumption of the Debtors' indemnification rights under the APA, and the value secured by the HBC Settlement for the Estates, among other things.  The Restructuring Committee and the Debtors believe that the HBC Settlement incorporated in the Plan is fair, reasonable, and provides substantial value to the Debtors' Estates that exceeds the standards for settlement approval under the Bankruptcy Code.

M.      *The Committee's Standing Motion*

On December 17, 2020, the Committee filed a motion seeking standing to pursue certain estate claims related to the Acquisition and attacking the HBC Settlement as inadequate (the "Standing Motion").  While many of the details of the Standing Motion were included in the proposed complaint filed under seal, the Committee believes that the claims described therein are significant, identifiable, and material.  These claims can generally be divided into six categories:  (1) constructive fraudulent transfer claims based on the Acquisition; (2) recharacterization and avoidance action with respect to the prepayment of the Inventory Note; (3) recharacterization and equitable subordination with respect to the validity and priority of the Seller Note; (4) claims with respect to breaches of the Transition Services Agreement; (5) an avoidance action with respect to setoffs under the Omnibus Agreement; and (6) lien avoidance actions relating to alleged perfection issues impacting the extent and validity of the HBC Prepetition Liens and HBC Prepetition Collateral (each as defined in the Cash Collateral Order).  The Committee believes these claims are colorable and could result in a significant recovery for the Debtors' Estates.  The Standing Motion also constitutes the commencement of a "Challenge" as defined in the Cash Collateral Order, pursuant to which the Committee is challenging the liens and claims of the HBC Secured Parties.

The Debtors believe that they have pursued the putative estate claims identified in the Committee's Standing Motion through settlement under the HBC Settlement and that many of the claims identified in the Committee Standing Motion are not colorable.  As discussed above, the Debtors further believe that the Plan and HBC Settlement deliver value to the Estates in general, and to unsecured creditors in particular, that far exceeds the value that might be obtained through protracted, expensive and uncertain litigation against the HBC Parties.  The HBC Parties also dispute the allegations in the Committee's Standing Motion and have identified numerous defenses to such claims.  Accordingly, the Debtors and the HBC Parties intend to oppose the Committee's Standing Motion.

N.      *Litigation Matters*

33

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

O.        *Other Procedural and Administrative Motions*

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On August 24, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 190] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On September 21, 2020, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 363].

- Retention Applications. To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in these chapter 11 cases, the Debtors filed applications requesting that the Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327 and 328 of the Bankruptcy Code: (a) Kirkland & Ellis LLP as counsel to the Debtors; (b) Kutak Rock LLP as co-counsel to the Debtors; (c) Nfluence as investment banker to the Debtors; (d) BRG as restructuring advisor to the Debtors (e) Deloitte Tax LLP as tax advisor to the Debtors; and (f) Katten as independent counsel to the Restructuring Committee.

- Establishment of the Bar Date. On August 27, 2020, the Court entered an order setting the General Claims Bar Date at September 28, 2020, at 5:00 p.m., prevailing Eastern Time, as well as the Governmental Bars Date at January 29, 2020. [Docket No 256]. Further, all entities asserting claims arising from the rejection of executory contracts and unexpired leases of the Debtors shall file a Proof of Claim on account of such rejection by the later of (i) the General Claims Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m., prevailing Eastern time, on the date that is thirty (30) days following entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors (the "Rejection Damages Bar Date").

- Establishment of an Administrative Claims Bar Date. On November 24, 2020, the Court entered an order setting the Administrative Claims Bar Date, for any administrative claim arising on or prior to December 4, 2020, at January 4, 20201, at 4:00 p.m., prevailing Eastern Time [Docket No. 600].

- Claims Administration. On November 24, 2020, the Court entered orders approving procedures for filing omnibus objections to claims [Docket No. 598] and settlement of *de minimis* claims [Dockete No. 599].

- Exclusivity Extension. On December 2, 2020, the Court entered an order extending the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances of a chapter 11 plan for each Debtor through and including March 30, 2021 and including May 29, 2020, respectively.

- Lease Dispositions. On December 11, 2020, the Debtors filed two notices to assume and assign the Master Lease, dated July 22, 2015, related to 24 store locations and the Master Lease, dated July 22, 2015, related to 4 store locations to LT Propco LLC or such other entity as it may designate. The assumption and assignment of these two leases will not require the Debtors to pay any cure costs in cash. On

Field Code Changed

December 11, 2020, the Debtors also filed a rejection notice related to the Amended and Restated Lease, dated November 6, 2019, relating to 4 store locations and three additional leases.

**ARTICLE VII.**
**SUMMARY OF THE PLAN**

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Classification and Treatment of Claims and Interests.*

1.    Classification of Claims and Interests.

The Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.    Confirmation Pursuant to 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

B.    *Means for Implementation of the Plan.*

1.    General Settlement of Claims.

Except as otherwise expressly provided in the Plan, pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion, proposed by the Debtors, to approve the good-faith compromise and

Field Code Changed

settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

2.        The HBC Settlement.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates and implements the HBC Settlement, a compromise and settlement of numerous issues and disputes between and among the Debtors and the HBC Parties designed to achieve a reasonable and effective resolution of the Chapter 11 Cases. Except as otherwise expressly set forth herein, the HBC Settlement constitutes a settlement of all potential issues and Claims between and among the Debtors and the HBC Parties.

