| | |
|---|---|
| Steven N. Serajeddini, P.C. (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:     (212) 446-4900<br><br>-and-<br><br>David L. Eaton (admitted *pro hac vice*)<br>Jaimie Fedell (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North La Salle  Street<br>Chicago, Illinois  60654<br>Telephone:     (312) 862-2000<br>Facsimile:     (312) 862-2200 | Michael A. Condyles (VA 27807)<br>Peter J. Barrett (VA 46179)<br>Jeremy S. Williams (VA 77469)<br>Brian H. Richardson (VA 92477)<br>**KUTAK ROCK LLP**<br>901 East Byrd Street, Suite 1000<br>Richmond, Virginia 23219-4071<br>Telephone:     (804) 644-1700<br>Facsimile:     (804) 783-6192 |

*Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LE TOTE, INC., *et al.*,[1] | ) | Case No. 20-33332 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF
## ED KREMER, CHIEF RESTRUCTURING OFFICER OF
## LE TOTE, INC. IN SUPPORT OF THE DEBTORS' SECOND AMENDED
## CHAPTER 11 PLAN OF LE TOTE, INC. AND ITS DEBTOR AFFILIATES

Pursuant to 28 U.S.C. § 1746, I, Ed Kremer, hereby declare as follows under penalty of perjury:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/letote/.  The location of the Debtors' service address is 8790 Beckett Road, West Chester, Ohio 45069.

**Background and Qualifications**

1. I am the Chief Restructuring Officer of Le Tote, Inc. ("Le Tote"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors," the "Company").

2. I have been Chief Restructuring Officer of Le Tote, Inc. since March, 2020. Prior to becoming the Debtors' Chief Restructuring Officer, I served as Chief Operating Officer since joining the Company in November, 2019. I previously served as a consultant to Le Tote since the end of 2018. Prior to joining the Company, I served as the Chief Executive Officer of Noon Home, Inc. and the Chief Financial Officer of 360fly, Inc. I also served as acting Chief Executive Officer of invention platform startup Quirky, Inc. ("Quirky"), and helped guide Quirky and its subsidiary Wink through their chapter 11 proceedings in the U.S. Bankruptcy Court for the Southern District of New York. Before serving in those roles, I served as the Vice President of Finance at Beats by Dr. Dre. I hold a Bachelor's of Business Administration in Finance from the University of Massachusetts at Amherst. In my capacity as Chief Restructuring Officer of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3. In my capacity as the Debtors' Chief Restructuring Officer, I have worked with the Debtors' advisors on a number of issues related to these chapter 11 cases, including with respect to strategic planning related to the chapter 11 cases. As a result of this role, I am familiar with the Debtors' day-to-day operations, employee compensation matters, business and financial affairs, and books and records. As a result of my positions, except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors'

operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

4. Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances and the Debtors' restructuring activities, information gathered from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am over the age of 18 and authorized to submit this declaration in support of the *Second Amended Chapter 11 Plan of Le Tote, Inc. and Its Debtor Affiliates (Technical Modifications)* (as modified, amended, or supplemented from time to time in accordance with its terms, the "Plan").[2] If I were called upon to testify, I could and would testify competently to the facts set forth herein.

**The Plan**

**I.      Background.**

5. The Plan seeks to effectuate an orderly wind down of the Debtors' operations in light of the difficult circumstances caused by the COVID-19 pandemic. I believe the Plan maximizes the value of the Debtors' assets by paying administrative and priority claims, wind-down expenses, and distributing remaining value, including the proceeds of the Urban Outfitters Litigation, in accordance with the HBC Settlement. The Plan provides as meaningful a recovery to as many of the Debtors' stakeholders as is possible under the circumstances.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan or the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Second Amended Chapter 11 Plan of Le Tote, Inc. and Its Debtor Affiliates (Technical Modifications)*, filed contemporaneously herewith.

3

6. The Plan is the product of extensive, good-faith, arm's-length negotiations between the Debtors and certain of their key stakeholders and, in my opinion, represents the best and only path available to expeditiously conclude these chapter 11 cases and maximize creditor recoveries.

## II. The Plan Satisfies the Requirements of Confirmation.

7. For the reasons detailed below and with the assistance of the Debtors' advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a plan of reorganization. I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents, or where it will be the subject of other testimony or evidence introduced at the Confirmation Hearing.