2.3.      Cancellation of Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of any Debtor under the Credit Agreement Documents and any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be fully released, settled, and compromised.  Notwithstanding the foregoing, (i) no executory contract or unexpired lease that (x) has been, or will be, assumed pursuant to ~~s~~Section 365 of the Bankruptcy Code or (y) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date ~~and~~, (ii) the Seller Note shall continue in effect solely for the purpose of allowing the HBC ~~Secured~~ Parties to receive the distributions provided for under the Plan~~.~~, and (iii) the Le Tote APA shall continue in effect solely for the purpose of the continuing indemnification obligations as set forth in Article V.E of the Plan.

3.4.      Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan~~, including the Asset Sales,~~ or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

4.5.      Sources of Plan Consideration and Priority Waterfall.

~~Distributions under the Plan will be funded by Available Cash, after the funding from Available Cash of the Priority Claims Reserve, the Professional Fee Escrow Account, and Wind Down Reserve and the reserve or payment in full of all Allowed Secured Tax Claims and Other Secured Claims. All remaining Distributable Cash shall be, after all senior claims are paid in full, allocated on a Pro Rata basis to Holders of General Unsecured Claims (the~~

Distributions to holders of Allowed General Unsecured Claims and the Seller Note Claim will be funded from Distributable Cash.  All Distributable Cash, other than any Urban Proceeds, shall be allocated as follows:

Field Code Changed

(i) first, to holders of the Seller Note Secured Claim, until the such holders receive $8 million on account of the Seller Note Secured Claim; (ii) second, to holders of Allowed General Unsecured Claims, until such holders have received $3 million on account of such claims; (iii) third, split 50/50 between holders of the Seller Note Secured Claims and the holders of Allowed General Unsecured Claims until the Seller Note Secured Claim is paid in full; and (iv) fourth, to the holders of Allowed General Unsecured Claims.

The Urban Proceeds shall be allocated as follows: (i) first to holders of Allowed General Unsecured Claims until such holders have received $1 million on account of the Allowed General Unsecured Claims; (ii) second, split 50/50 between holders of the Seller Note Secured Claim and holders of Allowed General Unsecured Claims until the Seller Note Claim is paid in full; and (iii) third, to holders of Allowed General Unsecured Claims (together with the immediately preceding paragraph, the "Waterfall Recovery").

Distributions on account of the Seller Note Secured Claim shall only be made from amounts allocated to the Seller Note Secured Claim pursuant to the Waterfall Recovery and not from amounts allocated to the holders of Allowed General Unsecured Claims therein.

In addition, all Residual Reserves shall be, after all senior claims are paid become Distributable Cash and shall be distributed in full, paid on a Pro Rata basis to Holders of General Unsecured Claims. accordance with the Waterfall Recovery.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreements, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Post–Effective Date Debtors and shall be subject to administration by the Plan Administrator, and the net proceeds thereof shall be Distributable Cash.

5. 6.      Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or Post-Effective Date Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) such other transactions that are required to effectuate the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

3.      Post-Effective Date Debtors.

7.      Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including all actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan or corporate structure of the Debtors or Post-Effective Date Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the

Field Code Changed

Plan) in the name of and on behalf of the Post-Effective Date Debtors.  The authorizations and approvals contemplated by Article IV.G shall be effective notwithstanding any requirements under non bankruptcy law.

        8.        Post-Effective Date Debtors.

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible including overseeing the Store Closing Sales in accordance with the Consultant Agreement as authorized by the Bankruptcy Court, in accordance with the Wind-Down Budget, (ii) resolving Disputed Claims, (iii) making distributions on account of Allowed Claims as provided under the Planhereunder, (iv) establishing and funding the Distribution Reserve Accounts in accordance with the Wind-Down Budget, (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (vi) filing appropriate tax returns, (vii) complying with theirany continuing obligations under the Asset Purchase Agreements, if any,Agreement and (viii) administering the Plan in an efficacious manner.  The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

        6.9.       Plan Administrator.

The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or sale director of the Post-Effective Date Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to any transition services agreements entered into on or after the Effective Date by and between the Post-Effective Date Debtors and the Purchasers.  The Debtors, after the Confirmation Date, and the Post-Effective Date Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall, subject to the powers and authority of the Plan Administrator Oversight Board, include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including:  (i) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (ii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts in accordance with the Wind-Down Budget; (iii) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (iv) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (v) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vi) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (vii) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.LO of the Plan; (viii) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (ix) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (x) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

Field Code Changed

(a)      Plan Administrator Oversight Board

On the Effective Date, the Plan Administrator Oversight Board shall be appointed.  The Plan Administrator Oversight Board shall consist of two members appointed by the HBC Parties and one member appointed by the Committee.  The members of the Plan Administrator Oversight Board shall not receive any additional compensation on account of serving in such capacity.

(a)(b)     Retention of Professionals.

The Plan Administrator shall have the right, subject to the Wind-Down Budget, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors.  The reasonable fees and expenses of such professionals shall be paid from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Plan Administrator'sPost-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

(b)(c)     Compensation of the Plan Administrator.

The Plan Administrator's Compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expenses reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

(c)(d)     Plan Administrator Expenses.

All costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, the Post-Effective Date Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Post-Effective Date Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget.  Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

(d)(e)     Exculpation, Indemnification, Insurance & Liability Information.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors.  The Plan Administrator may obtain, at the expenses of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

Field Code Changed

(e)(f)     Tax Returns.

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

(f)(g)     Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or in any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

7.10.     Wind-Down.

On and after the Effective Date, the Plan Administrator will be authorized, subject to the authority of the Plan Administrator Oversight Board, to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator, subject to the authority of the Plan Administrator Oversight Board shall:  (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreements and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have cancelled pursuant to the Plan all Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

11.     Continued HBC Support.

(a)     Transition Services Agreement.

Notwithstanding anything to the contrary in the Plan, the Transition Services Agreement shall be deemed terminated as of February 28, 2021; *provided* that if for any reason one or more of the Debtors' stores remains open following February 28, 2021, a charge of $513,017 for March 2021 (and any subsequent months for which such stores remain open) would apply.  If no stores remain open following February 28, 2021, but the Debtors determine that other transition services are required after such date, the Debtors and the HBC Parties shall negotiate in good faith the cost of such service.

Field Code Changed

(b)        HBC Operational Support

To the extent not already completed prior to the Effective Date, the HBC Parties shall ship Lord & Taylor-owned inventory located at the HBC Parties' Pottsville facility to brick and mortar Lord & Taylor stores, as the Debtors may reasonably request and at the Debtors' cost (a) at a cost per unit of $0.35 and (b) with shipping supplies and transportation costs passed through to Lord & Taylor at cost.

(c)        Containers.

The Containers shall be deemed property of the HBC Parties, and title to such Containers, if in the name of any Debtor, shall be transferred to the HBC Parties at the HBC Parties' sole cost.  The Debtors shall provide such cooperation as may reasonably be required to implement such title transfers, including a limited power of attorney authorizing the HBC Parties to effect such title transfers.

(d)        Further Assurances.

The Debtors shall use commercially reasonably efforts to transfer certain utility accounts for non-Debtor locations to the HBC Parties identified on Annex A to the Settlement Term Sheet, and assist the HBC Parties as required with respect to the in the assumption and assignment and/or rejection of certain contracts pursuant to the HBC Settlement, in each case at the HBC Parties' sole cost and expense.

12.        Wind-Down Support.

In order to assist with the Wind Down, the HBC Parties will deliver the following information to Le Tote in exchange for an incremental payment of $115,000:   (a) trial balance as of December 31, 2020, including reconciliations by account; (b) accounts payable aging as of December 31, 2020; (c) the latest "Vendor Master" file; and (d) three years of historical data for (i) AP invoice detail, (ii) vendor payment/cash receipts detail, (iii) inventory receipts/proofs of delivery, and (iv) vendor allowance detail, to the extent such data is available.

The HBC Parties shall make commercially reasonable efforts to cooperate with requests, if any, from taxing authorities exercising audit rights with respect to historical Lord & Taylor audits at a reasonable rate based on hours incurred to procure and provide requested data during the Wind Down.

8.13.    Dissolution and Board of Directors.

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

14.        Management Payments.

Upon the Effective Date, the members of the Debtors' management team who are "KEIP Participants" as defined in the KEIP Order shall receive payments in the same proportion and amount as set forth in the "Plan Goals" of the KEIP Order.

9.15.    Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Post-Effective Date Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities,

Field Code Changed

instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

<del>10.</del><ins>16.</ins>    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IV.<del>I.</del><ins>O</ins> and Article VIII of the Plan<del>and</del><ins>,</ins> the <del>Asset Purchase Agreements, if any, the Plan Administrator</del><ins>Post-Effective Date Debtors</ins> shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan<del>, other than Avoidance Actions and</del><ins> except for</ins> the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article<del>-</del> VIII of the Plan, which shall be deemed released and waived by the Debtors<del>,</del><ins> and</ins> the Post-Effective Date Debtors as of the Effective Date<del>, provided that Commercial Tort Claims shall be preserved for the sole benefit of the Holders of General Unsecured Claims and only the Plan Administrator shall have an obligation to commence, prosecute, or settle such Commercial Tort Claims, if any</del>.

The <del>Plan Administrator</del><ins>Post-Effective Date Debtors</ins>, on and after the Effective Date, may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action (other than <del>Avoidance Actions and</del> the Causes of Action<del>-</del> released by the Debtors pursuant to the releases and exculpations contained in the Plan), whether arising before or after the Petition Date, and the <del>Plan Administrator's</del><ins>Post-Effective Date Debtors'</ins> rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment<ins>, subject to the authority of the Plan Administrator Oversight Board</ins>, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the <ins>Post-Effective Date</ins> Debtors or the Plan Administrator will not pursue any and all available Causes of Action<del> against them</del>.  Unless any Cause of Action against an Entity is<del> expressly</del> waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the <del>Plan Administrator</del><ins>Post-Effective Date Debtors</ins> expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. <del>The Plan Administrator reserves</del><ins>The Post-Effective Date Debtors reserve</ins> and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The <del>Plan Administrator</del><ins>Post-Effective Date Debtors</ins> shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

<del>11.</del><ins>17.</ins>    Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Le Tote, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Le Tote.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Le Tote in accordance with the Bankruptcy Code and the Bankruptcy Rules.