### A. The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code — § 1129(a)(1).

#### 1. Proper Classification of Claims and Interests — § 1122.

8. It is my understanding that section 1122 of the Bankruptcy Code requires that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

9. It is my testimony that each of the Claims and Interests in each particular Class is substantially similar to the other Claims and Interests in such Class. In general, the Plan's classification scheme follows the Debtors' capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between Secured and Unsecured Claims, and with debt and equity classified separately.

4

10. Under Article III of the Plan, Claims and Interests are classified as follows:

| | | |
|---|---|---|
| Class 1 | Other Priority Claims |
| Class 2 | Other Secured Claims |
| Class 3 | Seller Note Secured Claims |
| Class 4 | General Unsecured Claims |
| Class 5 | Intercompany Claims |
| Class 6 | Intercompany Interests |
| Class 7 | Le Tote Interests |
| Class 8 | Section 510(b) Claims |

11. I believe that the Claims or Interests assigned to each particular class described above are substantially similar to the other Claims or Interests in each such class, and the distinctions among classes are based on valid business, factual, and legal distinctions.

12. Accordingly, I believe the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions. For the foregoing reasons, I believe the Plan satisfies section 1122 of the Bankruptcy Code.

### 2. Specification of Classes, Impairment, and Treatment — § 1123(a)(1-3).

13. It is my testimony that Article III of the Plan specifies in detail the classification of Claims and Interests, whether such Claims and Interests are impaired, and the treatment that each Class of Claims and Interests will receive under the Plan.

### 3. Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4).

14. It is my understanding that the Plan provides the same treatment for each Claim or Interest of a particular Class. Put simply, all Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.

### 4. Means for Implementation — § 1123(a)(5).

15. I believe that the Plan provides adequate means for implementation as I understand is required under section 1123(a)(5) of the Bankruptcy Code. I can confirm that Article IV and various other provisions of the Plan provide for the cancellation of existing securities and implementation of the transactions provided for in the Plan, including, among other actions: (a) the funding of the Priority Claim Reserves; (b) the Wind Down; and (c) the Dissolution of the Debtors and the Wind-Down Debtors. In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtors' wind-down, such as the retention and vesting of Causes of Action in the Wind-Down Debtors, the establishment and termination of certain agreements, and the settlement of Claims and Interests. As a result, it is my belief that the Plan satisfies section 1123(a)(5).

### 5. Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).

16. I am advised that section 1123(a)(6) of the Bankruptcy Code requires that a corporate debtor's chapter 11 plan and charter provide for the inclusion of a prohibition against the issuance of non-voting equity securities and related protections for holders of preferred shares. As the Debtors are winding down, there will be no new corporate charter and no issuance of new securities. Accordingly, I believe that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### 6. Selection of Officers and Directors — § 1123(a)(7).

17. It is my understanding that, to satisfy section 1123(a)(7) of the Bankruptcy Code, Article IV.L of the Plan discharges all of the Debtors' officers and managers from their duties effective as of the Effective Date. In addition, Article IV.I provides that on the Effective Date, the

terms of the existing board of directors will expire.[3] The Plan provides for the discharge of all of the Debtors' managers, directors, and officers from their duties and appointment of the Plan Administrator as the sole manager and sole officer of the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan.[4] The Debtors have also filed the bylaws of the Plan Administrator Oversight Board providing the identity of each member of the Plan Administrator Oversight Board.[5] I can confirm that I will be appointed as the Plan Administrator following consultation with the Committee and the HBC Parties.

### 7. The Debtors Proposed the Plan in Good Faith — § 1129(a)(3).

18. I believe that the Plan was proposed in good faith, with the legitimate and honest purpose of maximizing value for the Debtors and their estates.

19. It is my testimony that the Plan was the product of extensive negotiations conducted at arm's length among the Debtors and certain of their key stakeholders. Further, the Debtors incorporated comments from various stakeholders into the Plan and Confirmation Order. I believe that the support of the Plan by the Committee and Class 3 is strong evidence that the Plan has a proper purpose consistent with the objectives of section 1129(a)(3).

### 8. Payment of Professional Fees and Expenses Are Subject to Court Approval — § 1129(a)(4).

20. It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by a debtor, or by a person receiving

---

[3] Plan Art. IV.I.

[4] *See id*.

[5] *Notice of Filing of Plan Supplement for the Second Amended Joint Chapter 11 Plan of Le Tote, Inc. and Its Debtor Affiliates* (the "Plan Supplement") [Docket No. 990].

distributions of property under the plan, be approved by the Court as reasonable or remain subject to approval by the Court as reasonable. I can confirm that the Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code. Moreover, Article II.B of the Plan provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.