C.    *Treatment of Executory Contracts and Unexpired Leases.*

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

Field Code Changed

42

On the Effective Date, except as otherwise provided ~~in the Plan~~herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (i) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is ~~specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement~~listed on the Schedule of Assumed Executory Contracts and Unexpired Leases; (ii) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (iii) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Policy.

_____Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of:  (i) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (ii) 30 days after the Debtors provide notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (iii) 30 days after notice of any rejection that occurs after the Effective Date.  **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (x) be treated as a creditor with respect to such Claim, (y) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (z) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Post-Effective Date Debtors, or the property for any of the foregoing without the need for any objection by the Debtors, Post-Effective Date Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

Notwithstanding anything to the contrary in the Plan, any Proof of Claim arising from the rejection of the Propco Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity and Holders of such Claims may not receive any distributions on account of such Claims.

3.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (i) the amount of any Cure Claim; (ii) the ability of the Post-Effective Date Debtors~~, the Purchasers,~~ or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment.  Notwithstanding the foregoing, nothing herein shall prevent the Post-Effective Date Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

**Field Code Changed**

Unless otherwise provided by an order of the Bankruptcy Court ~~or in the Asset Purchase Agreements~~, if any, at least seven days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

4.    D&O Policies.

The D&O Policies shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, and nothing shall alter, modify, or amend, affect, or impair the terms and conditions of (or the coverage provided by) any of the D&O Policies including the coverage for defense and indemnity under any of the D&O Policies which shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

5.    Indemnification Obligations.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former ~~directors', managers'~~ directors', managers', and officers'~~'~~ respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor ~~and assigned to the Post-Effective Date Debtors which shall be deemed to have assumed the obligation~~, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything herein to the contrary, the Post-Effective Date Debtors'~~'~~ obligation to fund such indemnification obligations shall be limited to the extent of coverage available under any insurance policy ~~assumed by the Debtors and assigned to the Post-Effective Date Debtors, including any directors and officers insurance policies~~, including any D&O Policy.

Notwithstanding anything to the contrary in the Plan, the obligation of the HBC Parties to indemnify the Debtors pursuant to Section 9.02(a) of the Le Tote APA and the obligation of the Debtors to indemnify the HBC Parties pursuant to Section 9.02(b)(iii) of the Le Tote APA, as well as the relevant provisions of Section 9.01, 9.03, 9.04, and 9.05 of the Le Tote APA and any defined terms used therein shall survive Confirmation and Consummation and shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor.

6.    Termination Agreements.

Notwithstanding anything to the Contrary in the Plan, the Termination Agreements shall be assumed by the Post-Effective Date Debtors on behalf of the applicable Debtor effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.

Field Code Changed

6.7.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

7.8.    Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

8.9.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

D.    *Provisions Governing Distributions.*

1.    Timing and Calculation of Amounts to be Distributed.

Unless otherwise provided in the Plan, on the ~~Effective Date or as soon as reasonably practicable thereafter~~Initial Distribution Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the ~~date that~~next Quarterly Distribution Date after such Claim becomes Allowed or as soon as reasonably practicable thereafter~~,~~) or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim against or Allowed Interest in, as applicable, the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors or the Disbursing Agent on behalf of the Debtors, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

2.    Rights and Powers of the Disbursing Agent.

(a)    Powers of the Debtors and the Disbursing Agent.

~~Except as otherwise set forth in the Plan, all distributions under the Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter by the Debtors or the Disbursing Agent (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the Debtors or the Disbursing Agent, as applicable.~~

Field Code Changed

~~On and after the Effective Date, the Disbursing Agent and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any General Unsecured Claim, Priority Claim, or Other Secured Claim, subject to the terms hereof.~~

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

The Debtors and the Disbursing Agent, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Disbursing Agent is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash by the Debtors.

(b)    Fees of Disbursing Agent and Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Disbursing Agent in connection with such person's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash from the Wind-Down Amount.

3.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

(a)    Record Date for Distribution.

Except as provided in the Plan, on the Distribution Record Date, the Claims Register shall be closed and the Debtors and the Disbursing Agent, or any other party responsible for making distributions, shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

(b)    Delivery of Distributions in General.

(i)    Payments and Distributions on Disputed Claims.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims or Disputed Interests that are not Allowed Interests, as applicable, as of the Effective Date but which later become Allowed Claims, or Allowed Interests, as applicable, shall, in the reasonable discretion of the Disbursing Agent, be deemed to have been made on the Effective Date unless the Disbursing Agent and the Holder of such Claim agree otherwise.

(ii)    Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors or the Disbursing Agent, as applicable, on the one hand, and the Holder of a Disputed Claim or Disputed Interest, as applicable, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Disputed Interest, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim or Disputed Interest have become Allowed Claims or Allowed Interests or have otherwise been resolved by settlement or Final Order.

~~(i)    Distributions.~~

(c)    ~~On and after~~ Initial Distribution Date.

the Effective Date, the Post-Effective Date Debtors

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' books and records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided, further,* that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.

(d)    Quarterly Distribution Date.

Except as otherwise determined by the Plan Administrator, subject to the oversight of the Plan Administrator Oversight Board, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims or Allowed Interests under the Plan on such date. Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan herein because the Claim or Interest that would have been entitled to receive that distribution is not an Allowed Claim or Allowed Interest on such date, shall be held by the Debtors or the Disbursing Agent in reserve in accordance with the Plan, as applicable, and distributed on the next Subsequent first Quarterly Distribution Date that occurs after such Claim or Interest is Allowed. Subject to Article VI.E of the Plan, no interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date pursuant to the Plan.