      **9.    Compliance with Governance Disclosure Requirements — § 1129(a)(5).**

21. Based on consultation and guidance from legal counsel, I believe section 1129(a)(5) of the Bankruptcy Code does not apply. To the extent section 1129(a)(5) of the Bankruptcy Code applies to the Wind-Down Debtors, I believe that the Debtors have satisfied the requirements of this provision by, among other things, disclosing the terms of compensation of the Plan Administrator in the Plan Supplement and the identity of the Plan Administrator Oversight Board.

      **10.    The Debtors' Liquidation Analysis Satisfies the Best Interests Test — § 1129(a)(7).**

22. It is my understanding that the Plan satisfies the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors have sold all of their assets pursuant to store closing sales and the Sale Order. As a result, a chapter 7 proceeding would do nothing more than create additional costs associated with converting to a chapter 7 liquidation. These additional costs would likely include a percentage fee based on disbursements, as well as additional professional fees associated with a chapter 7 trustee selecting advisors. While information regarding the additional costs are speculative, the costs are clearly higher and more burdensome

for the Debtors' estates than the current proposed Plan (which does not have such incremental costs).

23. Class 4 (General Unsecured Creditors) voted to reject the Plan. Nevertheless, with respect to the Holders of Claims or Interests that did not vote to accept the Plan or that were deemed to reject the Plan[6], the Plan satisfies the best interests test because it provides a greater return than what these creditors would receive in a chapter 7 liquidation. Therefore, I do not believe that Holders of Claims in Class 4 (General Unsecured Creditors), or any other Holders of Claims or Interests, would do any better under a chapter 7 liquidation.

### 11.    Priority Cash Payments — § 1129(a)(9).

24. I understand that the Bankruptcy Code generally requires that claims entitled to administrative priority must be repaid in full in cash or receive certain other specified treatment. I can confirm that the Article II.A of the Plan contemplates that Allowed Administrative Claims will be repaid in full in cash or receive other treatment rendering them unimpaired. In addition, Allowed Priority Tax Claims will be paid in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 12.    At Least One Impaired Class of Claims Has Accepted the Plan— § 1129(a)(10).

25. I have been informed that section 1129(a)(10) of the Bankruptcy Code is an alternative to the requirement set forth in section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept a plan or be unimpaired under the plan. It provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider. Although the Voting Declaration sets forth that all

---

[6] Class 7 (Le Tote Interests) and Class 8 (Section 510(b) Claims) (collectively, the "Deemed Rejecting Classes").

Classes of Claims against each Debtor entitled to vote on the Plan voted to accept the Plan, the Debtors have agreed to allow Liquidity Capital II, LLP to change their Class 4 vote to reject the Plan. As such, Class 4 has voted to reject the Plan. Nevertheless, even though Class 4 (General Unsecured Creditors) voted against the Plan, Class 3 (which consists of the Seller Note Secured Claims owned by the HBC Parties), voted to accept the Plan. I have been informed that the Bankruptcy Code considers parties and their affiliates that control more than 20% of a debtors' voting stock to be considered statutory "insiders." As of the December 21, 2020, the HBC Parties do not hold any of the Debtor Le Tote, Inc.'s voting stock. Additionally, I have been informed that the Bankruptcy Code considers the closeness of the relationship between a debtor and non-debtor party and whether their relationship was at less than arm's length in determining whether a non-debtor party is a "non-statutory" insider. As previously stated, the HBC Parties do not hold equity in the Debtors, and even when they held equity in the Debtors, they only ever held a minority stake. Further, while officer and director affiliations are indicia of a "non-statutory" insider, while the HBC Parties previously had designees to the Debtors' board of directors (the "Board"), the designees resigned in March 2020, more than four months before the Debtors commenced these chapter 11 cases. Furthermore, none of the Debtors' officers are representative or affiliates of the HBC Parties. The HBC Parties do not hold equity in the Debtors, do not have a designee on the Board, and do not have a designee within the Debtors' management team. Further, the HBC Parties have made no strategic or operational decisions throughout these chapter 11 cases, including, for example decisions regarding personnel, sales and merchandising, or asset sales, such as the sale of the Debtors' e-commerce and intellectual property assets. The HBC Parties do not control the Debtors. Therefore, I do not believe that the HBC Parties are statutory or "non-statutory" insiders.