(e)    Minimum; *De Minimis* Distributions.

No Cash payment of less than $100, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim, and each Claim to which this limitation applies shall be satisfied pursuant to Article VIII of the Plan, and its Holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against the Post-Effective Date Debtors or their property.

(e)(f)    Undeliverable Distributions and Unclaimed Property.

In the event that With respect to any distribution to any Holder is returned as undeliverable Undeliverable Distribution, no distribution to such the relevant Holder shall be made unless and until the Disbursing Agent, as applicable, has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws to the contrary) to the Debtors or the Disbursing Agent, as applicable Post-Effective Date Debtors and shall become Distributable Cash, automatically and without need for a further order by the Bankruptcy Court and the Claim or Interest of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.    Setoffs and Recoupment.

Except as otherwise expressly provided in the Plan herein, the Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim it may have against the Holder of such Claim. Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the Plan Supplement shall discharge, release, impair, or otherwise preclude any valid right of setoff or recoupment of the Debtors' customers under applicable Law or an applicable contract that is assigned to the Purchasers, which valid right of setoff or recoupment shall continue against the Purchasers following the Effective Date.

E.    *Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.*

Field Code Changed

47

1.      Allowance of Claims and Interests.

On and after the Effective Date, and except with respect to Claims that are Allowed pursuant to the Plan, the Debtors or Post-Effective Date Debtors, as applicable, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

2.      Claims and Interests Administration Responsibilities.

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Debtors or Post-Effective Date Debtors, as applicable, by order of the Bankruptcy Court, shall have the sole authority with regard to all Claims and Interests:  (i) to File, withdraw, or litigate to judgment objections to Claims and Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.      Estimation of Claims and Interests.

As of the Effective Date, the Post-Effective Date Debtors or the Plan Administrator, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim or Interest is estimated.  Each of the foregoing Claims or Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims or Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.      Adjustment to Claims or Interests Without Objection.

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  The Debtors shall provide any Holder of such a Claim or Interest with fourteen (14) days' notice prior to the Claim or Interest being adjusted or expunged from the Claims Register as the result as the result of a Claim or Interest being paid, satisfied, amended or superseded.

Field Code Changed

5.        Time to File Objections to Claims.

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

6.        Disallowance of Claims.

Other than with respect to Claims Allowed under the Plan, no Claim of any Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Allowed, unless and until such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors.  All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided in the Plan or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

7.        Amendments to Claims.

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the Debtors and any such new or amended Claim or Interest Filed shall automatically be deemed disallowed in full and expunged without any further action; *provided that* a Claim may be Filed after the Effective Date if the Bankruptcy Court enters an order permitting such late filing.

8.        No Distributions Pending Allowance.

If an objection to a Claim or Interest or any portion thereof is Filed as set forth in Article VII of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or any portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

9.        Distributions After Allowance.

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions, if any, shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution, if any, that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy Law or as otherwise provided in Article III.B of the Plan.

F.        *Settlement, Release, Injunction, and Related Provisions.*

1.        Settlement, Compromise, and Release of Claims and Interests.

Field Code Changed

Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.      Term of Injunctions or Stays.

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

3.      Release of Liens.

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, the ABL Agent, the Term Loan Agent, and the HBC ~~Secured~~ Parties shall execute and deliver all documents reasonably requested by the Debtors, Post-Effective Date Debtors, or the Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

4.      Releases by the Debtors.

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates, the Post-Effective Date Debtors, and the Plan Administrator from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, or their Estates, the Post-Effective Date Debtors, or the Plan Administrator would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in a Debtor, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Le Tote APA, the formulation, preparation, dissemination, negotiation, or filing of the ~~the~~ Disclosure Statement, the Plan, the ~~Assets Sales~~Asset Sale, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the ~~the~~ Disclosure Statement, the Plan, the Chapter 11 Cases, the Asset Purchase Agreements, the Asset ~~Sales~~Sale, the Le Tote APA, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor**

Field Code Changed

and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutesis determined by a Final Order to constitute willful misconduct, fraud or gross negligence. Notwithstanding the inclusion of any Released Parties as a potential party to any Retained Causes of Action, such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party, or (iv) release the Debtors or the HBC Parties from the mutual indemnification obligations as set forth in Article V.E of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the releases herein; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties.

5. Releases by Holders of Claims and Interests.

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the Le Tote APA, the formulation, preparation, dissemination, negotiation, or filing of the the Disclosure Statement, the Plan, the Asset Sales, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, or the Plan, the Chapter 11 Cases, the Asset Purchase Agreements, the Asset SalesSale, the Le Tote APA, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutesis determined by a Final Order to constitute willful misconduct, fraud or gross negligence.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party, or (iv) release the Debtors or the HBC Parties from the mutual indemnification obligations as set forth in Article V.E of the Plan.

Field Code Changed

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the Releasing Parties; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after notice and opportunity for hearing; and (vi) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

6.  Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Asset Purchase Agreements, the Asset ~~Sales~~Sale, the Investigation, or any Restructuring Transaction, contract, instrument, release or other agreement or document  (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the Asset Purchase Agreements, the Asset Sales, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary herein, nothing in Article VIII.~~C~~E of the Plan shall release or exculpate any Exculpated Party for any act or omission arising before the Petition Date or after the Effective Date.