### 13. The Plan Is Feasible — § 1129(a)(11).

26. I believe that the Plan is feasible. Through the Plan, the Debtors will pay Other Secured Claims, Priority Claims, Prepetition Secured Claims, Allowed Priority Claims, Allowed Administrative Claims, and Allowed Priority Tax Claims in full. The Debtors will also establish and fund the Professional Fee Escrow Account to pay Professional Fee Claims. The Plan also provides for the appointment and payment of a Plan Administrator. Further, the Wind-Down Budget includes sufficient reserves, including substantial funding to pursue the Urban Outfitters Litigation. The Debtors have, therefore, established that the Wind-Down Debtors will have sufficient funds to satisfy all requirements and obligations under the Plan. Thus, I believe the Debtors will be able to meet their obligations under the Plan.

### 14. The Plan Provides for Payment of All Fees — § 1129(a)(12).

27. It is my testimony that the Plan includes an express provision requiring payment of all fees in compliance with the Bankruptcy Code.

### B. The Plan Satisfies the Requirements for Confirmation of Plan Over Nonacceptance of Impaired Classes — § 1129(b).

28. I understand that in the event that less than all classes of claims or interests either accept a plan or are unimpaired, section 1129(b) of the Bankruptcy Code provides that a court may confirm a plan if it does not discriminate unfairly and provides fair and equitable treatment to each rejecting impaired class. I understand that the Plan's treatment of the non-accepting impaired classes that rejected or are deemed to reject the Plan is proper.

29. I understand that a plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan (or is deemed to reject the plan) if, with respect to any dissenting classes of creditors, such creditors are fully satisfied before any junior creditor receives anything on account of its claim—that is, payments must follow the "absolute priority rule."

30. At least one of the Impaired Classes of Claims entitled to vote on the Plan has voted in favor of the Plan. Class 3 voted to accept the Plan and Classes 4 voted to reject the Plan. It is my understanding that the Plan does not discriminate unfairly with respect to the Rejecting Classes because the Plan's classification scheme rests on legally permissible rationale, and all similarly-situated Holders of Claims and Interests will receive substantially similar treatment. Moreover, no Objecting Party has asserted otherwise. As such, I believe the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

### III. The Principal Purpose of the Plan is not the Avoidance of Taxes as Required Under Section 1129(d) of the Bankruptcy Code.

31. The Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended. Moreover, no party that is a governmental unit, or any other entity, has requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. Rather, I believe the Debtors filed the Plan to accomplish their objective of efficiently and responsibly attempting to wind-down the Debtors' estates and provide recoveries to their stakeholders. Accordingly, I believe that the Debtors have satisfied what I understand to be the requirements of section 1129(d) of the Bankruptcy Code.

### IV. The Releases and Exculpations in the Plan Are Appropriate.

32. I believe that the Debtor Release is appropriate, justified, in the best interests of the stakeholders, and an integral part of the Plan. I do not believe the Debtors have any colorable Claims or Causes of Action against any of the Released Parties that would provide a material benefit to creditor recoveries were such Claims and Causes of Action pursued. In fact, certain parties related to the Debtors may have indemnification rights against the Debtors under applicable agreements for, among other things, all losses, damages claims, liabilities, or expenses, including

defense costs, for claims subject to the release provisions of the Plan. As such, I do not believe the Debtors have any material Causes of Action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such Causes of Action, and I believe the Debtor release is in the best interests of the Debtors' estates.

33. The third-party releases are a negotiated term of and in accordance with the terms of the Plan. Without the third-party releases, the Plan could not become effective, thus jeopardizing the Debtors' ability to wind down in an expeditious and efficient matter. Moreover, all third-party releasing parties have expressly consented to the third-party releases contemplated in the Plan.

34. I can confirm that the exculpation provision is an integral piece of the overall settlement embodied by the Plan and is the product of good faith, arm's-length negotiations. Further, the exculpation provision was negotiated by sophisticated entities that were represented by able counsel and financial advisors. As such, I believe the exculpation provision should be approved.

**V.     The Modifications to the Plan Do Not Materially or Adversely Impact Voting Classes.**

35. I am aware that the Plan has been modified subsequent to the date when it was solicited to creditors. I believe that those changes are not material and do not adversely affect the way creditors and stakeholders are treated.

**VI.    Good Cause Exists to Waive the Stay of the Confirmation Order.**

36. I understand that certain Bankruptcy Rules provide for the stay of an order confirming a chapter 11 plan, but that such a stay may be waived upon court order after a showing of good cause.

37. Given the complexity of the Plan and the various transactions implicated by the Plan, the Debtors may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective Date so that the Effective Date can occur as soon as needed.

Accordingly, I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  March 23, 2021

Respectfully submitted,

*/s/ Ed Kremer*
Ed Kremer
Chief Restructuring Officer
Le Tote, Inc.