7.  Injunction.

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold ~~C~~claims or ~~I~~interests that have been released or discharged pursuant to the Plan or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties):  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such ~~C~~claims or ~~I~~interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such ~~C~~claims or ~~I~~interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such ~~C~~claims or ~~I~~interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such ~~C~~claims or ~~I~~interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a ~~C~~claim or ~~I~~interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such ~~C~~claims or ~~I~~interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay

Field Code Changed

pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors until the closing of these Chapter 11 Cases.

8. ~~Protections~~Limited Substantive Consolidation.

The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating each of the Estates of the Debtors into a single consolidated Estate solely for purposes of voting, Confirmation, and distribution.  For the avoidance of doubt, the Plan shall not serve as a motion by the Debtors seeking entry of an order substantively consolidating the Debtors for any other purposes.  Notwithstanding anything in Article VIII.H of the Plan, all distributions under the Plan shall be made in accordance with Article VI of the Plan.

If the Debtors' Estates are substantively consolidated in accordance with t Article VIII.H of the Plan then, on and after the Effective Date, all assets and liabilities (including Allowed Claims) of the Debtors shall be treated as though they were merged into one Estate solely for purposes of voting, Confirmation, and distribution.  The limited substantive consolidation described herein shall not affect the legal and organizational structure of the Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, with respect to Executory Contracts or Unexpired Leases that were assumed or entered into during the Chapter 11 Cases, if any.  **Moreover, any alleged defaults under any applicable agreement with the Debtors or their respective Affiliates arising from substantive consolidation under the Plan shall be deemed waived or otherwise cured as of the Effective Date.**

If the Debtors' Estates are not substantively consolidated in accordance with Article VIII.H of the Plan, then the Plan shall constitute a motion to approve a 9019 settlement with respect to the distributions on account of General Unsecured Claims (the "9019 Settlement"), which reflects a compromise and settlement of Claims that such creditors may hold against the respective Debtors.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the 9019 Settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the 9019 Settlement is in the best interests of the Debtors and their Estates.  If the Effective Date does not occur, the 9019 Settlement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

If the 9019 Settlement is approved pursuant to the Confirmation Order, then, on and after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive it Pro Rata share of the portion of Distributable Cash allocated to holders of Allowed General Unsecured Claims in accordance with Article IV.E of the Plan without giving effect to the proportion that the amount of Allowed Claims against any one Debtor bears to the aggregate amount of Allowed Claims against all of the Debtors.

Notwithstanding the substantive consolidation provided for herein, nothing shall affect the obligation of each and every Debtor to pay the quarterly fees to the U.S. Trustee until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

~~8.~~9.     Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors or another Entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

~~9.~~10.    Recoupment.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice

Field Code Changed

thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

        10.11.    Subordination Rights.

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

        G.     *Conditions Precedent to Effective Date.*

        1.     <u>Conditions Precedent to the Effective Date</u>.

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

        (a)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the Restructuring Transactions;

        (b)     all allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

        (c)     the Distribution Reserve Amounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind-Down Amount;

        (d)     the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan;

        (e)     the Bankruptcy Court shall have entered the Confirmation Order and which shall have become a Final Order that has not been stayed or modified or vacated and shall:

        (i)     authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan;

        (ii)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

        (iii)     authorize the implementation of the Plan in accordance with its terms; and

        (iv)     provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of

Field Code Changed

assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(f) with respect to all actions, documents and agreements necessary to implement the Plan: (a) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (b) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (c) such documents and agreements shall have been effected or executed, and in each case all such actions, documents and agreements shall be consistent with the terms of the Plan.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

2. <u>Waiver of Conditions</u>.

The conditions to Consummation set forth in Article IX.A of the Plan may be waived by the Debtors at any time with the consent of the HBC Parties, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan.

3. <u>Substantial Consummation</u>.

"Substantial Consummation" of the Plan, as defined in section 1102(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date.

4. <u>Effect of Non-Occurrence of Conditions to the Effective Date</u>.

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

**ARTICLE VIII.**
**STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

A. *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan. **The Bankruptcy Court has scheduled the Confirmation Hearing for** ~~October 20, 2020~~**[February 22], 2021**, **at [●]:1:00** ~~[a.m./p.m.]~~**.,. prevailing Eastern Time.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures. Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Eastern District of Virginia; (3) state the name, address, phone number, and

Field Code Changed

e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties as required by the Case Management Order no later than the Plan Objection Deadline. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court**.

B.    *Confirmation Standards.*

1.    <u>Requirements for Confirmation of the Plan</u>.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

2.    <u>Best Interests of Creditors</u>.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Interests under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Asset Sales and the Plan effects the monetization of the Debtors' remaining assets not otherwise acquired in the Asset Sales. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of General Unsecured Claims than would a chapter 7 liquidation. Monetizing the Debtors' Estates under the Plan likely provides Holders of General Unsecured Claims with a larger, more timely recovery, primarily due to expected materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the

Field Code Changed

56

Debtors' businesses that the Debtors had when they proposed to sell their assets and commence the Wind-Down. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' assets, and these specific Chapter 11 Cases, in order to complete the administration of the Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

The Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

       3.      <u>Financial Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. The Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. The Debtors are confident that they will have sufficient means to provide for the distributions under the Plan and therefore believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

    C.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

                                                                             Field Code Changed

D.      *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.      No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.      Fair and Equitable Test.

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## ARTICLE IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.      *Risks Related to the Confirmation and Consummation of the Plan.*

1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with

Field Code Changed

58

the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met and not waived, the Effective Date will not take place.

3.      The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

4.      The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan, with the consent of the HBC Parties, not to be unreasonably withheld, as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5.      Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit

Field Code Changed

of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.    Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as delays in the resolution of the Causes of Action on the Schedule of Retained Causes of Action and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of these chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors obtained the exclusive right to propose the Plan upon filing their petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

7.    These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.    The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.    Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or

Field Code Changed

more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

> 11.    <u>The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved</u>.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, Released Parties, or Exculpated Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

> 12.    <u>The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated By the Debtors</u>.

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

> 13.    <u>The Total Amount of Allowed Administrative and Priority Claims May Be Higher and/or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtors</u>.

The amount of Cash the Debtors' ultimately receive prior to and following the Effective Date may be lower than anticipated.  Additionally, Allowed Administrative Claims and Allowed Priority Claims maybe higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

> 14.    <u>The Committee's Standing Motion May Be Granted</u>

If the Committee's Standing Motion is granted, the Plan may require material revision and may require resolicitation.  Among other revisions, the Plan's release, injunction, and exculpation provisions may need to be revised or removed, and the proposed distributions to the Holders of Other Secured Claims, the Seller Note Secured Claim, and the TSA Shortfall Claim may either need to be circumscribed or escrowed pending resolution of the estate claims authorized by the Standing Motion post-Confirmation.

> B.    *Risks Related to the Debtors' Businesses.*

> 1.    <u>The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness</u>.

The Debtors' ability to make scheduled payments depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness.

> 2.    <u>The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases</u>.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers,

Field Code Changed

customers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

    3.    <u>Results of Store Closing Sales May Not Meet Projections</u>.

The store closing sales may fail to meet projections due to the economic uncertainty surrounding the continued spread of COVID-19, which has had a significant impact on the Debtors' business in the context of consumer demand. On a macro level, this pandemic has dampened global growth and could ultimately lead to an economic recession. If this occurs, demand for retail and consumer goods will continue to decline. Significantly, such a continued decline during the Wind-Down and over the next several months could greatly impact the Debtors' sales at their remaining stores. Such a scenario would negatively impact the ability of the Debtors to sell inventory and complete the Wind-Down.

    4.    <u>The Wind-Down Budget May Change Materially</u>.

The Wind-Down Budget is the Debtors' best estimates of actual expenses and revenues during the remainder of the chapter 11 cases. Creditors should be aware that such numbers may change, potentially materially, and any changes to the actual expenses and revenues will ultimately impact the amount of Distributable Proceeds available to be paid to creditors under the Plan.

    5.    <u>Renewed Shelter-in-Place Orders May Interrupt Going Out of Business Sales</u>.

Renewed government lockdowns and employee infections could both inhibit the Debtors' ability to wind down their businesses. The inability to remain open to the public during the Wind-Down would materially impact the ability of the Debtors to facilitate an Asset Sale Transaction and liquidate inventory at store locations. The inherent risk that state governments may again shut down non-essential businesses plays a significant role in the success of the Plan.

    6.    <u>The Debtors Rely on Services Provided By HBC Which May Be Interrupted</u>.

The Debtors rely on certain mission-critical services provided by HBC pursuant to the Transition Services Agreement and its amendments. HBC has also agreed to pay the majority of the Debtors' obligations to its landlords along with various indemnification obligations thereto in accordance with the asset purchase agreement entered into in connection with the Acquisition. To the extent HBC discontinues services under the Transition Services Agreement or fails to make timely postpetition payments to landlords, the ability of the Debtors to conduct the store closing may be impaired. The Debtors could be required to find replacement services or make additional payments not contemplated under their budget, which could ultimately impact the amount of Distributable Proceeds available to be paid to creditors under the Plan.

    C.    *Disclosure Statement Disclaimer.*

    1.    <u>Information Contained in this Disclosure Statement is for Soliciting Votes</u>.

Field Code Changed

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

      2.      <u>This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission</u>.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

      3.      <u>No Legal or Tax Advice Is Provided to You by this Disclosure Statement</u>.

**<u>This Disclosure Statement is not legal advice to you</u>**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

      4.      <u>No Admissions Made</u>.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

      5.      <u>Failure to Identify Litigation Claims or Projected Objections</u>.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

      6.      <u>No Waiver of Right to Object or Right to Recover Transfers and Assets</u>.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

      7.      <u>Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors</u>.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

      8.      <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment

**Field Code Changed**

to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

        9.     <u>No Representations Outside this Disclosure Statement Are Authorized</u>.

      No representations concerning or relating to the Debtors, these chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

**ARTICLE X.**
**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

    A.     *Introduction.*

      The following discussion summarizes certain United States ("<u>U.S.</u>") federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), the U.S. Treasury Regulations promulgated thereunder (the "<u>Treasury Regulations</u>"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "<u>IRS</u>"), all as in effect on the date hereof (collectively, "<u>Applicable Tax Law</u>").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

      This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, or the Medicare tax imposed on certain net investment income, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (2) that are deemed to reject the Plan.

      For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all

Field Code Changed

substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      *Certain U.S. Federal Income Tax Consequences to the Debtors.*

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic.  The CARES Act contains certain tax law changes designed to provide relief to businesses, and the Debtors are currently evaluating the impact of the CARES Act on their net operating losses ("NOLs").

1.      Tax Consequences of the Asset Sales.

The Plan provides for Asset Sales.  Pursuant to the Asset Sales, Debtors would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets sold and the Debtors' tax basis in such assets.  To the extent any gain is recognized, such gain may be able to be offset, in whole or in part, by the Debtors' available tax attributes.  If the Debtors were to recognize gain in connection with the Asset Sales and such gain could not be entirely offset with available tax attributes, a cash tax liability would arise.

2.      COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("(the "COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule described in the preceding sentence.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the Debtors with respect to the sale of their assets).  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable

**Field Code Changed**

assets pursuant to section 108(b)(5) of the Tax Code.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

As a general matter, the rules related to COD Income will only be relevant to the Debtors to the extent that taxable income is realized following the conclusion of the current tax year.  In that case, the Debtors' existing tax attributes would, to the extent they are subject to reduction as a result of the rules described above, be unavailable.

C.    *Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims Entitled to Vote.*

The following discussion assumes that the Debtors will undertake the Asset Sales.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Asset Sales.

1.    <u>U.S. Federal Income Tax Consequences for Holders of Allowed Class 64 Claims.</u>

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 64 Claims, each Holder thereof will receive its Pro Rata share of the Distributable Cash pursuant to the Waterfall Recovery.

Each such Holder will be treated as exchanging such Claim in a taxable exchange under section 1001 of the Tax Code for the Distributable Cash.  Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Distributable Cash received, as applicable, in exchange for such Claim, and (2) such Holder's adjusted basis, if any, in such Claim.

The character of any such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange.

2.    <u>Accrued but Untaxed Interest.</u>

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims are urged to consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

Field Code Changed

3.        Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument immediately after such acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

4.        Character of Gain or Loss With Respect to Impaired Claims.

Generally, the gain or loss recognized by a U.S. Holder with respect to a Claim will be a capital gain or loss unless the Claim was acquired at a market discount (as discussed above), and depending on whether and the extent to which the Holder previously claimed a bad debt deduction.  Any such capital gain or loss generally should be long-term if the U.S. Holder's holding period in the Claim is more than one year and otherwise should be short-term.  Under current U.S. federal income tax law, certain non-corporate U.S. Holders (including individuals) are eligible for preferential rates of U.S. federal income tax on long-term capital gains.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (x) $3,000 ($1,500 for married individuals filing separate returns) or (y) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

5.        Distribution Reserve Accounts and Delayed Equity Distributions.

The Plan provides that certain distributions may be delayed while contingent, unliquidated, or disputed Claims are addressed.  Pending the resolution of such Claims, a portion of the property to be received by Holders of Claims may be deposited into the various Claim distribution accounts described in the Plan (including the Priority Claims Reserve).  The property that is subject to delayed distribution will be subject to "disputed ownership fund" treatment under Treasurey Regulations section 1.468B-9.  Pursuant to such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts.  Such accounts will be liable, as an entity, for taxes, including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution.  Such taxes shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to such accounts, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

D.        *Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims.*

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules

Field Code Changed

governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder is urged to consult its tax advisor regarding the U.S. federal, state, local and foreign tax consequences of the consummation of the Plan to such non-U.S. Holder.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

      1.     <u>Gain Recognition</u>.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount, if any), any gain realized by a non-U.S. Holder on the exchange of its Claim pursuant to the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise).  In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

      2.     <u>Accrued Interest</u>.

Subject to the discussion of FATCA below, payments to a non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

    (a)    the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Le Tote's stock entitled to vote;

    (b)    the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Le Tote (each, within the meaning of the Tax Code);

    (c)    the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

    (d)    such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Field Code Changed

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "*Accrued but Untaxed Interest*," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

    3.    <u>FATCA</u>.

Under the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each non-U.S. Holder is urged to consult its tax advisor regarding the possible impact of these rules on such non-U.S. Holder's exchange of its Claim.

    E.    *Information Reporting and Back-Up Withholding.*

The Debtors will withhold all amounts required by law to be withheld from any distributions made under the Plan. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

| Field Code Changed |

## ARTICLE XI.
## RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Holders of Allowed Claims and Allowed Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated:  ~~August 2~~December 21, 2020

LE TOTE, INC.
on behalf of itself and all other Debtors

_/s/ Ed Kremer_

Ed Kremer
Chief Restructuring Officer
Le Tote, Inc.

Field Code Changed

70

## EXHIBIT A

~~Plan~~


First Amended Plan

[Intentionally Omitted]


~~[Filed at Docket No. 24]~~

A-1

**EXHIBIT B**

**Corporate Structure Chart**

B-1

**EXHIBIT C**

**Disclosure Statement Order**

**[Intentionally Omitted]**

**[TO COME]**

**EXHIBIT D**

**Settlement Term Sheet**

D-1